## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

COMMONWEALTH OF PENNSYLVANIA
    1600 Arch Street, Suite 300
    Philadelphia, PA 19103

STATE OF MARYLAND
    200 St. Paul Place, 16th Floor
    Baltimore, MD 21202

STATE OF COLORADO
    1300 Broadway, 10th Floor
    Denver, CO 80203

STATE OF NEW JERSEY
    25 Market Street
    Trenton, NJ 08625-0080

STATE OF CONNECTICUT
    165 Capitol Avenue
    Hartford, CT 06106

STATE OF DELAWARE
    820 N. French Street, 5th Floor
    Wilmington, DE 19801

DISTRICT OF COLUMBIA
    441 4th Street, NW, 6th Floor
    Washington, D.C. 20001

STATE OF HAWAII
    425 Queen Street
    Honolulu, HI 96813

PEOPLE OF THE STATE OF ILLINOIS
    100 West Randolph Street
    Chicago, IL 60601

COMMONWEALTH OF MASSACHUSETTS
    One Ashburton Place, 18th Floor
    Boston, MA 02108

**FIRST AMENDED
COMPLAINT
CIVIL ACTION NO:
20-CV-1719**

ATTORNEY GENERAL DANA NESSEL on behalf
of the PEOPLE OF MICHIGAN
    525 West Ottawa Street, 7th Floor
    P.O. Box 30758
    Lansing, MI 48909

STATE OF MINNESOTA by and through
ATTORNEY GENERAL KEITH ELLISON
    445 Minnesota Street, Suite 1200
    St. Paul, MN 55101

STATE OF NEW MEXICO *ex rel.* ATTORNEY
GENERAL HECTOR H. BALDERAS
    201 Third Street NW, Suite 300
    Albuquerque, NM 87102

STATE OF NEW YORK
    28 Liberty Street
    New York, NY 10005

STATE OF NORTH CAROLINA *ex rel.*
ATTORNEY GENERAL JOSHUA H. STEIN
    114 West Edenton Street
    Raleigh, NC 27603

STATE OF OREGON
    1162 Court Street, NE
    Salem, OR 97301

STATE OF RHODE ISLAND
    150 South Main Street
    Providence, RI 02903

STATE OF VERMONT
    109 State Street
    Montpelier, VT 05609

COMMONWEALTH OF VIRGINIA *ex rel.*
ATTORNEY GENERAL MARK R. HERRING
    Barbara Johns Building
    202 North Ninth Street
    Richmond, VA 23219

STATE OF WISCONSIN
   17 West Main Street
   P.O. Box 7857
   Madison, WI 53707

                    Plaintiffs,
     v.

ELISABETH D. DEVOS, in her official capacity as
Secretary of Education,
   400 Maryland Avenue, SW
   Washington, D.C. 20202

UNITED STATES DEPARTMENT OF
EDUCATION,
   400 Maryland Avenue, SW
   Washington, D.C. 20202

                    Defendants.

# INTRODUCTION

1.     The Department of Education and Plaintiff States each invest billions of dollars in higher education annually so that all students may realize its benefits, irrespective of a student's background. The Department does so in part through various forms of aid authorized under Title IV of the Higher Education Act of 1965. *See* 20 U.S.C. §§ 1070-1099d. Plaintiff States similarly do so through state-funded grants and loans and through state-established systems of higher education. And the Department and Plaintiff States, along with independent accreditors, jointly oversee institutions of higher education so students who enroll in any institution receive a worthwhile education and so the investment in education is not wasted.

2.     Under the Higher Education Act, part of the Department's oversight responsibility is to ensure that students may use Title IV aid to attend programs operated by proprietary institutions—meaning for-profit institutions—or programs operated by vocational institutions

only if those programs "prepare students for gainful employment in a recognized occupation." *Id.* § 1002(b)(1)(A)(i), (c)(1)(A).

3.      The Higher Education Act does not define "gainful employment in a recognized occupation." Nor does the statute supply a methodology for evaluating whether a program meets that standard. So, in 2014, after a prior rule had been vacated, the Department promulgated a rule that implemented standards for identifying which of a proprietary or vocational school's programs "prepare students for gainful employment in a recognized occupation." *See Program Integrity: Gainful Employment*, 79 Fed. Reg. 64,890 (Oct. 31, 2014) ("GE Rule"). Through the GE Rule, the Department provided an enforceable definition of the otherwise ambiguous gainful employment requirement. As the Department said in 2011, its gainful employment rules give "meaning to an undefined statutory term, thereby fulfilling the Department's duty to enforce the provisions of the Higher Education Act in a clear and meaningful way." 76 Fed. Reg. 34,393 (June 13, 2011).

4.      The GE Rule determined whether a program prepared students for "gainful employment in a recognized occupation" through a simple comparison of a program's graduates' debt and earnings. Programs that did not pass under that metric were directed to publish warnings alerting current and prospective students of that program's disproportionate costs and benefits. Further, programs that repeatedly and flagrantly failed the Department's standard would have become ineligible to receive money through Title IV.

5.      Although multiple courts had ruled that the GE Rule reasonably implemented the Higher Education Act's ambiguous gainful employment provision, in 2019 the Department repealed the GE Rule altogether. *See Program Integrity: Gainful Employment*, 84 Fed. Reg. 31,392 (July 1, 2019) ("Repeal Rule"). The Repeal Rule eliminated the standard employed under

the GE Rule to evaluate whether programs prepared students for gainful employment—the same standard that would have informed which programs would be ineligible for Title IV aid. The Repeal Rule also did away with the warnings that failing programs owed to current and prospective students. The Department did not create any replacement mechanisms, leaving the Department without any meaningful way to enforce the gainful employment provision.

6.      Repealing the GE Rule will harm students. Before the GE Rule, scores of students took on loans to enroll in programs that offered a worthless education, a key contributor to a national student debt crisis. In egregious cases, students' harmful enrollment decisions were the consequence of unscrupulous recruiting practices by predatory for-profit institutions. In the current economic downturn, there is a large pool of people eager to pursue educational opportunities that will help advance or restart their career.[1] But with the Repeal Rule, the Department has reverted to the conditions that allowed for-profit schools to steer students into useless programs. So, many prospective students interested in furthering their career will instead invest in poor quality programs, earn worthless degrees, and face insurmountable debt. Even the Department admits that the Repeal Rule will lead to students enrolling in "sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both." 84 Fed. Reg. at 31,445.

7.      Without the Department enforcing the Higher Education Act's mandate, Plaintiff States will be injured. First, because of the Repeal Rule, students who would have enrolled in quality programs at public institutions of higher education will instead enroll in worthless proprietary or vocational programs. Plaintiff States will lose the value of their investment in

---

[1] Sarah Butrymowicz & Meredith Kolodner, *For-Profit Colleges, Long Troubled, See Surge Amid Pandemic*, N.Y. TIMES (June 17, 2020), https://www.nytimes.com/2020/06/17/business/coronavirus-for-profit-colleges.html?referringSource=articleShare.

state-systems of higher education, which have been created to maximize informed and productive populations. Second, when students combine state aid with Title IV aid to enroll in worthless programs, the States will lose the value of that state aid. Third, without the Department enforcing the condition that the Higher Education Act places on Title IV aid eligibility, students will call upon Plaintiff States to fill the enforcement void so that predatory institutions operating substandard programs are held accountable. Fourth, even with Plaintiff States' increased enforcement efforts, more students will enroll in worthless programs run by proprietary institutions, leading to a greater number of students who are burdened by an inordinate debt load. Plaintiff States, in turn, will be deprived of residents able to fully contribute to state economies.

8.    The Department's decision to repeal the GE Rule without promulgating any alternative standard for implementing the Higher Education Act's gainful employment provision is arbitrary, capricious, and contrary to law, and was accomplished without following the Administrative Procedure Act's procedural requirements. Trying to justify the Repeal Rule, the Department calls the Higher Education Act's gainful employment requirement an unambiguous standard that it need not enforce despite several court decisions holding otherwise. That position, a change for the Department, relies exclusively on irrelevant legislative history. Moreover, the Department illogically criticizes the GE Rule for disparately impacting programs at proprietary and vocational institutions, while also acknowledging that the Higher Education Act dictates which programs are subject to the gainful employment requirement. Finally, the Department used unidentified studies to condemn the metrics on which the GE Rule relied, while at the defending the reasonableness of a separate rule that limited relief for defrauded student borrowers precisely because that rule incorporated the GE Rule's metrics.

9.      Because the Repeal Rule is arbitrary, capricious, and contrary to law, and was promulgated without following proper procedure, it must be set aside.

## JURISDICTION AND VENUE

10.     This action arises under the Administrative Procedure Act. 5 U.S.C. §§ 701–706. This Court has subject matter jurisdiction over this action because it arises under federal law. 28 U.S.C. § 1331. In addition, this Court may issue the declaratory relief sought. 28 U.S.C. §§ 2201–2202.

11.     This is an action against officers and agencies of the United States. Therefore, venue is proper in this Court under 28 U.S.C. § 1391(e). Venue also is proper in this Court because Defendant Elisabeth D. DeVos performs her official duties in this judicial district, Defendant the United States Department of Education resides in this judicial district, and the events giving rise to this action took place in this judicial district.

## THE PARTIES

12.     Plaintiff the Commonwealth of Pennsylvania is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1. Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority. 71 Pa. Stat. § 732-204.

13.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Brian E. Frosh. The Attorney General has general charge, supervision, and direction of the State's legal business, and acts as legal advisor and representative of all major agencies, boards, commissions, and official institutions of state government. The Attorney General's powers and duties include

acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Md. Const. art. V § 3(a); Joint Res. 1 (2017).

14.     Plaintiff the State of Colorado is a sovereign state of the United States of America. Colorado brings this action by and through Attorney General Philip J. Weiser, who is the chief legal counsel of the State of Colorado, empowered to prosecute and defend all actions in which the state is a party. Colo. Rev. Stat. § 24-31-101(1)(a).

15.     Plaintiff the State of New Jersey is a sovereign state of the United States of America. This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer. N.J. Stat. Ann. § 52:17A-4(e), (g).

16.     Plaintiff the State of Connecticut is a sovereign state of the United States of America. This action is brought on behalf of the State of Connecticut by and through Attorney General William Tong, chief legal officer of the State with general supervision over all legal matters in which the State is an interested party. Conn. Gen. Stat. § 3-125.

17.     Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

18.     Plaintiff the District of Columbia is a sovereign municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Karl A. Racine. The Attorney General has general charge and conduct of all legal business of the District and all

8

suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

19.     Plaintiff the State of Hawaii is a sovereign state of the United States of America. This action is brought on behalf of the State of Hawaii by Attorney General Clare E. Connors, the chief legal officer of the State. Haw. Rev. Stat. § 661-10.

20.     Plaintiff the People of the State of Illinois brings this action by and through Attorney General Kwame Raoul, the legal officer of Illinois. Ill. Const. 1970, art. V, § 15. The Illinois Attorney General brings this action on behalf of the People of the State of Illinois pursuant to his statutory authority. 815 ILCS 505/1 *et seq.*

21.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts brings this action by and through Attorney General Maura Healey, who is the chief lawyer and law enforcement officer of the Commonwealth of Massachusetts. The Massachusetts Attorney General brings this action pursuant to her statutory authority. Mass. Gen. Law ch. 12, § 3.

22.     Plaintiff the People of Michigan are the sovereign of a state of the United States of America and are represented by and through Attorney General Dana Nessel. Attorney General Nessel is the chief legal officer of the State of Michigan and her powers and duties include acting in federal court in matters of concern to the People of Michigan, to protect Michigan residents. *Fieger v. Cox*, 734 N.W.2d 602, 604 (Mich. Ct. App. 2007); Mich. Comp. Laws §§ 14.28, 14.101. This action is brought to protect the interests of the People of Michigan.

23.     Plaintiff the State of Minnesota is a sovereign state of the United States of America and brings this action by and through its Attorney General Keith Ellison, who has the

common law and statutory authority to pursue this action on behalf of the state. Minn. Stat. ch. 8; *Slezak v. Ousdigian*, 110 N.W.2d 1, 308 (Minn. 1961).

24.     Plaintiff the State of New Mexico is a sovereign state of the United States. This action is brought for and on behalf of the State of New Mexico in its sovereign authority, by and through its duly elected Attorney General, Hector Balderas. The Attorney General, as chief legal officer of the State, is statutorily authorized to initiate and prosecute any and all suits deemed necessary for the protection of the interests and rights of the State. Attorney General Balderas is acting pursuant to his authority under, *inter alia,* NMSA 1978, Sections 8-5-1 *et seq.*; the New Mexico Unfair Practices Act, NMSA 1978, Sections 57-12-1 to -26; and the New Mexico False Advertising Act, NMSA 1978, Sections 57-15-1 to -10.

25.     Plaintiff the State of New York is a sovereign state of the United States of America. This action is being brought on behalf of the State by Attorney General Letitia James. *See* New York Executive Law § 63(1).

26.     Plaintiff State of North Carolina is a sovereign state of the United States of America. This action is brought on behalf of the State of North Carolina by Attorney General Joshua H. Stein, who is the chief legal counsel of the State of North Carolina and who has statutory authority and responsibility to represent the State, its agencies, its officials, and the public interest in litigation. N.C. Gen. Stat. § 114-2.

27.     Plaintiff the State of Oregon is a sovereign state of the United States of America. Oregon brings this action by and through Attorney General Ellen F. Rosenblum. The Attorney General has authority to commence an action on behalf of Oregon to protect the interests of the State. ORS 180.600(1).

28.     Plaintiff the State of Rhode Island is a sovereign state of the United States of America. Attorney General Peter F. Neronha is the chief law officer of the State of Rhode Island and has the authority to file civil actions to protect Rhode Island's rights and the rights of Rhode Island citizens. The Attorney General has the authority to file suit to take legal action against the federal government for the protection of the public interest and welfare of Rhode Island citizens as a matter of constitutional, statutory, and common law authority. R.I. Const. art. IX, sec. 12; R.I. Gen. Laws § 42-9-1, *et seq.*; *State v. Lead Industries, Ass'n*, 951 A.2d 428 (R.I. 2008).

29.     Plaintiff the State of Vermont is a sovereign state of the United States of America. This action is brought on behalf of Vermont by Attorney General Thomas J. Donovan, Jr., the chief law enforcement official of Vermont. The Attorney General may represent the State in all civil and criminal matters as at common law and as allowed by statute. Attorney General Donovan brings this action on behalf of the Commonwealth pursuant to his statutory authority. 3 V.S.A. § 152.

30.     Plaintiff the Commonwealth of Virginia is a sovereign state of the United States of America. Virginia brings this action by, through, and at the relation of Attorney General Mark R. Herring. As chief executive officer of the Department of Law, Attorney General Herring performs all legal services in civil matters for the Commonwealth. Va. Const. art. V, § 15; Va. Code Ann. §§ 2.2-500, 2.2-507.

31.     Plaintiff the State of Wisconsin is a sovereign state of the United States of America. Attorney General Joshua L. Kaul brings this action pursuant to his statutory authority. Wis. Stat. § 165.25(1m).

32.     Defendant Elisabeth D. DeVos is the Secretary of the United States Department of Education and is being sued in her official capacity. Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

33.     Defendant the United States Department of Education is an executive agency of the United States government. The Department's principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

FACTUAL ALLEGATIONS

## I. The Higher Education Act

34.     Title IV of the Higher Education Act of 1965 ("HEA"), as amended, authorizes various forms of federal financial aid for students attending institutions of higher education. That financial support opens higher education to those who might not otherwise be able to afford pursuing a degree or certificate.

35.     In fiscal year 2019, the Department of Education provided about $121.8 billion in financial aid to, or on behalf of, students.[2] Seventy-two percent of all undergraduates received some type of financial aid in the 2015-16 academic year.[3]

36.     For eligibility to receive Title IV aid, the HEA creates three classifications of institutions: (1) "public or other nonprofit"; (2) "proprietary"; and (3) "postsecondary vocational." 20 U.S.C. § 1002(a); *see also id.* § 1001(a)(4).

---

[2] *Fiscal Year 2019 Annual Report* at 8 (Nov. 15, 2019), https://www2.ed.gov/about/reports/annual/2019report/fsa-report.pdf.

[3] National Center for Education Statistics, *2015–16 National Postsecondary Student Aid Study* ("*Student Aid Study*") at 5 (Jan. 2018), http://nces.ed.gov/pubs2018/2018466.pdf.

37.     Proprietary institutions are owned and operated as businesses; several are owned by publicly traded companies. Like other for-profit businesses, a principal function of these schools is to produce economic returns for their owners and shareholders.[4]

38.     Because proprietary institutions that enroll students who receive Title IV aid may keep that aid even if students are unable to make required repayments on any loans, the HEA imposes safeguards to protect against ineffective institutions enrolling students who receive Title IV aid.

39.     For proprietary institutions and postsecondary vocational institutions, initial eligibility to receive Title IV aid depends on whether the school "provides an eligible program of training to prepare students for gainful employment in a recognized occupation." 20 U.S.C. § 1002(b)(1)(A)(i), (c)(1)(A). Accordingly, programs offered by proprietary or vocational institutions often are referred to as gainful employment programs.

40.     With the exception of certain non-degree programs offered by non-profit schools, the gainful employment requirement does not apply to public schools or private, non-profit schools. *Id.* §§ 1001(a), 1002(a)(1).

**II. History of Abuse by Proprietary Institutions**

41.     Title IV aid supports students attending certain programs at public schools; private, non-profit schools; and for-profit schools. Students attending programs at for-profit schools, however, more heavily rely on Title IV aid than do students attending other institutions.[5]

---

[4] *See* U.S. Senate, Health, Education, Labor and Pensions Committee, *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* ("*Senate Report*") at 1 (July 30, 2012), https://www.help.senate.gov/imo/media/ for_profit_report/PartI-PartIII-SelectedAppendixes.pdf.

[5] *Student Aid Study*, *supra* note 3, at 6.

42.     That aid is an important source of revenue for for-profit institutions. The HEA caps revenue that for-profit schools may receive from Title IV aid at 90% of total revenue. 20 U.S.C. § 1094(a)(24). In fiscal years ending between July 1, 2017 and June 30, 2018, the 15 largest for-profit schools received $4.6 billion from Title IV aid, representing an average of 70% of their total revenue.[6] That revenue sustains many for-profit schools. For example, ITT Educational Services, Inc. declared bankruptcy shortly after losing eligibility to enroll students receiving Title IV aid.[7]

43.     Many students who attend programs run by for-profit schools are unable to repay their Title IV loans. For fiscal year 2016, the Department calculated that over 15% of students who attended for-profit schools defaulted on their federal student loans, compared to 9.6% of students who attended public schools and 6.6% of students who attended private, non-profit institutions. For the same fiscal year, defaults by students who attended for-profit schools accounted for 32.6% of all federal student-loan defaults, even though those students accounted for only 21% of all borrowers entering repayment.[8]

44.     In some cases, the burdensome debt load for graduates of programs operated by for-profit schools reflects institutions prioritizing profits over student success, including in some cases by defrauding students. A 2012 Senate Report concluded that, as a whole, the for-profit

---

[6] *Proprietary School Revenue Percentages Report for Financial Statements with Fiscal Year Ending Dates between 07/01/17–06/30/18* (Aug. 14, 2019), https://studentaid.gov/data-center/school/proprietary.

[7] Danielle Douglas-Gabriel, *ITT Technical Institutes Shut Down After 50 Years in Operation*, WASHINGTON POST (Sept. 6, 2016), https://www.washingtonpost.com/news/grade-point/wp/2016/09/06/itt-technical-institutes-shut-down-after-50-years-in-operations/.

[8] *Comparison of FY 2016 Official National Cohort Default Rates to Prior Two Official Cohort Default Rates* (Aug. 4, 2019), http://www2.ed.gov/offices/OSFAP/defaultmanagement/schooltyperates.pdf.

education industry devoted significant resources to questionable recruiting methods and imposed comparatively high tuition that resulted in high withdrawal and loan default rates. Industry-wide, for-profit schools spent 23% of revenue on marketing and recruiting and only 17% on educational instruction; the same schools employed more recruiters than career services and support services staff, combined. [9]

45.     Students attending for-profit schools have submitted over 98% of "borrower defense" claims, a claim that defrauded students may submit to the Department to seek loan forgiveness.[10]

46.     By the Department's estimate, for-profit schools are seven times more likely to engage in misconduct than are public or other non-profit educational institutions. 83 Fed. Reg. 37,298 (Table 5) (July 31, 2018).

47.     Four of the largest for-profit education companies exemplified some of the pervasive problems:

- **Career Education Corporation** ("CEC"), which once operated schools at over 83 physical locations and online under multiple brand names, entered into voluntary agreements with 49 State Attorneys General in 2019 to resolve allegations that it had engaged in abusive recruiting practices and other deceptive conduct, starting before 2014. That deceptive conduct included misrepresenting costs related to educational programs, the transferability of credits, the status of programmatic accreditation, and job placement rates. Those agreements required CEC to forgive $490 million in accounts receivable owed by about 179,000

---

[9] *Senate Report*, *supra* note 4, at 97, 173, A22-1.

[10] Anthony Walsh, *For-Profit Colleges Continue to Generate Most Loan Relief Claims*, The Century Foundation (June 25, 2019), http://tcf.org/content/commentary/profit-colleges-continue-generate-loan-relief-claims/.

students.[11] Earlier, New York separately entered into a $10.25 million settlement to resolve allegations that CEC inflated its graduates' job placement rates.[12]

- **Corinthian Colleges, Inc.** once operated at 105 locations and online under various brand names. In 2014, the Department announced that Corinthian had failed to provide enrollment and job placement data required by federal law, and "failed to fully address concerns about its practices, including faulty job placement data used in marketing claims to prospective students and allegations of altered grades and attendance."[13]

- **Education Management Company** ("EDMC") once operated 107 campuses in 32 states and online. In 2015, 39 State Attorneys General reached agreements with EDMC resolving allegations that it had engaged in deceptive and abusive recruiting practices and misrepresented job placement rates, transferability of credits, and program accreditation status. Those agreements required EDMC to forgive about $100 million in private loans owed by about 90,000 former students.[14]

- **ITT Educational Services, Inc.** once operated schools at over 145 locations and online. The Department banned ITT programs from enrolling students using Title IV aid "due to significant concerns about ITT's administrative capacity, organizational integrity, financial viability, and ability to serve students."[15] ITT then declared bankruptcy and during the bankruptcy proceeding the estate trustee settled a class complaint from former students that alleged ITT underinvested in educational services, concentrating instead on increasing enrollment through abusive and deceptive recruiting practices. The settlement required ITT to abandon about $560 million of student receivables (not including federal student

[11] Assurance of Voluntary Compliance, *In re: Career Education Corp.* (Jan. 2, 2019), https://www.iowaattorneygeneral.gov/media/cms/CEC_AVC_FINAL_w_Sigs_and_Exhibits_8E 59529F9FFF0.pdf/.

[12] *A.G. Schneiderman Announces Groundbreaking $10.25 Million Dollar Settlement With For-Profit Education Company That Inflated Job Placement Rates To Attract Students* (Aug 19, 2013), https://ag.ny.gov/press-release/2013/ag-schneiderman-announces-groundbreaking-1025-million-dollar-settlement-profit.

[13] *U.S. Department of Education Accepts Operating Plan from Corinthian Colleges Inc.*, (July 3, 2014), https://www.ed.gov/news/press-releases/us-department-education-accepts-operating-plan-corinthian-colleges-inc.

[14] Consent Judgment, *Iowa v. Education Management Co., et al.* (Nov. 17, 2015), www.iowaattorneygeneral.gov/media/cms/EDMC_Consent_Order_C3A2D45F174D3.pdf.

[15] *Department of Education Bans ITT from Enrolling New Title IV Students, Adds Tough New Financial Oversight* (Aug. 25, 2016), https://www.ed.gov/news/press-releases/department-education-bans-itt-enrolling-new-title-iv-students-adds-tough-new-financial-oversight.

loans).[16] In 2019, a company that managed private loans for ITT students agreed to a $168 million settlement to resolve an investigation conducted by 44 State Attorneys General into predatory lending practices between 2009 and 2011.[17] And in 2020, a second company that managed private loans for ITT agreed to a stipulated judgment to settle claims that it had recklessly pushed students into loans that they did not understand or could not afford; that judgment will require forgiving $330 million in student loans.[18]

48.     In 2016, these four companies were responsible for defaults of over $1.2 billion for students who started to repay in 2012.[19]

## III. Gainful Employment Rules

### A. 2011 Rules

49.     The Department has long known that aggressive and deceptive marketing in higher education harms vulnerable students and leads them to enroll in low-quality educational programs.

50.     In 2009, the Department announced that it would begin to "develop proposed regulations to maintain or improve program integrity in the Title IV, HEA programs." 74 Fed. Reg. 24,728 (May 26, 2009). Creating a mechanism of regulatory enforcement for the HEA's previously undefined gainful employment requirement was one item to be visited. *Id.*

---

[16] Settlement Agreement, *In re: ITT Educational Services* (Jan. 13, 2018), https://predatorystudentlending.org/wp-content/uploads/2018/02/2290-1-student-settlement-motion-exhibits.pdf.

[17] *See AG Shapiro Secures $5.3 Million in Debt Relief for 570 Pennsylvania ITT Tech Students in Multistate Settlement* (June 17, 2019), https://www.attorneygeneral.gov/taking-action/press-releases/ag-shapiro-secures-5-3-million-in-debt-relief-for-570-pennsylvania-itt-tech-students-in-multistate-settlement/.

[18] *Consumer Financial Protection Bureau and Multiple States Enter Into Settlement with Owner of ITT Private Loans for Substantially Assisting ITT in Unfair Practices* (Sept. 15, 2020), https://www.consumerfinance.gov/about-us/newsroom/cfpb-multiple-states-enter-settlement-itt-private-loans-owner-assisting-itt-unfair-practices/.

[19] Ben Miller, *The Cost of Insufficient Student Loan Accountability,* Center for American Progress (August 30, 2018), https://www.americanprogress.org/issues/education-postsecondary/news/2018/08/30/457302/cost-insufficient-student-loan-accountability/.

51.     When the Department promulgated its final rules implementing the gainful employment provision, it noted that "significant advances in electronic reporting and analysis now allow the Department to collect accurate and timely data that could not have been utilized in the past." 76 Fed. Reg. at 34,392–393. Analysis of the novel data would "provide the Department, students, and the institutions offering these programs with information about how well the programs are performing under the measures," enabling the Department to create a metrics-based approach to define what it means for a program to "prepare students for gainful employment in a recognized occupation." *Id.* at 34,393. And with those data, the Department could "give[] meaning to an undefined statutory term, thereby fulfilling the Department's duty to enforce the provisions of the HEA in a clear and meaningful way." *Id.*

52.     Critically, the Department established several metrics for assessing whether a program prepared its students for gainful employment, which were based, alternatively, on a comparison of students' debt and earnings or on students' loan repayment rates. *Id.* at 34,448–449. Programs that failed under the Department's metrics were obligated to provide certain disclosures to current and prospective students. *Id.* at 34,437–438.

53.     An industry group of for-profit institutions challenged the 2011 rules. Resolving that case, the district court first rejected the argument that "gainful employment in a recognized occupation" is an unambiguous phrase not open to agency interpretation. *Ass'n of Private Sector Colleges & Universities v. Duncan* ("*APSCU I*"), 870 F. Supp. 2d 133, 145-46 (D.D.C. 2012). The district court also decided that the disclosure requirement and the debt-to-earning metric were reasonable tools for implementing the HEA's gainful employment requirement. *Id.* at 146–49. Yet the district court concluded that the administrative record did not support the loan

repayment rate metric, and that the repayment rate metric was too entangled with the rule's other components to be severed. *Id.* at 152–54. So, the 2011 rules were vacated entirely. *Id.* at 154–55.

### B. 2014 Rule

54.     The Department started over after *APSCU I*, issuing a new notice of proposed rulemaking that again expressed concern about programs that have qualified as gainful employment programs but leave "students with unaffordable levels of loan debt in relation to their earnings" thus "leading to default." 79 Fed. Reg. 16,433 (Mar. 25, 2014).

55.     The Department reiterated in the final version of the rule that much of the evidence showing that gainful employment programs operated by proprietary institutions had misrepresented program outcomes came from investigations led by State Attorneys General. 79 Fed. Reg. at 64,907–908.

56.     Under the final version of the rule—the GE Rule—a school met its statutory obligation to "prepare students for gainful employment in a recognized occupation" if it complied with complementary accountability and transparency frameworks. The GE Rule's two elements reflected that a program that requires students to take on large amounts of debt without providing the skills needed to earn enough to repay that debt fails its obligation to prepare students for gainful employment. *Id.* at 65,038.

57.     The accountability framework directed how programs were to be initially certified as eligible for Title IV aid and created a process for continuous review of eligibility. A program gained eligibility for Title IV aid if the institution operating the program certified that the program satisfied state or federal accrediting requirements, and that it satisfied any state licensing or certification requirements for the occupations for which the program is designed to prepare students to enter. *Id.* at 65,018–019.

58.     To continue receiving Title IV aid, a certified program had an ongoing duty to satisfy the Department's eligibility metrics. Those metrics compared debt for a program's graduates against those graduates' discretionary income or against their annual earnings. The Department was to draw income data from the Social Security Administration. *Id.*

59.     These metrics were referred to as "debt-to-earning" or "D/E" rates.

60.     A program was "passing" under the eligibility standard if: (1) graduates' debt was no more than 8% of annual earnings; or (2) graduates' debt was no more than 20% of discretionary income. *Id.* at 65,008.

61.     A program was "in the zone" under the eligibility standard if: (1) graduates' debt was greater than 8%, but less than 12%, of annual earnings; or (2) graduates' debt was greater than 20%, but less than 30%, of discretionary income. *Id.*

62.     A program was "failing" under the eligibility standard if: (1) graduates' debt was more than 12% of annual earnings; (2) graduates' debt was more than 30% of discretionary income; (3) or graduates had neither annual earnings nor discretionary income. *Id.*

63.     A program lost eligibility for Title IV aid if: (1) it was "failing" for two out of three consecutive years for which the program's debt-to-earning rates were calculated; or (2) was either "in the zone" or "failing" for four consecutive years for which the program's debt-to-earning rates were calculated. *Id.* at 65,012–013.

64.     If a program was in danger of becoming ineligible for Title IV aid during the following year, it needed to send warning letters to its enrolled and prospective students. *Id.* The Department's regulations directed the content of those warnings. *Id.*

65.     The Department, backed by multiple studies, picked the 8% threshold utilized for "passing" because that level "has long been referred to as a limit for student debt burden." *Id.* at

64,919. The Department also cited a study concluding that borrowers typically feel overburdened when debt is more than 8% of earnings. *Id*. Although some commenters suggested that one study on which the Department relied defeated the reasonableness of using the 8% threshold, the Department explained that the study's authors "specifically acknowledge the widespread acceptance of the 8 percent standard and conclude that, although it is not as precise as a standard based on a function of discretionary earnings, it is 'not . . . unreasonable.'" *Id*.

66.   The Department's 20% discretionary income threshold was based on the same study that the district court in *APSCU I* had called an "objective criteria upon which the Department could reasonably rely." 870 F. Supp. 2d at 153; *see also* 79 Fed. Reg. at 64,918–922.

67.   Lastly, the Department explained that earnings data for the debt-to-earning rate from any source other than Social Security Administration, including data from the Bureau of Labor Statistics, would be inadequate. 79 Fed. Reg. at 64,941–942.

68.   The second component of the GE Rule—the transparency framework—was designed to "increase the quality and availability of information about the outcomes of students enrolled in GE programs." *Id*. at 64,890. It contained a reporting and a disclosure dimension.

69.   Under the reporting requirement, an institution had to report student-level information regarding programs subject to the gainful employment requirement, programmatic job placement rates, and "any other information the Secretary requires the institution to report" to the Department every year. *Id*. at 65,013.

70.   The disclosure requirement outlined 16 items that any program needed to post on its website, provide in its promotional materials, and supply directly to a prospective student before enrollment. This information included, but was not limited to, the total cost of the

program, the average debt load, the student loan default rate, and the average earnings of program graduates. *Id.* at 65,013–014.

71.     Two industry groups challenged the GE Rule. In each case, the GE Rule was upheld entirely. *See Ass'n of Private Sector Colleges & Universities v. Duncan* ("*APSCU II*"), 110 F. Supp. 3d 176 (D.D.C. 2015), *aff'd by Ass'n of Private Sector Colleges & Universities v. Duncan*, 640 Fed. Appx. 5 (D.C. Cir. 2016); *Ass'n of Proprietary Colleges v. Duncan* ("*APC*"), 107 F. Supp. 3d 332 (S.D.N.Y. 2015).

72.     Each court, relying on analysis from *APSCU I*, concluded that the HEA's use of "prepare students for gainful employment in a recognized occupation" is ambiguous and that the GE Rule reasonably interpreted that phrase. *APSCU II*, 110 F.3d at 185–90; *APC*, 107 F. Supp. 3d at 359–63. And each court rejected that the Department had arrived at any aspect of the GE Rule in an arbitrary or capricious manner. *APSCU II*, 110 F.3d at 190–204; *APC*, 107 F. Supp. 3d at 363–68.

### C. Success of the GE Rule

73.     In 2017, the Department released its first debt-to-earning rates for gainful employment programs. More than 2,000 programs were "failing" or "in the zone." *See* 84 Fed. Reg. at 31,445. Of the over 800 programs that were "failing," 97% were offered by for-profit institutions. *Id.* And the Department calculates the failure rate of gainful employment programs run by proprietary institutions at 12.8%, a rate 25 times greater than that of non-profit programs subject to the gainful employment requirement. *Id.* at 31,392.

74.     The Department's release revealed that in Plaintiff States alone, over 134,000 students graduated between 2008 and 2012 from programs that were not passing in the

Department's initial release of gainful employment data; those students carried over $2.7 billion in loan debt.[20]

75.     The GE Rule gave students, for the first time, access to uniform, reliable, and program-level information on student outcomes that could inform decisions about higher education. It also provided a roadmap for schools to improve their programs and cull ones that were not leading to gainful employment.

76.     Based on the initial data released in 2017, researchers at Seton Hall University found among for-profit schools that "passing GE was associated with a lower likelihood of a program or college closing."[21] The researchers believed that "for-profit colleges, possibly encouraged by accrediting agencies and/or state authorizing agencies, closed lower-performing programs and focused their resources on their best-performing programs."[22]

77.     Even in the Repeal Rule's cost-benefit analysis, the Department acknowledged that "a number of large proprietary chains have closed since the [GE] Rule was promulgated" and that, after the GE Rule, "declines in enrollments at proprietary institutions have been sharper than declines in other sectors." 84 Fed. Reg. at 31,437–438.

---

[20] The Institute for College Access and Success, *How Much Did Students Borrow To Attend The Worst-Performing Career Education Programs?* (Aug. 2018), https://ticas.org/wp-content/uploads/legacy-files/pub_files/ge_total_debt_fact_sheet.pdf.

[21] *See* Robert Kelchen & Zhuoyao Liu, *Did Gainful Employment Regulations Result in College and Program Closures? An Empirical Analysis* [Draft] at 1 (Nov. 2019), https://kelchenoneducation.files.wordpress.com/2019/11/kelchen_liu_nov19.pdf.

[22] Robert Kelchen, *New Working Paper on the Effects of Gainful Employment Regulations* (Nov. 10, 2019), https://robertkelchen.com/2019/11/10/new-working-paper-on-the-effects-of-gainful-employment-regulations/.

78.     The president of APSCU credited the GE Rule for improving the quality of the for-profit education industry.[23]

79.     By August 2018, 65% of the programs that failed the Department's metrics had closed or had been modified because they did not provide adequate post-graduation value.[24] Several for-profit institutions that closed were notorious for saddling students with enormous debt loads while offering very little earning potential. Institutions that closed shortly after the finalization of the 2014 GE Rule included:

- **EDMC**, which sold its assets to a non-profit corporation in 2017. The assets are currently under receivership, and the institution's programs are closed.[25]

- **Education Corporation of America**, which closed in 2018. In a letter to students announcing the closure, the institution's president and CEO stated it was closing because "the Department of Education added requirements that made operating our schools more challenging."[26]

- **Globe University**, which closed in 2018, two years after the Department discovered that Globe had misrepresented the success of its students and that "[m]any graduates incurred thousands of dollars of debt but had limited options for successful job placement in their chosen fields."[27]

---

[23] Erica L. Green, *Devos Ends Obama-Era Safeguards Aimed at Abuses by For-Profit Colleges*, N.Y. TIMES (Aug. 10, 2018), https://www.nytimes.com/2018/08/10/us/politics/betsy-devos-for-profit-colleges.html.

[24] Comment from New Am. Found., to U.S. Dep't of Educ., Docket No. ED-2018- OPE-0042 1, at 16 (Sept. 13, 2018), https://www.regulations.gov/contentStreamer?documentId=ED-2018-OPE-0042-13659&attachmentNumber=1&contentType=pdf.

[25] Andrew Kreighbaum, *Few Lessons Learned on For-Profit Closures,* INSIDE HIGHER ED (Apr. 3, 2019), https://www.insidehighered.com/news/2019/04/03/another-profit-giant-collapses-critics-dream-center-deal-wonder-why-feds-didnt-seek.

[26] Chris Salvemini, *Knoxville Virginia College Campus to Shut Down Dec. 7 after Losing Accreditation*, KNOX NEWS (Dec. 5, 2018), https://www.knoxnews.com/story/news/2018/12/05/virginia-college-other-eca-colleges-close-after-losing-accreditation/2220761002/.

[27] *Globe University, Minnesota School of Business Denied Access to Federal Student Aid Dollars*, (Dec. 6, 2016), https://www.ed.gov/news/press-releases/globe-university-minnesota-school-business-denied-access-federal-student-aid-dollars.

- **Sanford-Brown College**, a division of CEC, closed in 2015. Before the closure, its students left school with an average of $45,000 in loans despite students earning less than $21,000 on average. CEC cited "a challenging regulatory environment" and "the gainful employment regulations issued last year" as the reasons for closing.[28]

- **Westwood College** closed in 2016 after multiple investigations by State Attorneys General and the Senate HELP Committee alleging the school had misled students about graduate employment and earnings outcomes. The school attributed its closure to years of declining enrollment which it claimed was caused by "market shifts and changes in the regulatory environment."[29]

## IV. The Department Delays Crucial Aspects of the GE Rule

80.     Despite the success of the GE Rule in both identifying programs failing to meet the HEA's gainful employment standard and providing that information to students, in March 2017 the Department announced a three-month delay of several of the GE Rule's annual deadlines. Those included deadlines for programs to disclose their costs and benefits. The only basis offered for these delays was that they were "taken to allow the Department to further review the GE regulations and their implementation."[30]

81.     In July 2017, the Department announced it was delaying schools' annual disclosure obligations again, this time by a full year, to July 1, 2018. 82 Fed. Reg. 30,975 (July 5, 2017).

---

[28] Kevin Carey, *DeVos Is Discarding College Policies That New Evidence Shows Are Effective,* N.Y. TIMES (June 30, 2017), https://www.nytimes.com/2017/06/30/upshot/new-evidence-shows-devos-is-discarding-college-policies-that-are-effective.html.

[29] Westwood College Statement (Jan. 27, 2016), https://denver.cbslocal.com/2016/01/27/westwood-college-statement/; *see also Westwood College Used Deceptive Marketing to Lure Students into Thousands in Debt, Limited Job Opportunities* (Jan. 18, 2012), https://illinoisattorneygeneral.gov/pressroom/2012_01/20120118.html

[30] *See* Gainful Employment Electronic Announcement #105 (Mar. 6, 2017), https://ifap.ed.gov/electronic-announcements/03-06-2017-gainful-employment-subject-gainful-employment-electronic.

82.     In June 2018, the Department announced that it was delaying annual disclosure obligations by yet another year, to July 1, 2019. 83 Fed. Reg. 28,177 (June 18, 2018).

83.     Meanwhile, the Department stopped fulfilling its own obligations under the GE Rule. For each Title IV loan award year, the Department was supposed to begin the process of determining each program's debt-to-earning rates by "[c]reating a list of the students who completed the program during the cohort period and providing the list to the institution" and "[a]llowing the institution to correct the information about the students on the list." 34 C.F.R. § 668.405(a)(1), (2). The Department admitted, in August 2017, that it had not done so and did not have a timetable to do so going forward.[31]

84.     Although the Department had a continuing legal obligation to calculate debt-to-earning rates using data from the Social Security Administration, the Department and the Social Security Administration did not renew a Memorandum of Understanding that expired on May 24, 2018.[32] That memorandum allowed the Social Security Administration to share information with the Department that was needed to complete debt-to-earnings rates. *See* 84 Fed. Reg. at 31,392.

85.     Many of the Plaintiff States challenged the Department's delays and its abdication of responsibility for implementing the GE Rule. *See Maryland v. Dep't of Ed.*, No. 17-cv-2139-KBJ (D.D.C.).

---

[31] *Gainful Employment Delay and Implementation*, https://assets.documentcloud.org/documents/3914394/DeVosDurbinGainful.pdf (last visited on June 22, 2020).

[32] *Amended Information Exchange Agreement between the Department of Education & the Social Security Administration for Aggregate Earnings Data* at 8, https://www.warren.senate.gov/imo/media/doc/ED%20Agreements1.pdf.

**V. The Repeal Rule**

86.    While it was delaying enforcement of the GE Rule, the Department also published a proposal to repeal the GE Rule entirely.  83 Fed. Reg. 40,167 (Aug. 14, 2018).

87.    As part of its rationale for the proposed rule, the Department explained that "Research published subsequent to the promulgation of the GE regulations adds to the Department's concern about the validity of using D/E rates as to determine whether or not a program should be allowed to continue to participate in title IV programs." *Id.* at 40,171. The Department, however, never identified the research it was relying upon.

88.    Elsewhere, the Department stated that "[o]ther research findings suggest that D/E rates-based eligibility creates unnecessary barriers for institutions or programs that serve larger proportions of women and minority students." *Id.* But here the findings that the Department cited did not relate to GE programs.

89.    In its semi-annual report to Congress, the Department's own Office of the Inspector General notified Congress that it disagreed with the Department's proposal "to eliminate the Gainful Employment regulations without an adequate replacement to ensure accountability."[33]  Specifically, the Inspector General explained the need for "continued definition of gainful employment in order to ensure compliance with the gainful employment requirement established by Congress in the HEA," citing, in particular, concerns about proprietary schools' history of fraudulent and abusive practices.[34]

---

[33]*Semiannual Report to Congress*, No. 77 at 65 (Nov. 2018), https://www2.ed.gov/about/offices/list/oig/semiann/sar77.pdf.

[34]*Id.*

90.     Less than a year after publishing its proposal to repeal the GE Rule entirely, the Department issued its final rule doing so. *See generally* 84 Fed. Reg. 31,392. The Repeal Rule had a July 1, 2020 effective date, although the Secretary exercised her authority to designate certain parts of the Repeal Rule for "early implementation" at the discretion of each regulated institution. *Id.* at 31,395–396. Early implementation allowed institutions to opt-out of compliance with the GE Rule before the July 1, 2020 effective date. The Repeal Rule did not obligate any institution to alert the Department that it had elected to implement the repeal early.

91.     By the Department's estimate, the Repeal Rule will cost the federal government $6.2 billion over the next ten years primarily because programs that would have become ineligible to receive Title IV aid will remain eligible for that funding with the Department now declining to enforce the gainful employment provision. *Id.* at 31,447.

92.     The Department gave three justifications for repealing the GE Rule's eligibility component.

93.     First, the Department explained that it "did not need[] to define the term 'gainful employment' beyond what appears in the statute" because that term "has been widely understood to be a descriptive term that differentiates between programs that prepare students for named occupations and those that educate students more generally in the liberal arts and humanities, including all degree programs offered by public and private, non-profit institutions." *Id.* at 31,401. But the Department did not explain why the federal court decisions construing the phrase "prepare students for gainful employment in a recognized occupation" as ambiguous, and upholding the Department's rule to enforce that phrase, all were wrong. In fact, the Department did not acknowledge those decisions.

94.     In reversing its prior interpretation of that phrase, the Department explained only that it had previously "incorrectly described congressional intent." *Id.* at 31,402. The Department's new read of congressional intent, however, drew only from the statement of a single member of Congress made in 1972 (incorrectly attributed in the Repeal Rule to a House Conference Report), from a 2011 letter from a minority of members in one chamber, and from a failed 2013 bill. *Id.* at 31,401–402. None of those sources justifies the Department's changed position.

95.     Second, the Department justified the Repeal Rule based on the GE Rule's purported "disparate impact" on for-profit schools, as well as related concerns that the GE Rule both "failed to equitably hold all institutions accountable [for] student outcomes" and was "under-inclusive" because it did not apply to all schools. *Id.* at 31,394. Yet even in the Repeal Rule the Department conceded that the purported "disparate impact" on for-profit programs resulted from Congress's decision to apply the gainful employment standard to only certain categories of programs. *Id.*

96.     Third, the Department raised several criticisms of the GE Rule's reliance on debt-to-earning rates as the basis for Title IV aid eligibility. Specifically, the Department asserted that what qualified as a "passing" rate was arbitrary, that the debt-to-earning rates themselves "lack an empirical basis," and that GE Rule's reliance on only debt-to-earning rates obscured other variables that bear on student success. *Id.* at 31,407–408, 409–416. The Department also claimed that Social Security Administration "data may be inaccurate," that the "earnings portion of the D/E calculation [is] subject to significant errors," and that use of the data will "[p]enalize programs." *Id.* at 31,409–410.

97.     The Department, however, did not provide factual support for its critiques of the debt-to-earning rates. In part, the Department justified its decision by referencing "analysis provided by Federal Student Aid, in 2018" but without supplying any discernible indication of what analysis the Department was referencing. *Id.* at 31,398 n.27. At another point, the Department rejected the input of a commenter that offered a "bibliography" of "papers conclud[ing] that students who attend proprietary institutions, in many instances, have outcomes that are inferior to students who attend other institutions," by noting that "the Department believes that our analysis of the outstanding student loan portfolio demonstrates that poor outcomes are not limited to these institutions or the small number, relative to total postsecondary enrollment, of students who attend them." *Id.* at 31,405. Once more, the Department did not disclose any details about what the Department's "analysis" entailed, what findings it relied on, or what methods were employed.

98.     And at the same time the Department criticized the metrics used in the GE Rule, it relied on the very same metrics as justifying the Department's opposition to providing debt relief to thousands of defrauded students seeking to use "borrower defense" rules to discharge repayment obligations.[35] Indeed, the Department recently recommitted to the utility of the GE Rule's metrics when defending against borrowers' claims of a right to debt relief.[36]

---

[35] Memo from Acting General Counsel, Steven Menashi, to James Manning at 8 (Dec. 14, 2017), https://int.nyt.com/data/documenthelper/6576-menashi-memo/e1518a22b8810dd9f9a3/optimized/full.pdf.

[36] *Secretary DeVos Approves New Methodology for Providing Student Loan Relief to Borrower Defense Applicants* (Dec. 10, 2019), http://www.ed.gov/news/press-releases/secretary-devos-approves-new-methodology-providing-student-loan-relief-borrower-defense-applicants.

99. In litigation, the Department has defended rules that limit debt relief available to defrauded students precisely because those rules incorporate the GE Rule's metrics. Supp. Br. of Defs.-Appellees at 4-6, *Calvillo Manriquez v. DeVos*, No. 18-16375 (9th Cir. Mar. 5, 2019).

100. The Department justified repealing the GE Rule's transparency component based on the costs and burdens imposed on institutions that offer gainful employment programs. 84 Fed. Reg. at 31,418. At the same time, the Department acknowledged concerns that because of its repeal "some students would be more likely to make poor educational investments," *id.* at 31,394, and also that "[t]o the extent non-passing programs remain accessible with the rescission of the [GE] Rule, some students may choose sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both," *id.* at 31,445. The Department further acknowledged that "this could lead to greater difficulty in repaying loans, increasing the use of income-driven repayment plans or risking defaults and the associated stress, increased costs, and reduced spending and investment on other priorities." *Id.*

101. The Department's answer to these admitted harms was that it would expand the College Scorecard, a publicly available, government-operated website that houses various pieces of data about institutions of higher education. *Id.* at 31,394. Expanding the College Scorecard, however, is not an adequate substitute for the GE Rule's disclosure requirements. For example, under the GE Rule's transparency framework, institutions had to provide information about their programs directly on that program's website and in its promotional materials. The College Scorecard is an independent platform, which students are less likely to find. And as another example, the GE Rule required institutions to provide specific warnings to students before they enrolled in a failing a program. The College Scorecard contains no similar warnings.

102.    The Repeal Rule eliminates the Department's only enforceable interpretation of the HEA's ambiguous requirement that Title IV aid may be used to enroll in propriety and vocational programs only if they "prepare students for gainful employment in a recognized occupation." When Congress enacts an ambiguous provision and assigns enforcement responsibility to a federal agency, Congress intends the agency to use its expertise to supply a reasonable means of enforcing that provision. Although the Department repealed the GE Rule, it did not create any alternative that would prevent Title IV aid from being squandered on programs that fail to prepare students for "gainful employment in a recognized occupation." Thus, the Department has abdicated its responsibility to give meaning to an ambiguous phrase.

103.    The Department did not dispute that it would no longer provide an enforceable method for evaluating which gainful employment programs satisfy their obligations under the HEA, but instead said that the Department would rely on States and accreditors to review program quality. *Id.* at 31,403.

104.    The Department, despite dispensing with its only enforceable interpretation of what it means to prepare students for "gainful employment in a recognized occupation," did not consider alternatives other than repealing each aspect of the GE Rule. And although the Repeal Rule constitutes a change in the Department's view of what the HEA requires, the Department did not adequately justify its flipped position.

105.    And the Department also claimed that "[b]ecause the Department was unaware at the time of negotiated rulemaking and publication of the notice of proposed rulemaking" that the Social Security Administration would not renew the agencies' Memorandum of Understanding, the Department did not raise in the proposed rule, and thus did not seek comment, alternatives to Social Security Administration data, such as "data from the Internal Revenue Service (IRS) or

the Census Bureau" that could be used to calculate debt-to-earnings rates. 84 Fed. Reg. at 31,392–393. Yet the agencies' agreement expired on May 24, 2018, which was almost three months before the Department issued its notice of proposed rulemaking. Additionally, the Department has since submitted a declaration in other litigation confirming that the Department was aware before the Memorandum of Understanding expired, and thus before the notice of proposed rulemaking, that the Social Security Administration would not renew the agreement. *See* Decl. of Diane Auer Jones ¶¶ 4–6, *American Federation of Teachers v. DeVos*, No. 5:20-cv-455 (N.D. Cal. May 26, 2020) (ECF No. 26-1).

106.    Finally, the Department did not address any reliance interests it would be upending by repealing the GE Rule.

## VI. Harm to the States

107.    Following the Repeal Rule, more students will enroll in "sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both." 84 Fed. Reg. at 31,445. That will happen both because without the GE Rule students will not receive warnings about failing programs and because programs that repeatedly demonstrate their inability to prepare students for gainful employment may remain eligible to enroll students using Title IV aid.

108.    Plaintiff States will be harmed in four ways by students continuing to enroll in worthless programs run by for-profit institutions. First, Plaintiff States' investment in informed and productive residents, accomplished through state-funded institutions of higher education, will be harmed by increased competition from substandard programs. Second, because of the Repeal Rule, students are more likely to waste state-aid given for higher education by using that aid to attend worthless programs operated by for-profit institutions. Third, the students who will

33

again enroll in substandard and predatory programs will call upon Plaintiff States to seek redress for the attendant harms. Fourth, students who are now more likely to enroll in substandard for-profit programs will be unable to fully contribute to Plaintiff States' economies.

### A. The Repeal Rule will impair the purposes of Plaintiff States' expenditures on public institutions of higher education.

109.    Education is not "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." *Plyler v. Doe*, 457 U.S. 202, 221 (1982). Rather, education "has a fundamental role in maintaining the fabric of our society" because it "prepares individuals to be self-reliant and self-sufficient participants in society." *Id.* at 221–22 (internal citation omitted). For these reasons, "education is perhaps the most important function of state and local governments." *Id.* at 222 (internal quotation omitted).

110.    Consistent with these principles, many Plaintiff States promote a state-wide system of community colleges, public colleges, and public universities. Those schools are an integral part of the higher education landscape and make postsecondary education available at a reduced cost compared to private institutions. Community colleges, public colleges, and public universities facilitate the Plaintiff States' interest in all residents becoming informed and productive contributors to the States, and Plaintiff States have an interest in their institutions achieving the purposes for which they were established.

111.    Pennsylvania's commitment to higher education is demonstrated through its funding of three separate systems of higher education. Specifically, Pennsylvania's State System of Higher Education (PASSHE) institutions were created to "provide high quality education at the lowest possible cost to [Pennsylvania] students," 24 P.S. § 20-2003-A. In the 2019-20 fiscal year alone, Pennsylvania appropriated $477.5 million to the PASSHE institutions. Additionally, Pennsylvania funds four state-related institutions, on of which the state legislature described as

34

an "integral part of a system of higher education in Pennsylvania" that "improv[es] and strengthen[s] higher education … [and] extend[s] Commonwealth opportunities for higher education." *See, e.g.*, 24 P.S. § 2510-202(6). In the 2019-20 fiscal year, Pennsylvania appropriated $597.1 million to state-related schools. Finally, Pennsylvania funds community colleges to "promote[]the health, safety and welfare of our children." 2013 Pa. Legis. Serv. Act 2013-59 (H.B. 1141). In the 2019-20 fiscal year, Pennsylvania appropriated $243.9 million to community colleges. *See, e.g.*, Pennsylvania House Appropriations Committee, Higher Education: Primer at 8 (Sept. 18, 2019): https://www.houseappropriations.com/files/ Documents/HigherEd_BP_Final_091819%20--%202019-12-11_03-37-23.pdf (summarizing appropriations for all three systems of higher education).

112.   In Colorado, the General Assembly funds public institutions of higher education to "maximize opportunities for post-secondary education in Colorado" and to best utilize "available resources as to achieve an adequate level of higher education in the most economic manner." Colo. Rev. Stat. § 23-1-101. In the 2018-19 academic year, Colorado spent $192 million to support its fourteen community colleges and its fourteen public colleges and universities.[37]

113.   New Jersey, too, has 11 senior public colleges and universities and provides significant financial support to 18 community and county colleges. New Jersey supports these institutions both through grants and direct operating funding. In 2019, New Jersey spent over $273 million in grant money for students attending state colleges and universities and $48 million in grant money for students attending community and county colleges. And through its

_____

[37] Colo. Dep't of Higher Education, *Fiscal Year 2018-19 Financial Aid Report* at 3, https://highered.colorado.gov/Publications/Reports/FinancialAid/FY2019/201819_ FAReport_rell1272019.pdf.

NJ STARS Program, a program that pays for the State's high-achieving students to enroll in degree-granting programs at their local community colleges, the State spent $6.4 million during the 2018-19 academic year.[38] New Jersey's legislature described the program as "necessary for the State's citizens to acquire an education beyond the secondary level in order to succeed during the 21st century" and added that "[a] well-trained and educated population, moreover, is vital to New Jersey's efforts to attract and retain highly skilled businesses, and to ensure the State's continued economic well-being." N.J. Stat. Ann. § 18A:71B-82. Additionally, in fiscal year 2019, the State appropriated about $1.89 billion in direct operating support and reimbursement for state employee benefits to public institutions of higher education, including $188 million in operating support and employee benefits for community colleges.[39]

114.    In Delaware, the General Assembly has expressed a strong belief in the benefits of accessible and affordable higher education opportunities. *See* Del. Code Ann. tit. 14, ch. 1, subch. V. To make those benefits readily available, the State committed more than $247 million in fiscal year 2020 to supporting Delaware's three public higher education institutions, which collectively enroll more than 40,000 students.[40]

115.    In Illinois as well, the legislature has declared that "endeavors that serve the higher education needs of the people of the State represent an essential function of State government." 110 ILCS 979/5. To that end, Illinois community colleges receive over $317

---

[38] *See NJ Stars: New Jersey Student Tuition Assistance Reward Scholarship* (Oct. 17, 2019), https://www.hesaa.org/Documents/NJSTARS_program.pdf.

[39] *See FY2020 Citizens' Guide to the Budget* at 22, https://www.state.nj.us/treasury/omb/publications/20citizenguide/citguide.pdf.

[40] *See State of Delaware Fiscal Year 2020 Budget Bill*, 82 Del. Laws ch. 64, https://delcode.delaware.gov/sessionlaws/ga150/chp064.shtml.

million annually in state grants. That money supports the State's mission to provide high-quality, accessible, cost-effective educational opportunities.

116.    Massachusetts maintains a system of public institutions of higher education. *See* Mass. Gen. Law ch. 15A, § 5. As set by statute, the mission of Massachusetts' public colleges and universities includes providing "citizens with the opportunity to participate in academic and educational programs for their personal betterment and growth, as well as that of the entire citizenry"; growing "the existing base of research and knowledge in areas of general and special interest, for the benefit of our communities, our commonwealth and beyond"; and preparing "its citizens to constitute a capable and innovative workforce to meet the economic needs of the commonwealth at all levels." *Id.* § 1.

117.    Between 2017 and 2019, Oregon spent over $2 billion on higher education, including $736.9 on public universities and $570.3 million on community colleges.[41] Like student aid, State funding for community colleges and public universities serves Oregon's "survival and economic well-being" through cultivating "able and imaginative" people "for the direction and operation of all its institutions," and meets Oregon's need for "wise and effective leadership and an informed citizenry" as well as "alert and informed consumers." ORS 350.001. Funding for Oregon's 17 community colleges advances the need for state-level economic and workforce development. And funding for Oregon's seven public universities helps prepare Oregon's residents for economic success, and furthers the State's need for innovation and research.

---

[41] Higher Education Coordinating Commission, Fact Sheet: *Higher Education Legislatively Adopted Budget, 2017-2019* (July 28, 2017), https://www.oregon.gov/highered/about/ Documents/Commission/COMMISSION/2017/08-August-9- 10/3.1%20LAB%20Fact%20Sheet.pdf.

118.    The people of Rhode Island have made a constitutional commitment "to promote public schools . . . , and to adopt all means which it may deem necessary and proper to secure to the people the advantages and opportunities of education." R.I. Const. art. XII, sec. 1. To that end, Rhode Island has established several public universities and community colleges. *See* R.I. Gen. Laws §§ 16-31, 16-32, 16-33.1, 16-44. In particular, the purpose of the Community College of Rhode Island is to "to offer all students the opportunity to acquire the knowledge and skills necessary for intellectual, professional and personal growth by providing an array of academic, career and lifelong learning programs, while contributing to Rhode Island's economic development and the needs of the region's workforce." *Id.* § 16-33.1-2. Rhode Island colleges and universities awarded over $91 million in student aid to students in 2016.

119.    Virginia, too, has passed legislation committing to prepare its resident-students "by establishing a long-term commitment, policy, and framework for sustained investment and innovation that will (i) enable the Commonwealth to build upon the strengths of its excellent higher education system and achieve national and international leadership in college degree attainment and personal income and (ii) ensure that these educational and economic opportunities are accessible and affordable for all capable and committed Virginia students." Va. Code § 23.1-301(B). Virginia promotes access to quality higher education institutions through a program of financial assistance that supports students attending non-profit institutions, *id.* §§ 23.1-600 to 23.1-642, and by having established public institutions of higher education, including community colleges, *id.* §§ 23.1-1300 to 23.1-2913.

120.    The Wisconsin Technical College System currently has 16 technical colleges. In the 2018-19 academic year, Wisconsin supplied more than $88.5 million of state aid to that system. Because Wisconsin values schools that properly prepare students for success after

graduation, the legislature made funding for the technical colleges a product of a model that allocates up to 30% of state aid based on those colleges meeting 10 criteria, including job placement rates, the transition of adult basic education students to skills training, and workforce training provided to businesses and individuals. Wisconsin also has created the University of Wisconsin System, which currently operates 13 universities across 26 campuses. The university system furthers the State legislature's commitment to providing access to higher education that enables all people "to participate in the search for knowledge," that "fosters diversity of educational opportunity," that "makes effective and efficient use of human and physical resources," among other interests. *See* Wis. Stat. § 36.01. Between 2017 and 2019, Wisconsin provided about $138 million of general aid to the University of Wisconsin System.

121.    Publicly-funded schools compete with for-profit schools for student attendance. Many students decide between enrolling in a for-profit program or in a community college program. PASSHE, for example, has found that transfer student enrollment at state-owned universities and community colleges has declined 16.6% since 2013, which reflects in part competition from low-cost out-of-state online providers.[42] Following the Repeal Rule, students will be more likely to attend programs that fail to prepare them for gainful employment than programs at a community college, public college, or public university.

122.    Many of Plaintiff States' community colleges are open enrollment, sometimes called open admission. That means any student with a high school diploma or GED may enroll. Consequently, students who would have been dissuaded from enrolling in a program operated by a for-profit school because of the GE Rule's disclosure requirement, or who would have chosen

---

[42] Pa. State System of Higher Education, *See 2020-21 Appropriations Request* at 33 https://www.passhe.edu/doc/State_System_2020-21_Approps_Binder.pdf.

not to attend any of those programs that lost eligibility to enroll students using Title IV aid, would have been able to enroll instead in a community college if they wanted.

123.    When students attend ineffectual for-profit programs rather than Plaintiff States' community colleges or public universities, the beneficial, and often constitutional, purposes for which those schools have been created are diminished because Plaintiff States' efforts to establish an informed and productive population are impaired.

124.    Moreover, decreased enrollment in publicly-funded schools harms States. First, public schools receive federal funding commensurate with enrollment. For example, in the 2018-19 academic year, Colorado community college students received over $88 million in federal Pell grants.[43] This is 33% of the financial aid that Colorado's community college students received during the 2018-19 academic year. Second, students that graduate from public schools have higher median earnings than students at for-profit schools. Decreased enrollment at public schools, then, depresses States' tax revenue.

### B. The Repeal Rule will waste state educational aid.

125.    The Department estimates that the Repeal Rule will cost the federal government $6.2 billion over the next decade primarily because students will be able to use Title IV aid to attend programs that would have become ineligible if the GE Rule remained in effect. 84 Fed. Reg. at 31,447. In other words, because of the Repeal Rule, the federal government will spend $6.2 billion to support students who will enroll at "sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both." *Id.* at 31,445.

---

[43] Colo. Cmty. Coll. Sys., *Fact Book: Academic Year 2018-2019* at 72, https://www.cccs.edu/wp-content/uploads/documents/AY-2018-2019-Fact-Book-Master-Copy-Revised-10.17.2019-final.pdf.

126.    Plaintiff States, like the federal government, financially support higher education through financial grants for their residents, often to advance a state constitutional commitment to higher education. In some Plaintiff States, those grants have been used by students to attend programs that did not pass under the Department's 2017 release of debt-to-earning rates.

127.    Pennsylvania, for example, has enacted several financial assistance programs. Those programs respond to "a tragic underdevelopment of the Commonwealth's human talent" attributable to "the inability of many needy students to finance a postsecondary educational program." 24 Pa. Stat. § 5151. As the legislature has explained, Pennsylvania's economic and social success requires giving every individual "the opportunity to contribute to the full extent of his capabilities." *Id.* Between 2013 and 2019, Pennsylvania distributed $102.5 million from its largest grant program to support students attending business, trade, and technical schools located in Pennsylvania.[44] Under a separate grant program, Pennsylvania spent about $6.3 million in fiscal year 2019 for students to attend short-term vocational programs that are Title IV approved.[45] For example, from 2013 to 2019, Pennsylvania spent $17.8 million from state grant programs on institutions owned by CEC, Corinthian, EDMC, and ITT. In the 2018 fiscal year, Pennsylvania distributed $3.4 million from its state grant funds to institutions with non-passing programs under the Department's 2017 debt-to-earning release.[46]

---

[44] Pa. Higher Education Assistance Agency ("PHEAA"), *2018-19 Pennsylvania State Grant Program Year-by-Year & Institutional Statistics Report* at 18 (Table 15), https://www.pheaa.org/about/pdf/state-grant-yby.pdf.

[45] ("PHEAA"), *Quarterly Finance Report for December 31, 2019 and 2018* at 3, https://www.pheaa.org/about/pdf/financial-reports/quarterly/123119.pdf; PHEAA, *PA-TIP 2019 Annual Report* at 4, 7, https://www.pheaa.org/funding-opportunities/pa-tip/pdf/annual-report.pdf.

[46] *Pennsylvania State Grant Program*, *supra* note 44, at 52–64 (Table 64).

128.    Maryland has a grant program to provide need-based financial assistance to cover students' educational costs to attend institutions of higher education, which students attending for-profit schools can use to cover tuition costs. *See* Md. Code Ann. Education Article § 18-301, *et. seq.* Maryland also offers grants to students attending non-degree programs, including programs run by for-profit schools. *Id.* § 18-1201, *et. seq.* Between 2011 and 2018, Maryland distributed $1.2 million through these grant programs to students attending programs operated by for-profit schools.[47]

129.    In Colorado, the general assembly has declared "that the provision of a higher or career and technical education for all residents of this state who desire such . . . is important to the welfare and security of this state and nation and, consequently, serves an important public purpose." C.R.S. §23-3-102. To make higher education broadly accessible, Colorado provides student aid each year. In fiscal year 2018-19, Colorado paid about $1.25 million to proprietary institutions in state-funded financial aid. All proprietary institutions that received state aid in 2018-19 were accredited and eligible to receive federal aid as well.[48] And between 2011 and 2016, the Colorado Department of Higher Education allocated more than $13 million in grant money to for-profit colleges, some of which were subject enforcement actions brought by the Colorado Attorney General under the State's consumer protection laws.

130.    New Jersey supports students' pursuit of higher education through several funding mechanisms, including state grant programs. Tuition Aid Grants is one such program.[49] New

---

[47] *See* Nat'l Assoc. of State Student Grant and Aid Programs, Table 9, https://www.nassgapsurvey.com/ (list visited July 17, 2020).

[48] *Fiscal Year 2018-19 Financial Aid Report*, *supra* note 37, at 3, 8, 16–17.

[49] *See Strengthening New Jersey One Student at a Time: HESAA's 2019 Annual Report* at 11, https://www.hesaa.org/Documents/Financial/AnnualReports/annualreport2019.pdf.

Jersey provides funds through this program for undergraduate study at public, non-profit, and proprietary institutions. N.J. Stat. Ann. § 18A:71B-18. During academic year 2018-19, 1,851 students received $17.7 million from the Tuition Aid Grants program for enrollment at proprietary institutions.[50] Over the past seven academic years, New Jersey provided 16,746 grants, including about $125 million to students at proprietary schools.[51] In addition, New Jersey's Department of Labor and Workforce Development provides both federally-funded and state-funded grants for occupational education and job training programs, many of which go to students attending for-profit institutions.[52]

131.    The Delaware General Assembly has expressed a strong belief and interest in the benefits to Delaware and its residents of accessible and affordable higher education opportunities. *See* Del. Code Ann. tit. 14, ch. 1, subch. V. To further that interest, Delaware has created grant and loan programs that support students attending institutions of higher education. Del. Code Ann. tit. 14, ch. 34. Delaware awards about $10 million annually in scholarships and loans for Delaware residents attending accredited institutions of higher learning, including for-profit schools.

132.    The District of Columbia has demonstrated its commitment to higher education through laws designed, for example, to protect "the quality of postsecondary education," D.C. Code § 38-1301(1), "ensure [the] authenticity and legitimacy of [post-secondary] educational institutions," *id.* § 38-1303, and to provide financial aid programs that will "enable[] college-

---

[50] *Id.* at 27.

[51] *See HESAA Annual Reports*, https://www.hesaa.org/Pages/AnnualReports.aspx (last visited June 22, 2020).

[52] *See generally* N.J. Dep't of Labor & Workforce Devel., *Workforce Programs*, https://www.nj.gov/labor/programs/workforce_programs_index.html (last visited June 22, 2020).

bound residents of the District of Columbia to have greater choices among institutions of higher education," *id.* § 38-2701. In service of those goals, the District of Columbia has a wide variety of grant and loan programs that provide student financial aid, including an aid program that can be used to attend for-profit schools. *E.g., id.* §§ 38-1207.02, -2702, -2704, -2733(a); 29 DCMR §§ 7000–7099. Several of these programs provide aid only to students attending schools eligible for Title IV funding. *E.g.*, D.C. Code §§ 38-2702(c)(1), -2704(c)(1), -2731(3).

133.   Massachusetts also funds a "grant program for undergraduate students enrolled at an approved institution of higher education within the commonwealth." Mass. Gen. Law ch. 15A § 16. Aid from that program, the MASSGrant Program, may be used to attend "a state-approved public, private, independent, for-profit or non-profit institution."[53]

134.   In Minnesota, the legislature has declared that state investment in higher education advances "democratic values and enhance[s] Minnesota's quality of life by developing understanding and appreciation of a free and diverse society" and "enhance[s] the economy by assisting the state in being competitive in the world market, and to prepare a highly skilled and adaptable workforce that meets Minnesota's opportunities and needs." Minn. Stat. §§ 135A.011, 136A.61. To further those important interests, Minnesota has grant and loan programs that support students attending institutions of higher education, including private schools. *See generally id.* §§ 136A.091-136A.146, 136A.15-136A.1795. Under Minnesota's programs, aid may be used to attend a private school if that school also is eligible for Title IV aid. *Id.* § 136A.103(b)(3). From 2010 to 2019, $123 million of state money went to for-profit schools,

---

[53] *See* Office of Student Financial Assistance, *MASSGrant & MASSGrant Plus*, https://www.mass.edu/osfa/programs/massgrant.asp (last visited June 22, 2020).

including several schools subject to enforcement actions, investigations, class actions, findings of fraud, or abrupt closures.

135.    New York State allocates over $1 billion annually to programs aimed at making higher education more affordable and at encouraging the "best and brightest students to build their future in New York State."[54] A significant portion of such funding is distributed in grants to individual students through the State's Tuition Assistance Program. In the 2017-18 academic year, New York State awarded more than $50 million from that program to students enrolled at for-profit colleges.[55]

136.    In Oregon, the legislature has declared that institutions of higher education are necessary to ensure the State's "survival and economic well-being" because Oregon "needs able and imaginative" people "for the direction and operation of all its institutions," as well as "wise and effective leadership and an informed citizenry" and "alert and informed consumers." ORS 350.001. To achieve these ends, the legislature found that "Oregonians need access to educational opportunities beyond high school and throughout life." ORS 350.005. One way Oregon facilitates access to higher education is through grant programs, including the Oregon Barber and Hairdresser Grant Program, OAR 575-035-0005, *et seq.*, and the Oregon Student Child Care Grant, OAR 575-095-0005, *et seq.* These grant programs permit students to enroll in proprietary or vocational institutions, subject to some limitations. Oregon provided at least $185,044 in aid to students attending proprietary institutions between 2007 and 2018.[56]

---

[54] *See* Higher Education Servs. Corp., *2018-2019 New York State Budget Highlights*, https://www.hesc.ny.gov/partner-access/colleague-emails/834-2018-19-new-york-state-budget-highlights.html (last visited June 22, 2020.

[55] *See* Table 9, *supra* note 47.

[56] *See* Table 9, *supra* note 47.

137.     Wisconsin furthers its commitment to higher education, in part, through state grant, scholarship, and loan programs that support students attending institutions of higher education, including the University of Wisconsin System schools, Wisconsin's technical colleges, Wisconsin's tribal colleges, and Wisconsin's private non-profit schools. *See generally* Wis. Stat. §§ 39.435, 39.30, 39.435(2), 39.44, 39.435(5), 39.41, 39.415, 39.40, 39.393, 39.399, and 39.398. Additionally, Wisconsin has an Indian Student Assistance Grant, which is awarded to Wisconsin residents who are at least 25% Native American and can be used to attend the University of Wisconsin, Wisconsin's technical colleges, independent colleges and universities, tribal colleges, or proprietary institutions based in Wisconsin. *See id.* § 39.38.

138.     From 2010 to 2018, Plaintiff States collectively provided over $1.4 billion in need-based grants to proprietary institutions, according to the National Association of State Student Grant and Aid Programs.[57] In 2017, at least one for-profit school in every State and the District of Columbia reported to the National Center for Education Statistics having received state grant money.[58]

139.     As with federal Title IV aid, the Repeal Rule will cause state grant money to be spent at "sub-optimal programs" that offer little benefit. That will happen both because the GE Rule would have forced those substandard programs to close and because the GE Rule would have required the schools offering those programs to warn students about the programs' poor track record. Program closures and program transparency would have resulted in some students instead enrolling in schools capable of providing a beneficial education. Because, following the

---

[57] *See* Table 9, *supra* note 47.

[58] Nat'l Center for Education Statistics, *Integrated Postsecondary Education Data System*, (search conducted June 12, 2020).

Repeal Rule, more students will use state aid to enroll in programs that do not provide educational value, millions of state dollars will be spent on education that offers no return on Plaintiff States' investment and fails to meet the objectives of Plaintiff States' aid programs.

*C. The Repeal Rule transfers greater oversight responsibility to Plaintiff States.*

140.   The federal government, States, and accrediting organizations share responsibility for overseeing higher education institutions and protecting students from abusive practices.

141.   One essential facet of the federal government's oversight is enforcing the HEA's requirements, including its gainful employment provision. Through its enforcement of the HEA's gainful employment requirement, the Department can forestall the harm caused by students enrolling in ineffectual programs both through alerting students of poor-performing programs and restricting flow of Title IV aid to the worst offending programs. The Department is uniquely suited to these roles as only the Department has access to data necessary to review program performance nationwide.

142.   States complement the Department's oversight. For an institution to be eligible for the HEA's grant programs, it must be "legally authorized to provide an educational program beyond secondary education in the State in which the institution is physically located." 34 C.F.R. § 600.4(a)(3); *accord id.* § 600.5(a)(4); *id.* 600.6(a)(3). And an institution "is legally authorized by a State if the State has a process to review and appropriately act on complaints concerning the institution including enforcing applicable State laws." *Id.* § 600.9(a)(1). In a recent rulemaking, the Department cited this provision as providing students with important consumer protection. 84 Fed. Reg. 58,843 (Nov. 1, 2019).

143.   Additionally, State Attorneys General enforce consumer protection statutes that prohibit unfair and deceptive acts or practices that harm consumers, including the unfair or

deceptive conduct of for-profit schools.[59] Indeed, throughout its rulemaking about the HEA's gainful employment requirement, the Department has recognized that State Attorneys General have a stake in the integrity of institutions of higher education. 74 Fed. Reg. 46,400 (Sept. 9, 2009); 78 Fed. Reg. 35,179 (June 12, 2013); 82 Fed. Reg. 41,194 (Aug. 20, 2017).

144.    In the Repeal Rule specifically, the Department justified its exit from enforcing the HEA's gainful employment requirement in part by noting that there are "other mechanisms, such as *state attorneys general*, consumer protection agencies, civil legal proceedings, internal resolution arrangements, and borrower defense to repayment regulations that enable students to take action against institutions that have committed fraud." 84 Fed. Reg. at 31,400 (emphasis added). And the Department explained that the Repeal Rule will not harm students because the Department "will continue to rely on States to execute their consumer protection functions and accrediting agencies to evaluate program quality so that the regulatory triad will retain its importance and shared responsibility in the oversight of institutions of higher education." *Id.* at 31,403.

145.    Indeed, both before the GE Rule took effect and during its nascence, Plaintiff States were active in policing the for-profit industry through enforcement actions necessitated by for-profit institutions' abusive practices.

---

[59] *See, e.g.,* Colo. Rev. Stat. § 6-1-101, *et seq.*; Conn. Gen. Stat. Sec. 42-110b; Del. Code Ann. tit. 6, §§ 2511–2527, 2531–2536; D.C. Code § 28-3901, *et seq.*; Haw. Rev. Stat. § 480-2; 815 ILCS 505/2; Md. Code Ann., Com. Law § 13-101, *et seq.*; Mass. Gen. Law ch.93A, § 1, *et seq.*; Minn. Stat. §§ 325D.44, 325F.69; N.J. Stat. Ann. § 56:8-2; New York General Business Law §§ 349–350; NMSA 1978, §§ 57-12-1 to -26; NMSA 1978, §§ 57-15-1 to -10; New York Executive Law § 63(12); N.C. Gen. Stat. § 75-1, *et seq.*; ORS 646.605, *et seq.*; 73 Pa. Stat. § 201-1, *et seq.*; R.I. Gen. Laws § 6-13.1-1, *et seq.*; 9 V.S.A. § 2451, *et seq.*; Va. Code § 59.1-196, *et seq.*; Wis. Stat. § 100.18.

146.     For example, in the last 10 years, the Colorado Office of Attorney General spent more than 30,000 hours related to investigations of and enforcement against for-profit schools, including a four-week bench trial, to address reports of fraud committed by for-profit schools. Many of the investigated schools enrolled borrowers into failing programs. Similarly, the Minnesota Office of Attorney General has spent at least 17,545 hours investigating reports of fraud committed by for-profit schools. Wisconsin's Department of Justice, too, has spent more than 650 hours investigating and litigating against Everest College-Milwaukee, a branch of the now-defunct Corinthian College, and more than 350 hours investigating and litigating against the now-defunct Brensten Education, Inc. In Maryland, Oregon, Pennsylvania, and Rhode Island, the Offices of Attorney General have spent considerable time investigating institutions such as CEC, Corinthian, EDMC, Education Corporation of America, and ITT.

147.     These actions were not in vain. State-led actions against for-profit institutions such as CEC, Corinthian, EDMC, and ITT, as well as the Career Institute LLC, Globe University, Westwood College, and others, together have led to hundreds of millions of dollars in settlements for defrauded students.

148.     Corinthian in particular declared bankruptcy on the heels on an investigation led by several State Attorneys General. And when Corinthian declared bankruptcy, the Department requested that State Attorneys General assist with outreach to Corinthian's defrauded borrowers. Forty-seven State Attorneys General, pooling funds through the National Association of Attorneys General, spent over $280,000 to retain a third-party settlement administrator to identify eligible borrowers and contact them with information about discharging their loans.

149.     Elsewhere, the State Council of Higher Education for Virginia estimates that it spent $91,288.88 related to for-profit school closure and enforcement issues from January 1,

2015 to December 31, 2019. Of that, $52,725 was for processing complaints; $4,108.25 was to audit schools that had multiple noncompliance issues; $19,359.12 was for assisting students affected by closures; $4,081.85 supported informal fact-finding conferences that were a predicate to revoking a certificate to operate; and $11,014.66 was for a formal hearing.

150.    New Mexico budgets over $500,000 to regulate private colleges. Students in New Mexico that have been harmed by the conduct of for-profit colleges may file a complaint with either the New Mexico Office of the Attorney General, Advocacy and Intervention Division or with the New Mexico Higher Education Department.

151.    The Oregon Higher Education Coordinating Commission likewise has received over 40 student inquiries related to proprietary and vocational schools since 2017, and its two private school regulation offices have expended over $100,000 since 2017, the vast majority of which was related to proprietary schools.

152.    Just as the Department anticipates, without the Department supplying an enforceable definition for the HEA's gainful employment provision, more students will lodge complaints with Plaintiff States about the misconduct of gainful employment programs. Under 34 C.F.R. 600.9(a)(1), the Plaintiff States must expend resources to accept and "appropriately act" on those complaints. And to protect students from being defrauded by predatory schools that work to enroll students in worthless programs, Attorneys General for the Plaintiff States will need to undertake costly investigations and incur significant enforcement expenses.

### D. The Repeal Rule will diminish contributions to Plaintiff States' economies.

153.    When students enroll in effective institutions of higher education, including Plaintiff States' publicly-funded institutions, the Plaintiff States' economies benefit in at least two ways. First, public institutions themselves stimulate economic activity in Plaintiff States.

Second, graduates of effective institutions of higher education make more meaningful contributions to Plaintiff States' economies than graduates burdened by excessive student debt.

154.    Pennsylvania's 14 state-system universities, as one example, contributed $4.4 billion in economic impact to Pennsylvania in 2015, representing $10.61 for every one dollar of public funds expended.[60] In Colorado, the community college system adds $5.8 billion annually, roughly the equivalent of 981,000 jobs, to the state's economy.[61] And in Oregon, universities contribute significantly to the state economy. For example, Portland State University alone provided around $1.5 billion in economic impact in the 2018 fiscal year.

155.    Graduates of Illinois's community colleges also boost local economies. Illinois's community college graduates realize a 44% increase in expected lifetime earnings over those not completing a community college program. And nearly 90% of community college students stay in Illinois for employment in the 5-year period following graduation. As one example, in 2012, Illinois community colleges generated a total economic output of $3.1 billion.

156.    Students who enroll in worthless programs, however, often are burdened by insurmountable debt. In total, over 134,000 students from Plaintiff States graduated between 2008 and 2012 from programs that were not passing in the Department's initial release of gainful employment data; those students carry over $2.7 billion in loan debt.[62] In fiscal year 2016, defaults by students who attended for-profit schools accounted for 32.6% of all federal student-

---

[60] *2020-21 Appropriations Request*, *supra* note 42, at 9.

[61] Colo. Cmty. Coll. Sys., *CCCS Facts and Figures* at 2, https://www.cccs.edu/wp-content/uploads/documents/CCCS-Factsheet-08.29.18_nobleed.pdf (last visited June 22, 2020).

[62] *How Much Did Students Borrow To Attend The Worst-Performing Career Education Programs?*, *supra* note 20.

loan defaults, even though those students accounted for only 21% of all borrowers entering repayment.[63]

157.    With the Repeal Rule, more students will enroll in programs that burden students with debt that they cannot repay. These students are more likely to experience "associated stress, increased costs, and reduced spending and investment on other priorities." 84 Fed. Reg. at 31,445.

158.    The scale of these harms is magnified as the country faces a recession. As the U.S. Census Bureau has noted, "[a]t least since the mid-twentieth century, postsecondary enrollment has increased during recessionary periods as labor market conditions degrade."[64] And widespread unemployment caused by the coronavirus pandemic gives for-profit colleges an opportunity to attract students who may be eager to find new professional opportunities.[65]

159.    With residents of Plaintiff States now more likely to enroll in programs that weigh their graduates down with burdensome debt, many residents of Plaintiff States will make more limited contributions to state economies because a greater percentage of more modest earnings will be diverted to student loan debt payments rather than to purchases made in the Plaintiff States' economies.

---

[63] *FY 2016 Default Rates*, *supra* note 8.

[64] Erik Schmidt, *Postsecondary Enrollment Before, During, and Since the Great Recession*, U.S. Census Bureau (2018), https://www.census.gov/content/dam/Census/library/publications/2018/demo/P20-580.pdf.

[65] Butrymowicz & Kolodner, *supra* note 1.

## CAUSES OF ACTION

### Count I – Agency Action that Is Arbitrary, Capricious, and Not in Accordance with Law (Repeal of Eligibility Framework)

160. Plaintiff States incorporate by reference paragraphs 1 through 159 of this Complaint.

161. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ." 5 U.S.C. § 706(2)(A).

162. The Repeal Rule is a final agency action. 5 U.S.C. § 704.

163. Every federal court to have reviewed the phrase "prepare students for gainful employment in a recognized occupation" as used in the HEA has concluded that phrase is ambiguous and leaves a regulatory gap for the Department to fill. Nevertheless, the Department, in the Repeal Rule, asserted that "prepare students for gainful employment in a recognized occupation" needs no further definition to be enforced. The Department took that position without referencing any court decision ruling otherwise. Contradicting the ruling of each court to have reviewed whether the HEA's use of "prepare students for gainful employment in a recognized occupation" is an ambiguous phrase that the Department must define to enforce, without even acknowledging those decisions, makes the Repeal Rule arbitrary and capricious.

164. Until 2019, it also was the Department's position that "prepare students for gainful employment in a recognized occupation" is an ambiguous phrase that requires further definition to be enforced. Departing from the Department's prior interpretation of "prepare students for gainful employment in a recognized occupation," without adequately justifying the change, also makes the Repeal Rule arbitrary and capricious.

165.    By repealing the GE Rule without putting in place any alternative, the Department has stopped enforcing the HEA's requirement that programs operated by for-profit and vocational schools are eligible for Title IV aid only if they "prepare students for gainful employment in a recognized occupation." Accordingly, the Department has failed in its responsibility to interpret an ambiguous phrase and has ceased to enforce a statutory mandate. For each reason, the Repeal Rule is arbitrary and capricious and not in accordance with law.

166.    The Department repealed the GE Rule on the grounds that the GE Rule "did not comport with congressional intent" and constituted "regulatory overreach." Each justification rests on the faulty legal premise that the Department lacks discretion under the HEA to define the term "gainful employment in a recognized occupation" through metrics comparing students' debt and earnings. The Repeal Rule is thus arbitrary and capricious and not in accordance with law.

167.    And, to the extent the Department stopped enforcing the HEA's gainful employment requirement because it was skeptical of how the GE Rule defined "gainful employment in a recognized occupation," the Department was obligated to consider alternatives to repealing the GE Rule. Because the Department failed to consider alternative ways to give meaning to "gainful employment in a recognized occupation," the Repeal Rule is arbitrary and capricious.

168.    Moreover, the Department specifically claimed that it had no need to consider alternatives to repealing the GE Rule because that rule depended on the Department's access to data from the Social Security Administration, which the Department lost access to once the Memorandum of Understanding between the two agencies expired in May 2018. The Department never considered whether alternative data sources would suffice because, it claimed, the Department did not know at the time it issued its proposal to repeal the GE Rule that it would

lose access to data from the Social Security Administration. But, in fact, the Department was aware by the time of its proposed rulemaking that the Social Security Administration would not renew the agencies' Memorandum of Understanding, making the Department's failure to consider sources of data other than the Social Security Administration arbitrary and capricious.

169.    The Department also justified the repeal based on the GE Rule's purported disparate impact on for-profit and vocational schools, while simultaneously acknowledging that the HEA itself subjects only some schools to the gainful employment standard. By justifying the repeal based on a purported disparate impact, when any such impact in fact reflects Congress's judgment about which schools are subject to additional requirements, the Repeal Rule is arbitrary and capricious and not in accordance with law.

170.    The Department further explained its repeal by criticizing the metrics on which the GE Rule's eligibility framework relied. But the Department's criticisms lacked evidentiary support. And at the same time the Department criticized the GE Rule's metrics, it relied on those very same metrics to defend against borrower defense claims raised by defrauded student borrowers. For each reason, the Repeal Rule is arbitrary and capricious.

171.    Finally, the Department did not consider whether the GE Rule had engendered any reliance interests. Because the Department overlooked this essential consideration, the Repeal Rule is arbitrary and capricious.

## Count II – Agency Action that Is Arbitrary, Capricious, and Not in Accordance with Law (Repeal of Transparency Framework)

172.     Plaintiff States incorporate by reference paragraphs 1 through 159 of this Complaint.

173.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . ." 5 U.S.C. § 706(2)(A).

174.     The Repeal Rule is a final agency action. 5 U.S.C. § 704.

175.     By eliminating the transparency framework without a reasonable explanation or consideration of any alternatives, and by justifying the repeal through allusion to an inadequate substitute for the transparency framework, the Department acted in a manner that is arbitrary and capricious.

## Count III – Agency Action not in Accordance with Proper Procedure

176.     Plaintiff States incorporate by reference paragraphs 1 through 159 of this Complaint.

177.     Under the APA, before an agency issues a final rule, the agency must provide a "notice of proposed rule making," which shall include . . . either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). Interested parties then have the "opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

178.     To comply with section 553's requirements, an agency's notice of proposed rule making must include the technical studies and data on which the agency will rely. *Banner Health v. Price*, 867 F.3d 1323, 1336 (D.C. Cir. 2017).

179.    The Department's  proposal to repeal the GE Rule relied  on unidentified  "research" and the Repeal Rule itself  relied  on unidentified  "analysis."  For each reason, the Department  violated  the APA's procedural requirements.

## PRAYER  FOR RELIEF

WHEREFORE,  Plaintiff  States request that this Court enter judgment  in their  favor and grant the following  relief:

    a.  Declare the Repeal Rule to be arbitrary and capricious  and not otherwise  in accordance with law;

    b.  Hold unlawful,  set aside, and vacate the Repeal Rule;

    c.  Enjoin  the Department  from enforcing  the Repeal Rule;

    d.  Award Plaintiffs  reasonable costs, including  attorneys'  fees; and

    e.  Grant such other relief as the Court deems just and proper.

Dated: October 2, 2020                                  Respectfully  submitted,

**JOSH SHAPIRO**                                        **BRIAN E. FROSH**
*Attorney General*                                      *Attorney General*
*Commonwealth of Pennsylvania*                          *State of Maryland*

Michael  J. Fischer
Jesse F. Harvey                                         /s/ *Christopher J. Madaio*
Chief Deputy Attorneys  General                         Christopher  J. Madaio
                                                        Assistant  Attorney  General
                                                        Office  of the Attorney  General
 /s/ *Jacob B. Boyer*                                   Consumer  Protection  Division
Jacob B. Boyer                                          200 St. Paul Place, 16th Floor
Kevin R. Green                                          Baltimore,  MD 21202
Francesca Iovino                                        (410) 576-6585
Deputy Attorneys  General                               cmadaio@oag.state.md.us
Office of the Pennsylvania  Attorney  General           *Attorney for Plaintiff State of Maryland*
1600 Arch Street, Suite 300
Philadelphia,  PA 19103

(267) 768-3968
jboyer@attorneygeneral.gov
*Attorneys for Plaintiff Commonwealth of*
*Pennsylvania*

**PHILIP J. WEISER**
*Attorney General*
*State of Colorado*

/s/ *Martha Fulford*
Martha Fulford  (D.C. Bar No. 101194)
First Assistant  Attorney  General
Olivia  D. Webster
Senior Assistant Attorney General
Brady J. Grassmeyer
Assistant  Attorney  General
1300 Broadway, 10th Floor
Denver,  CO 80203
(720) 508-6000
martha.fulford@coag.gov
*Attorneys for Plaintiff State of Colorado*

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

Mayur P. Saxena
Assistant  Attorney  General

/s/ *Elspeth L. Faiman Hans*
Elspeth  Faiman  Hans
John T. Passante
Deputy Attorneys  General
Office  of the Attorney  General
Division  of Law
Richard  J. Hughes Justice Complex
25 Market Street
Trenton,  NJ 08625
(609) 376-2752
elspeth.hans@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

**WILLIAM  TONG**
*Attorney General*
*State of Connecticut*

/s/ *Joseph J. Chambers*
Joseph J. Chambers
Assistant  Attorney  General
Office  of the Attorney  General
165 Capitol Avenue
Hartford,  CT 06106
(860) 808-5270
Joseph.chambers@ct.gov
*Attorney for Plaintiff State of Connecticut*

**KATHLEEN  JENNINGS**
*Attorney General*
*State of Delaware*

/s/ *Christian Douglas Wright*
Christian  Douglas  Wright
Director  of Impact Litigation
Vanessa L. Kassab
Deputy Attorney  General
Delaware Department  of Justice
820 North French Street, 5th Floor
Wilmington,  DE 19801
(302) 577-8600
christian.wright@delaware.gov
vanessa.kassab@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

/s/ *Benjamin M. Wiseman*

Benjamin M. Wiseman (D.C. Bar No. 1005442)
Director, Office of Consumer Protection
Attorney General for the District of Columbia
441 4th Street, NW, 6th Floor
Washington, D.C. 20001
(202) 741-5226
benjamin.wiseman@dc.gov
*Attorney for Plaintiff District of Columbia*

**CLARE E. CONNORS**
*Attorney General*
*State of Hawaii*

/s/ *Bryan C. Yee*

Bryan C. Yee
Thomas Francis Mana Moriarty
Deputy Attorneys General
425 Queen Street
Honolulu, HI 96813
(808) 586-1180
bryan.c.yee@hawaii.gov
mana.moriarty@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

/s/ *Greg Grzeskiewicz*

Greg Grzeskiewicz
Bureau Chief, Consumer Fraud Bureau
Joseph Sanders
Gregory W. Jones
Assistant Attorneys General
Office of the Illinois Attorney General
Consumer Fraud Bureau
100 West Randolph Street, 12th Floor.
Chicago, IL 60601
(312) 814-6796 (Sanders)
(312) 814-4987 (Jones)
jsanders@atg.state.il.us
gjones@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

/s/ *Yael Shavit*

Yael Shavit
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2197
yael.shavit@mass.gov
*Attorney for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
*Attorney General*
*State of Michigan*

/s/ *D.J. Pascoe*

D.J. Pascoe
Brian Green
Assistant Attorneys General
Michigan Department of Attorney General

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

/s/ *Jason Pleggenkuhle*

Jason Pleggenkuhle
Assistant Attorney General
Bremer Tower, Suite 1200
445 Minnesota Street

525 West Ottawa Street, 7th Floor
P.O. Box 30736
Lansing, MI 48933
(517) 335-7632
PascoeD1@michigan.gov
GreenB@michigan.gov
*Attorneys for Plaintiff State of Michigan*

St. Paul, MN 55101
(651) 757-1147
jason.pleggenkuhle@ag.state.mn.us
*Attorney for Plaintiff State of Minnesota*

**HECTOR H. BALDERAS**
*Attorney General*
*State of New Mexico*

/s/ *Lisa Giandomenico*

Lisa Giandomenico
Assistant Attorney General
Consumer and Environmental Protection
Division
201 3rd Street NW Suite 300
Albuquerque, NM 87102
(505) 490-4846
lgiandomenico@nmag.gov
*Attorney for Plaintiff State of New Mexico*

**LETITIA A. JAMES**
*Attorney General*
*State of New York*

/s/ *Jane M. Azia*

Jane M. Azia
Chief, Bureau of Consumer Frauds and
Protection
28 Liberty Street
New York, NY 10005
(212) 416-8727
jane.azia@ag.ny.gov
*Attorney for Plaintiff State of New York*

**JOSHUA H. STEIN**
*Attorney General*
*State of North Carolina*

/s/ *Matthew L. Liles*

Matthew L. Liles (D.C. Bar No: 994408)
Assistant Attorney General
North Carolina Department of Justice
114 West Edenton Street
Raleigh, NC 27603
(919) 716-0141
mliles@ncdoj.gov
*Attorney for Plaintiff State of North Carolina*

**ELLEN F. ROSENBLUM**
*Attorney General*
*State of Oregon*

/s/ *Katherine A. Campbell*

Katherine A. Campbell
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97101
(971) 673-1880
katherine.campbell@doj.state.or.us
*Attorney for Plaintiff State of Oregon*

60

**PETER F. NERONHA**
*Attorney General*
*State of Rhode Island*

/s/ *Justin S. Sullivan*
Justin S. Sullivan
David R. Marzilli
Special Assistant Attorneys General
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 ext. 2007 (Sullivan)
(401) 274-4400 ext. 2030 (Marzilli)
jjsullivan@riag.ri.gov
dmarzilli@riag.ri.gov
*Attorneys for Plaintiff State of Rhode Island*

**THOMAS J. DONOVAN, JR.**
*Attorney General*
*State of Vermont*
/s/ *Christopher J. Curtis*
Christopher J. Curtis
Assistant Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5586
christopher.curtis@vermont.gov
*Attorney for Plaintiff State of Vermont*

**MARK R. HERRING**
*Attorney General*
*Commonwealth of Virginia*
/s/ *Samuel T. Towell*
Samuel T. Towell
Deputy Attorney General, Civil Litigation
Mark S. Kubiak
Assistant Attorney General, Consumer
Protection Section
202 North Ninth Street
Richmond, VA 23219
(804) 786-6731
stowell@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of
Virginia*

**JOSHUA L. KAUL**
*Attorney General*
*State of Wisconsin*

/s/ *Shannon A. Conlin*
Shannon A. Conlin
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-1677
conlinsa@doj.state.wi.us
*Attorney for Plaintiff State of Wisconsin*

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the foregoing document, and any attachments thereto, to be electronically filed with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system, and that all participants in the case will be served by the CM/ECF system.

*/s/ Jacob B. Boyer*
Jacob B. Boyer