# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>ELISABETH D. DEVOS, in her official capacity as<br>Secretary of Education, *et al*.,<br><br>　　　　　Defendants. | No. 1:20-cv-1719 KBJ |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ................................................................................... 1

BACKGROUND .................................................................................... 3

    I.     Statutory Background ........................................................ 3

    II.    Regulatory Background ...................................................... 4

    III.   *Maryland v. U.S. Dep't of Education* .................................... 8

    IV.   This Lawsuit ................................................................... 10

STANDARD OF REVIEW ..................................................................... 11

ARGUMENT ...................................................................................... 13

    I.     THE STATES LACK STANDING TO ASSERT COUNTS I AND II ............ 13

          A.    The States Fail To Identify Cognizable Injuries Fairly Traceable to the Rescission of the 2014 GE Rule's Accountability Framework or Transparency Framework ..................................................... 13

               1.    A speculative harm to States' investments in State-run schools is not a cognizable injury fairly traceable to the rescission ......... 15

               2.    The alleged waste of State financial aid funds and the costs of enforcing State laws against fraudulent GE programs are self-inflicted injuries not fairly traceable to the rescission ......... 19

               3.    The alleged reduction in State-run school enrollees' contributions to the States' overall economies is far too speculative to support the States' standing .................................. 22

          B.    Other Factors Show the States' Asserted Injuries Are Not Fairly Traceable to the 2019 Rule and Are Not Be Redressable ......................... 24

               1.    The unavailability of SSA data prevented the Department from calculating D/E rates before the rescission of the 2014 GE Rule's accountability framework and forecloses any redress through this case ......................................................... 24

2.      Because the Secretary had discretion to determine the content of any GE program disclosures pursuant to the 2014 GE Rule, the States cannot establish causation or redressability with respect to the rescission of the transparency framework .......................... 27

C.      The States Cannot Rely on *Parens Patriae* Standing To Bring APA Claims Against the Federal Government ................................................. 29

II.     THE STATES LACK STANDING TO ASSERT COUNT III .......................... 30

A.      The States Fail To Identify a Cognizable Procedural Harm Under the Critical Material Doctrine ........................................................................ 31

B.      The States Fail To Satisfy the Other Requirements for Procedural Standing ................................................................................................... 33

CONCLUSION ........................................................................................................ 35

## TABLE OF AUTHORITIES

**Cases**

*Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1 (D.C. Cir. 1999) ................................................... 31

*\*Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982) ...................................... 10, 29

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ........................................ 30, 31

*Am. Ass'n of Cosmetology Schools ("AACS") v. DeVos*,
   258 F. Supp. 3d 50 (D.D.C. 2017) ................................................................................... 7

*\*Am. Fed'n of Teachers ("AFT") v. DeVos*,
   No. 20-455, 2020 WL 5257561 (N.D. Cal. Sept. 3, 2020) ...... 1, 13, 25, 26, 27, 28, 33, 35

*Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008) ...................................... 31

*Ass'n of Accredited Cosmetology Schs. v. Alexander*, 979 F.2d 859 (D.C. Cir. 1992) ................ 3

*Ass'n of Private Colls. & Univs. APSCU v. Duncan ("APSCU I")*,
   870 F. Supp. 2d 133 (D.D.C. 2012) ....................................................................... 3, 4, 5

*APSCU v. Duncan ("APSCU II")*, 681 F.3d 427 (D.C. Cir. 2012) ............................... 5, 6, 23, 26

*APSCU. v. Duncan ("APSCU III")*, 110 F. Supp. 3d 176 (D.D.C. 2015) ................................. 6-7

*Ass'n of Proprietary Colls. v. Duncan ("APC")*, 107 F Supp. 3d 332 (S.D.N.Y. 2015) ......... 6, 26

*Attias v. Carefirst, Inc.,* 865 F.3d 620 (D.C. Cir. 2017) ............................................................ 12

*Banner Health v. Price,* 867 F.3d 1323 (D.C. Cir. 2017) ......................................................... 30

*Boster v. Reliance Standard Life Ins.*, 959 F. Supp. 2d 9 (D.D.C. 2013) ...................................... 8

*City of Orrville v. FERC*, 147 F.3d 979 (D.C. Cir. 1998) ............................................................ 33

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..................................................... 12, 16, 18

*Ctr. for Biological Diversity v. Bernhardt*,
   No. 19-cv-02898 (APM), 2020 WL 5702087 (D.D.C. Sept. 24, 2020) ........................ 33

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ......................................................... 11, 12

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95 (D.C. Cir. 2019) .................. 27

*Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) (en banc) ..................................... 34

*Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019) ........................................... 10, 29

*Kiakombua v. Wolf*, No. 19-CV-1872 (KBJ), 2020 WL 6392824 (D.D.C. Oct. 31, 2020) ......... 30

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) .......................................................... 11

*Lewis v. Casey*, 518 U.S. 343 (1996) ........................................................................................ 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................ 12, 26, 30

*Marino v. NOAA*, 451 F. Supp. 3d 55 (D.D.C. 2020) ................................................................ 28

*Maryland v. U.S. Dep't of Educ.*,
   No. 17-2139, 2020 WL 4039315 (D.D.C. July 17, 2020) ........................................ *passim*

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................................ 10

*Massachusetts v. Mellon*, 262 U.S. 447 (1923) ................................................................. 10, 29

*Md. People's Counsel v. FERC*, 760 F.2d 318 (D.C. Cir. 1985) ................................................ 29

*Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8 (D.C. Cir. 2020) .... 12, 34

*Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) .......................................................... 18

*Pharm. Research & Mfrs. v. U.S. Dep't of Health & Human Servs.*,
   43 F. Supp. 3d 28 (D.D.C. 2014) ........................................................................................ 7

*Post Acute Med. at Hammond, LLC v. Azar*, 311 F. Supp. 3d 176 (D.D.C. 2018) .................... 30

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ................................................................. 12, 28

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ............................................................... 33

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ...................................................... 12

*Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645 (2017) ......................................... 12, 13

*United Food & Commercial Workers Union, Local No. 663 v. U.S. Dep't of Agric.*,
   451 F. Supp. 3d 1040 (D. Minn. 2020) .............................................................................. 13

*United States v. Wells*, 519 U.S. 482 (1997) ........................................................................... 29

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,

454 U.S. 464, 483 (1982) ................................................................................. 21

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) ................................. 34

*Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc*., 435 U.S. 519 (1978) .................. 31

## Statutes

National Vocational Student Loan Insurance Act of 1965 ("NVSLIA"),
    Pub. L. No. 89-287, 79 Stat. 1037 ........................................................... 3

Higher Education Amendments of 1968, Pub. L. No. 90–575, 82 Stat. 1014 ............................. 3

Higher Education Amendments of 1992, Pub. L. No. 102-325, 106 Stat. 448 ........................... 3

5 U.S.C. § 553 ........................................................................................ 30, 31

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ........................................... *passim*

5 U.S.C. § 702 ............................................................................................ 10

5 U.S.C. § 706 ............................................................................................ 11

20 U.S.C. § 1001 .......................................................................................... 5

20 U.S.C. § 1002 ...................................................................................... 1, 4, 5

Higher Education Act ("HEA") Title IV, 20 U.S.C. §§ 1070 *et seq.* .................................... 3

20 U.S.C. § 1088 ....................................................................................... 1, 4

20 U.S.C. § 1221e-3 ....................................................................................... 4

20 U.S.C. § 3474 .......................................................................................... 4

## Regulations

Final regulations, 53 Fed. Reg. 11208 (Apr. 5, 1988) ................................................. 4

Notice of proposed rulemaking ("NPRM"), 75 Fed. Reg. 34806 (June 18, 2010) ......................... 4

Final regulations, 75 Fed. Reg. 66832 (Oct. 29, 2010) ............................................... 4

Final regulations ("2014 GE Rule"), 79 Fed. Reg. 64890 (Oct. 31, 2014) ............. 5, 6, 13, 14, 17

NPRM, 83 Fed. Reg. 40167 (Aug. 14, 2018) ................................................. 8

Final regulations ("2019 Rule"), 84 Fed. Reg. 31392 (July 1, 2019) .................................. *passim*

84 Fed. Reg. 58834 (Nov. 1, 2019) ........................................................ 20

34 C.F.R. § 668.4 ....................................................................... 20

34 C.F.R. § 668.5 ....................................................................... 20

34 C.F.R. § 668.8 ....................................................................... 5

34 C.F.R. § 668.9 ....................................................................... 20

34 C.F.R. §§ 668.401 to 668.415 (2019) (rescinded 2020) ....................................... 5

34 C.F.R. § 668.402 (2019) (rescinded 2020) ................................................. 5

34 C.F.R. § 668.403 (2019) (rescinded 2020) ........................................... 6, 8, 26

34 C.F.R. § 668.404 (2019) (rescinded 2020) ................................................ 26

34 C.F.R. § 668.405 (2019) (rescinded 2020) ........................................... 5, 7, 26

34 C.F.R. § 668.406 (2019) (rescinded 2020) ............................................. 6, 7

34 C.F.R. § 668.410 (2019) (rescinded 2020) ................................................ 6

34 C.F.R. § 668.412 (2019) (rescinded 2020) ........................................ 6, 14, 27, 28

## Other Administrative Material

Intent to establish negotiated rulemaking committees, 82 Fed. Reg. 27640 (June 16, 2017) ....... 8

Announcement of applicable dates; request for comments, 82 Fed. Reg. 39362 (Aug. 18, 2017) 7

## INTRODUCTION

In this case, a group of states (the "States") bring suit under the Administrative Procedure Act ("APA"), seeking to overturn a final rule (the "2019 Rule") promulgated by defendants the U.S. Department of Education and Elizabeth DeVos, the Secretary of Education, (collectively, "Defendants" or "the Department"). The 2019 Rule rescinded a prior rule, issued in 2014, that set forth new frameworks for certain postsecondary programs that, under definitions that Congress had set forth decades earlier in Title IV of the Higher Education Act of 1965 ("HEA"), "prepare students for gainful employment [("GE")] in a recognized occupation." *See* 20 U.S.C. §§ 1002(b)(1)(A)(i), 1002(c)(1)(A), 1088(b)(1)(A)(i).

Soon after this case was filed, this Court dismissed for lack of standing a prior case, brought by a similar group of states before the GE rule ("2014 GE Rule") was rescinded, alleging that the Department was failing to properly implement that rule. *See Maryland v. U.S. Dep't of Educ.*, No. 17-2139, 2020 WL 4039315 (D.D.C. July 17, 2020). The plaintiff states in *Maryland*, like the States here, asserted injuries allegedly caused by the absence of an operative GE rule. The Court's analysis in *Maryland*—which the Court has deemed related to this case—and its conclusion that the states there failed to identify cognizable injuries fairly traceable to the Department's alleged failure to implement the 2014 GE Rule, are therefore fully on point and require dismissal of the States' claims for the same reasons.

In addition, another court has recently recognized, in two other cases challenging the 2019 Rule in the Northern District of California, that claims seeking to reinstate the 2014 GE Rule, or to require the promulgation of a similar rule, are not redressable. *See Am. Fed'n of Teachers* ("*AFT*") *v. DeVos*, No. 20-455, 2020 WL 5257561 (N.D. Cal. Sept. 3, 2020). The fact that the Department no longer has access to aggregate program earnings data that previously was provided

by the Social Security Administration ("SSA") renders the prospect of resuming debt-to-earnings calculations—at the heart of the 2014 GE Rule's accountability framework—nothing more than dubious speculation. Moreover, given the lack of any unambiguous statutory directive, the Department would have no obligation to promulgate replacement metrics if the 2019 Rule were set aside. Similarly, although none of the States' asserted injuries relates to the rescission of the 2014 GE Rule's transparency framework, to the extent they seek to challenge that rescission, the Department cannot be compelled to require disclosures of specific information when the 2014 GE Rule itself granted the Secretary full discretion over the content of such disclosures—and even before the rescission, the Secretary had limited the information to be included in GE programs' disclosure templates. Any prospect of redress on this basis is thus also speculative.

Finally, the States' addition of a third, purportedly procedural, claim in their Amended Complaint is of no avail in conferring standing. The States seek to invoke a narrowly-defined obligation to disclose material studies or data that an agency relied upon when promulgating a rule when such disclosure is necessary to allow a meaningful opportunity to comment. But the States fail to allege a procedural harm that could invoke this obligation. In particular, they do not identify any internal studies that the Department relied upon that were not already public, nor do they assert that the Department's alleged failure to disclose would have affected their ability to comment. Nor do the States otherwise meet standing requirements under a procedural injury framework. The same problems with the States' asserted injuries that prevent them from demonstrating regular standing also foreclose the States' ability to establish a concrete interest for purposes of a procedural claim. And although the redressability requirement is relaxed in a procedural context, the speculative nature of any possible relief dooms the States' standing on this basis as well.

The Court therefore should dismiss the States' claims in their entirety for lack of standing.

# BACKGROUND

## I.      Statutory Background

The HEA's Title IV, 20 U.S.C. §§ 1070 *et seq*., authorizes the Department to enter into agreements with postsecondary schools that allow students at those schools to receive federal loans guaranteed by the United States. *See Ass'n of Accredited Cosmetology Schs. v. Alexander*, 979 F.2d 859, 860 (D.C. Cir. 1992). From the beginning, Congress provided loan insurance not only for the college-bound student—that is, for students earning traditional degrees at traditional colleges and universities—but also for students at vocational schools. *See Ass'n of Private Colls. & Univs.  v. Duncan* ("*APSCU I*"), 870 F. Supp. 2d 133, 138-40 (D.D.C. 2012) (describing statutory background).[1]  Originally, eligible public or non-profit vocational schools were defined as those providing "not less than a one-year program of training to prepare students for gainful employment in a recognized occupation," *id.* at 139 (citing HEA § 435(a)), while eligible for-profit vocational schools were those that provided "postsecondary vocational or technical education designed to fit individuals for useful employment in recognized occupations, *id.* (citing NVSLIA § 17(a)). In 1992, Congress revised and reorganized these definitions. *See id.* at 140 (citing Higher Education Amendments of 1992, § 481, Pub. L. No. 102-325, 106 Stat. 448). Since then, the terms "proprietary institution of higher education" (covering most degree and non-degree programs offered at proprietary (for-profit) schools), and "eligible program" (insofar as that term covers non-degree vocational programs offered at public and non-profit schools) are defined, in part, as those programs that provide "an eligible program of training to prepare students for gainful employment

---

[1] At first, the HEA governed grants and guaranteed student loans at traditional colleges and universities while another statute enacted the same year, the National Vocational Student Loan Insurance Act of 1965 ("NVSLIA"), Pub. L. No. 89-287, § 17(a), 79 Stat. 1037, governed guaranteed student loans at vocational schools. *See id.* These programs were merged in 1968. Higher Education Amendments of 1968, Pub. L. No. 90–575, 82 Stat. 1014.

in a recognized occupation." *See* 20 U.S.C. §§ 1002(b)(1)(A)(i), (c)(1)(A), 1088 (b)(1)(A)(i).

## II.    Regulatory Background

Congress has vested the Secretary with broad authority to "make, promulgate, issue, rescind, and amend rules and regulations governing the manner of operation of, and governing the applicable programs administered by, the Department." 20 U.S.C. § 1221e-3; *see also id*. § 3474 ("The Secretary is authorized to prescribe such rules and regulations as the Secretary determines necessary or appropriate to administer and manage the functions of the Secretary or the Department."). However, Congress never specifically directed the Secretary to promulgate regulations addressing the term "gainful employment" in the definitions of "proprietary institution of higher education" in 20 U.S.C. § 1002 or "eligible program" in § 1088. For nearly 45 years after the HEA's enactment, the Secretary did not address the phrase "gainful employment," or impose any obligations on either public, non-profit, or for-profit vocational programs in connection with this phrase. *E.g*., Final regulations, 53 Fed. Reg. 11208 (Apr. 5, 1988) (promulgating regulations addressing Secretary's determination of vocational schools' Title IV eligibility).

Beginning in 2010, however, the Department issued a series of rules intended to establish new Title IV disclosure and eligibility requirements for the educational programs covered by these definitions on the theory that such measures were necessary to ensure that those programs did in fact prepare students for gainful employment. *See APSCU I*, 870 F. Supp. 2d at 141-43 (describing rulemaking history); Notice of proposed rulemaking ("NPRM"), 75 Fed. Reg. 34806, 34809 (June 18, 2010); Final regulations, 75 Fed. Reg. 66832 (Oct. 29, 2010). These requirements would thus apply to non-degree vocational programs at public and non-profit schools, and to most degree and

non-degree programs offered at proprietary schools. *See* 34 C.F.R. § 668.402 (2019)[2] (cross-referencing 34 C.F.R. § 668.8(c)(3) and (d)); *cf.* 20 U.S.C. § 1002(b), (c).[3]

The Department's first attempt at promulgating GE regulations "never took effect" because the regulations were struck down in large part in 2012. *Ass'n of Private Sector Colls. & Univs. v. Duncan* ("*APSCU II*"), 110 F. Supp. 3d 176, 182 (D.D.C. 2015) (citing *APSCU I*, 870 F. Supp. 2d at 154-57). The court agreed that the Department could interpret the term "gainful employment," even though that term appeared in Title IV within the definitions of other terms, because the fact that the term was not itself further defined in the statute suggested that Congress had not unambiguously prohibited the Department from providing an interpretation. *APSCU I*, 870 F. Supp. 2d at 146-47. However, the court concluded that the Department had failed to provide an adequate explanation for certain aspects of the original rule and struck down the debt measure components of the GE scheme. *Id.* at 154.

The Department then promulgated revised regulations in 2014—the 2014 GE Rule. *See* Final regulations, 79 Fed. Reg. 64890 (Oct. 31, 2014). The 2014 GE Rule established both an "accountability framework" and a "transparency framework." *Id.* at 64890, 64891. Under the accountability framework, the Department would engage in a multi-step process to calculate debt-to-earnings ("D/E") rates for each covered program ("GE program") every year. *Id.* at 64891; 34 C.F.R. § 668.405 (2019). This process required the participation of the GE programs, in reporting and reviewing lists of their graduates, and the SSA, in using those lists to calculate aggregate

---

[2] Unless otherwise indicated, citations to now-rescinded provisions of the 2014 GE Rule, 34 C.F.R. §§ 668.401 to 668.415, reference the versions in effect in 2019, immediately prior to the rescission.

[3] Unlike public or non-profit schools, proprietary schools are not eligible for Title IV at all insofar as they offer non-vocational programs, such as liberal arts programs, except for certain accredited programs that have provided liberal arts bachelor's degrees since 2009. *Compare id.* § 1001(a) (covering higher education programs at public or nonprofit schools), *with id.* § 1002(b)(1)(A)(ii).

earnings data for each program. *See id.* Based on the final D/E rate, programs would be assigned either a "passing," "failing," or intermediate "in the zone" rating each year. 34 C.F.R. § 668.403(c) (2019). Programs could appeal the Department's initial assessment if they provided alternate earnings data that showed their graduates had greater earnings than was indicated in the SSA's data. *Id.* § 668.406 (2019). However, GE programs that received a failing rating for two out of three consecutive years, or a combination of failing and "zone" rating for four consecutive years, would be deemed ineligible for Title IV participation. *Id.* § 668.403(c)(4). Programs in danger of becoming ineligible after the next year's D/E calculation cycle were required to issue warnings to current and prospective students. *Id.* § 668.410(a) (2019).

Under the 2014 GE Rule's transparency framework, GE programs were required to report certain information to the Secretary. 79 Fed. Reg. at 64891. GE programs were also required to disclose information to students and prospective students through a "disclosure template," which would be developed by the Secretary. *Id.* The 2014 GE Rule provided a nonexclusive list of information that the Secretary "may include" in the template but indicated that "[t]he Secretary identifies the information that must be included in the template in a notice published in the Federal Register." 34 C.F.R. § 668.412(a) (2019).

The GE regulations were immediately challenged, in two separate cases, by associations whose members were proprietary schools subject to the regulations. *APSCU II*, 110 F. Supp. 3d at 184; *Ass'n of Proprietary Colls. v. Duncan* ("*APC*"), 107 F Supp. 3d 332, 340 (S.D.N.Y. 2015). The regulations were upheld in both cases, with the courts agreeing with the court in *APSCU I* that Title IV did not unambiguously prohibit the Department's interpretation. *APC*, 107 F. Supp. 3d at 363; *APSCU II*, 110 F. Supp. 3d at 185-86.  However, the litigation did not conclude until March 2016. *See APSCU v. Duncan* ("*APSCU III*"), No. 15-5190, 640 Fed. Appx. 5 (D.C. Cir. Mar. 8,

2016). Meanwhile, the Department began the process of calculating an initial year's D/E rates, but there were numerous delays in completing the multiple steps of § 668.405.[4]

Among other things, in the course of another lawsuit initiated in 2017, a court struck down the alternative earnings appeals process set forth in 34 C.F.R. § 668.406, concluding that the graduate survey response requirements imposed on schools seeking to provide alternate earnings data were too stringent and failed to adequately compensate for the Department's use of imperfect SSA data when calculating D/E rates. *Am. Ass'n of Cosmetology Schs. v. DeVos* ("*AACS*"), 258 F. Supp. 3d 50, 76 (D.D.C. 2017). That ruling led to further delays in finalizing the first year's rates, as the Department set forth new requirements for appeals and extended the appeals deadline. Announcement of applicable dates; request for comments, 82 Fed. Reg. 39362, 39363 (Aug. 18, 2017). And although the Department began the process of calculating D/E rates for a second year, the second year's calculations were never finalized because the SSA stopped providing the necessary data. 2019 Rule, 84 Fed. Reg. 31392, 31392 (July 1, 2019) (explaining that SSA did not sign a new Memorandum of Understanding ("MOU") with the Department to share earnings data, and that, as a result, "the Department is currently unable to calculate D/E rates"); *see also* Declaration of Diane Auer Jones ("Jones Decl.") ¶¶ 4-7, *AFT* ECF No. 26-1 (N.D. Cal. filed May

---

[4] The Department announced various updates, deadlines, and delays in electronic announcements ("EAs") posted on a Department website page devoted to implementation of the 2014 Rule, https://ifap.ed.gov/gainful-employment-information-dear-colleague-letters-and-electronic-announcements. The Court may take judicial notice of material on the Department's website. *Pharm. Research & Mfrs. v. U.S. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies."). In December 2015, the Department announced it expected to complete the second step of the D/E rate calculation process for the initial D/E rate calculation year later that winter, EA #71 (Dec. 11, 2015), but later revised that estimate to spring 2016, *see* EA #73 (Feb. 3, 2016). The initial year's D/E rates (for the 2015 Debt Measure Year), subject to appeal if they were failing or in the zone, were then issued in January 2017. EA #100 (Jan. 6, 2017). No D/E rates for subsequent years were issued before the 2019 Rule took effect.

26, 2020) (attached hereto) (same).[5] Because, under the 2014 Rule, a GE program could not lose Title IV eligibility until at least two years' worth of D/E rates had been calculated, 34 C.F.R. § 668.403(c)(4),  no GE program has lost Title IV eligibility pursuant to the 2014 Rule.

On June 16, 2017, the Department announced its intent to initiate a new negotiated rulemaking committee to reconsider the GE regulations. Intent to establish negotiated rulemaking committees, 82 Fed. Reg. 27640. Following the conclusion of negotiated rulemaking meetings where no consensus was reached, the Department issued an NPRM on August 14, 2018, *see* NPRM, 83 Fed. Reg. 40167, and issued the 2019 Rule at issue here, rescinding the 2014 GE Rule, on July 1, 2019, 84 Fed. Reg. 31392. The 2019 Rule went into effect on July 1, 2020. *Id.* at 31392.

### III.   *Maryland v. U.S. Dep't of Education*

This case has been deemed related to *Maryland v. U.S. Dep't of Education*, No. 1:17-cv-2139 (D.D.C. filed Oct. 17, 2017). In that case, brought while the 2014 GE Rule was still in effect, a group of states alleged that the Department had improperly delayed its implementation of the 2014 GE Rule. On July 17, 2020, the Court issued a Memorandum Opinion holding that the states in that case lacked standing and accordingly dismissed their claims for lack of subject matter jurisdiction. *Maryland,* 2020 WL 4039315.

In concluding that the *Maryland* states lacked standing, the Court rejected theories of injury based on both nonsovereign and quasi-sovereign interests. *Id.* at *10. In regard to nonsovereign interests, the Court rejected "three species of harm." *Id.* First, the Court concluded that the alleged "loss of tuition dollars at state-run schools due to students who choose to attend problematic GE Programs instead of those public institutions" was too speculative to support the states' standing

---

[5] The Jones Declaration is cited, and thus incorporated by reference, in the Amended Complaint, Am. Compl. ¶ 105. *See Boster v. Reliance Standard Life Ins*., 959 F. Supp. 2d 9, 29 (D.D.C. 2013).

because each of five separate steps would have to occur to get from the Department's alleged failure to implement the 2014 GE Rule to the States' asserted loss of revenue. *Id.* at *11-12.[6] The Court deemed this chain of possible events too attenuated to support standing, particularly because they were "contingent upon the independent decisions" of students and admissions departments. *See id.* at *13.

Second, the Court held that the two remaining asserted nonsovereign interests—an alleged waste of state loan and grant funding and an alleged increased cost in investigating fraudulent proprietary GE programs—were "self-inflicted" harms, of the states' own making, and thus not fairly traceable to the Department's actions. *Id.* In regard to state educational funding, the Court concluded that the states were under no federal obligation to "link their fiscs to federal practices," or to provide financial aid to students enrolling in GE Programs that the states deemed problematic. *Id.* at *14. The Court similarly concluded that "it is the States themselves that have chosen to assume the obligation to police GE Programs." *Id.* Moreover, given that "the GE Rule was never fully implemented," the states were unable to identify any change in their losses and investments that could possibly relate to the Department's enforcement or non-enforcement of the 2014 GE Rule. *See id.* at *15. The Court also pointed out that state spending decisions involve complex economic cost-benefit analyses of the anticipated benefits of any expenditure and therefore could

---

[6] Specifically, the Court identified:

at least the following logical links: (1) students who are attending or are set to attend failing GE Programs would have to choose not to attend (or would be unable to attend) the GE Programs on the basis of the information that the GE Rule requires disclosed or the designation that those programs receive from the DOE; (2) instead of abandoning the prospect of higher education altogether, students who would have attended the GE Programs would have to apply to state-run educational institutions; (3) the state-run educational institutions would have to admit these students; (4) the students would have to choose to matriculate at the state-run institutions; and (5) the students' attendance at these institutions would have to enhance, rather than detract from, state's finances.

*Id.* at *12.

not easily be viewed as a cognizable injury in fact. *See id.*

The Court also rejected the *Maryland* states' assertion of standing based on the "'special solicitude' owed to states" recognized in *Massachusetts v. EPA*, 549 U.S. 497 (2007). *Maryland*, 2020 WL 4039315, at *16. Citing the D.C. Circuit's analysis in *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 182 (D.C. Cir. 2019), the Court explained that in *Massachusetts*, the state had identified a cognizable injury to its property interest in its coastal land areas "'in its capacity as a landowner,'" *as well as* a "'quasi-sovereign' interest in 'preserv[ing] its sovereign territory,'" and the Supreme Court *also* had construed the Clean Air Act as providing the state with a statutory right. *Maryland*, 2020 WL 4039315, at *16. In *Maryland*, by contrast, the states "failed to assert *any* cognizable nonsovereign injury," nor had they identified any threat to "their own sovereignty or their sovereign territory." *Id.*

Finally, the Court rejected the *Maryland* states' assertion of *parens patriae* standing, citing the well-established bar on states' ability to sue the federal government in a *parens patriae* capacity. *Id.* at *19 (citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982); *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923)).  The Court rejected the states' argument that the APA provided a statutory override to this bar. *Id.* at *20. To the contrary, the Court interpreted the APA as foreclosing *parens patriae* standing because, by its plain language, the APA allows only those who have "'suffer[ed] [their own] legal wrong'" to invoke its judicial review provisions. *See id.* (quoting 5 U.S.C. § 702).

**IV.   This Lawsuit**

The States, comprising many of the same plaintiff states in *Maryland*[7], filed suit on June

---

[7]Thirteen states (Maryland, Pennsylvania, Connecticut, Delaware, Hawaii, Illinois, Minnesota, New York, North Carolina, Oregon, Rhode Island, Vermont, and Virginia) and the District of Columbia are plaintiffs here and also were plaintiffs in *Maryland*. The *Maryland* states also

24, 2020, shortly before the Court issued its decision in *Maryland*. *See* Compl. [ECF 1]. Their Complaint set forth two claims, challenging the 2019 Rule's rescission of the 2014 GE Rule's eligibility framework as arbitrary, capricious, and not in accordance with law, and challenging its rescission of the 2014 GE Rule's transparency framework as arbitrary and capricious, pursuant to the APA, 5 U.S.C. § 706(2)(A). After the Court determined that the two cases were related, and in light of its conclusion in *Maryland* that the plaintiff states lacked standing to pursue similar claims, it ordered the parties in this case to brief standing "as a threshold matter, prior to briefing other issues in this case." Minute Order of Aug. 10, 2020. The instant Motion to Dismiss serves as the mechanism, agreed upon by the parties, for complying with that directive. *See* JSR [ECF 18]. The States also filed an Amended Complaint on October 2, 2020. Am. Compl. [ECF 22]. The Amended Complaint added a third claim, alleging that the Department "violated the APA's procedural requirements" by failing to identify "research" and an "analysis" that were referenced in the proposed or final 2019 Rule. *Id.* ¶¶ 87-88, 97, 179.

## STANDARD OF REVIEW

Defendants move for dismissal under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. In reviewing a motion to dismiss under Rule 12(b)(1), a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Thus, a federal court must presume that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006). The burden of demonstrating the contrary "'rests upon the party asserting

---

included California (which has brought a separate challenge to the 2019 Rule in the Northern District of California in a case deemed related to *AFT*, *California v. DeVos*, No. 5:20-cv-1889 (N.D. Cal. filed Mar. 18, 2020)), Iowa, and Washington while the States also include Colorado, New Jersey, Michigan, and Wisconsin.

jurisdiction.'" *Id.*

The States accordingly also have the burden to establish each element of the "irreducible constitutional minimum of standing[.]" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The States must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). These elements must be met "as of the commencement of suit." *Lujan*, 504 U.S. at 571 n.5 (rejecting notion that later events could confer standing where "redressability clearly did not exist" when the case was filed). The elements of standing also must be satisfied "for each claim [a plaintiff] seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc*., 137 S. Ct. 1645, 1650 (2017) (citation omitted).

To demonstrate a cognizable injury-in-fact, a plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.]" *Lujan*, 504 U.S. at 560. Because the States seek prospective relief, they must establish that they are "suffering an ongoing injury or face[] an immediate threat of injury." *Narragansett Indian Tribal Historic Pres. Office v. FERC*, 949 F.3d 8, 12–13 (D.C. Cir. 2020) (internal quotation omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 & n.5 (2013)) (internal quotation omitted). However, if the alleged injury depends upon "a highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, it is "too speculative to qualify as an injury in fact," *Maryland*, 2020 WL 4039315, at *11 (quoting *Attias v. Carefirst, Inc.,* 865 F.3d 620, 626 (D.C. Cir. 2017)).

## ARGUMENT

## I.   THE STATES LACK STANDING TO ASSERT COUNTS I AND II

### A.   The States Fail To Identify Cognizable Injuries Fairly Traceable to the Rescission of the 2014 GE Rule's Accountability Framework or Transparency Framework

As the States acknowledge, Am. Compl. ¶ 56, they challenge the rescission of two discrete regulatory frameworks. *Cf.* 79 Fed. Reg. at 64890 (2014 GE Rule separately established both an "accountability framework" and a "transparency framework"). In Count I, they challenge the rescission of the 2014 GE Rule's accountability framework, which addressed GE programs' continued eligibility for Title IV participation. *See* Am. Compl. ¶¶ 57-67, 160-71; *cf.* 79 Fed. Reg. at 64891. In Count II, they challenge the rescission of the 2014 GE Rule's transparency framework, which required schools to report certain information to the Department and to disclose information, to be identified by the Secretary, to prospective students. *See* Am. Compl. ¶¶ 68-70, 172-75; *cf.* 79 Fed. Reg. at 64891.

Because these two frameworks are "legally distinct," the States must establish standing separately for Counts I and II. *Town of Chester*, 137 S. Ct. at 1650 (plaintiff must demonstrate standing "for each claim he seeks to press"); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) (explaining that "the right to complain of one administrative deficiency" does not "automatically confer[] the right to complain of all administrative deficiencies"); *AFT*, 2020 WL 5257561, at *6 (holding that plaintiffs bringing similar challenges to 2019 Rule must establish standing separately for their challenges to the rescission of the 2014 GE Rule's accountability framework—which the court called the plaintiffs' Eligibility Claims—and transparency framework—which the court called the plaintiffs' Disclosure Claims); *United Food & Commercial Workers Union, Local No. 663 v. U.S. Dep't of Agric.*, 451 F. Supp. 3d 1040, 1051 (D. Minn. 2020) ("Although Plaintiffs are

challenging the Final Rule that contains both regulatory changes, the Court only has jurisdiction over the claims for which Plaintiffs have alleged an injury.").

.      As an initial matter, the States' asserted injuries appear to relate solely to Count I, not to Count II. For example, the States assert that their purported injuries "will happen both because without the GE Rule students will not receive warnings about failing programs" and because programs that might otherwise be identified as failing "may remain eligible to enroll students using Title IV aid." Am. Compl. ¶ 107; *see also id.* ¶ 139 (referencing "warn[ings]"). Both the "warnings" that the States describe and the possibility of losing Title IV eligibility arise under the 2014 GE Rule's accountability framework. *See* 79 Fed. Reg. at 64891 (accountability framework included process for calculating D/E rates as well as warnings); *see also* 34 C.F.R. § 668.410 (2019) (describing warnings required under the 2014 GE Rule). The transparency framework, on the other hand, as described above, has to do with GE programs' reporting requirements and with the Secretary's discretion to identify categories of information that programs must include in a disclosure template, as described in the former 34 C.F.R. § 668.412. *See* 79 Fed. Reg. at 6491, 64976. The Court may therefore dismiss Count II for lack of standing because the States make no attempt to identify any injury stemming from the rescission of the 2014 GE Rule's transparency framework.

Aside from that deficiency, regardless of whether the States seek to identify their alleged harms as stemming from the rescission of the 2014 GE Rule's accountability framework or its transparency framework or both, the Court's prior analysis in *Maryland* is directly applicable here. In *Maryland*, the plaintiff states similarly failed to attribute their alleged harm to any of the specific alleged final agency actions that they sought to challenge, instead relying on the Department's alleged failure, in general, to implement the 2014 GE Rule. *E.g.*, *Maryland*, 2020 WL 4039315, at

14

*12 (describing plaintiff states' "counterfactual that *hypothesizes*" a certain result "if the DOE had, in fact, implemented the GE Rule"). Here, although the final agency action at issue is different (the 2019 Rule's rescission, rather than pre-rescission decisions or failures to act), the supposed source of the State's alleged harm—the non-implementation of the 2014 GE Rule, or an equivalent accountability and transparency framework—is identical. Applying the Court's reasoning in *Maryland* to the States' allegations here compels the conclusion that the States fail to demonstrate standing for either Count I or Count II.

1.     **A speculative harm to States' investments in State-run schools is not a cognizable injury fairly traceable to the rescission**

The States first assert that the rescission of the 2014 GE Rule will lead to "increased competition" for "state-funded institutions of higher education" that will in turn harm the States' "investment in informed and productive residents." Am. Compl. ¶ 108. Essentially, this allegation rests on the assumption that the absence of the 2014 GE Rule increases the likelihood that students will enroll in proprietary GE programs rather than in higher education institutions run by the States, which the States contend will in turn cause them to lose federal funds, in the form of Pell grants provided to the additional students they assume would attend State-run schools, as well as the higher tax revenues that the States assert would be paid by those who attend State, rather than proprietary, programs. *See* Am. Compl. ¶¶ 123-24.

This asserted injury—which relies on the hypothetical decisions of future students, whose identities cannot possibly be known, to attend State-run schools—is purely speculative in multiple ways. As a starting point, we cannot know which, if any, GE programs might have been deemed ineligible, had the 2014 Rule remained in effect, nor can we know who will attend those programs, on what basis they will make their decisions, or where the future attendees of these unknown programs would have gone, hypothetically, if the programs had been deemed Title IV-ineligible

or had been identified as at risk of being deemed ineligible. There is therefore no basis to assume that any given individual who will, in the future, choose to attend a GE program at a proprietary school will be attending a program that would have been deemed ineligible under the 2014 GE Rule, nor that this unknown individual would instead have chosen to attend a State school if the proprietary program had actually been deemed ineligible. Such a hypothetical individual could instead have chosen to attend a different proprietary school, a non-profit school, a public school in a non-Plaintiff state, or no school at all.

In *Maryland*, the Court rejected the plaintiff states' assertions that their state-run schools would lose tuition dollars as too speculative to support standing. *Maryland*, 2020 WL 4039315, at *11-12. The Court reasoned that the states could not rely on an attenuated chain of possibilities, particularly where they were "contingent upon" decisions by independent third parties, including students themselves. *Id.* at *13. In particular, the Court observed that, under the states' theory, students would have to choose *not* to attend certain GE programs based on the effects of the 2014 GE Rule, and they would then have to choose to attend a state-run school instead, rather than "abandoning the prospect of higher education altogether." *Id.* at *12. The Court concluded that the states failed to identify a viable theory of standing because their theory rested "'on speculation about the decisions of independent actors.'" *Id.* at *13 (quoting *Clapper*, 568 U.S. at 414).

The 2019 Rule recognizes the very uncertainties that the Court in *Maryland* emphasized, noting that the Department "was unable to monetize" the impact of the rescission on future students because it was not possible to determine what choices students might have made if they had been displaced from a GE program deemed ineligible under the 2014 GE Rule. 84 Fed. Reg. at 31444. Such students  might have chosen a different proprietary or a non-profit program rather than a state program, might have ended up in a general studies program rather than a GE program, or might

instead have discontinued their education altogether. *See id.* The Department also recognized that the rescission would give students even more choices, allowing them to "seek out the information that interests them," and to "rely on their own judgement in choosing a program based on a variety of factors," including a program that, for "[w]hatever the reason," may not have remained Title IV-eligible under the 2014 Rule. *See* 84 Fed. Reg. at 31445. Although the States suggest that the Department, through this statement, "admit[ted]" that "more students will enroll in 'sub-optimal programs,'" Am. Compl. ¶ 107, they distort what the Department actually said, which again simply recognized that students will be able to choose which program they wish to attend, and to take into account the factors that they deem most important when making that choice. Because these choices cannot be known, the Department did not purport to predict what students would actually do, instead merely identifying possibilities while "encourag[ing] students to make informed enrollment decisions regardless of which institutions or programs they are considering, and regardless of whether the institution is proprietary, non-profit, or public." 84 Fed. Reg. at 31445.

The States' assertions in the Amended Complaint are, if anything, even more speculative than those this Court rejected in *Maryland*. Not only do the States rely on the same speculative chain of possibilities described in *Maryland*, but they rely on the further assumptions that the net fiscal impact of any additional students at State-run schools would be a gain for the States—a conclusion that the Court in *Maryland* recognized was far from clear since "the record evidence actually appears to contradict the States' premise that the diversion of students from state-run institutions to GE programs costs the States money," *Maryland*, 2020 WL 4039315, at *12 n.5. In fact, the 2014 GE Rule predicted the opposite. *Cf.* 79 Fed. Reg. at 65081 (predicting that, if students transferred from proprietary to public schools, "[s]tate and local governments may experience increased costs"). The States provide no evidence that higher enrollments in State-run programs

and higher receipts of Pell grants would have a net positive financial impact on the States' budgets. Rather, the States' descriptions of their budgetary allocations to State-run higher educational institutions, Am. Compl. ¶¶ 111-20, amount to a concession that the opposite is true. Clearly, State-run schools do not pay for themselves through tuition, including tuition subsidized by federal financial aid, but instead rely on subsidies from State legislatures.

The States' further assertion that students who would have attended State-run schools, but for the rescission of the 2014 GE Rule, would have gone on to earn more money than they will otherwise, and that, as a result, they would have paid more taxes to the States, Am. Compl. ¶ 124, cannot help them establish standing when the D.C. Circuit has held that "impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact to support state standing." *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976). Here, moreover, the States' assertion only further compounds the attenuated nature of the States' asserted injury. The speculative possibility that unidentified individuals will end up paying lower taxes to the States because of the rescission cannot possibly be deemed a "certainly impending" injury, *Clapper*, 568 U.S. at 410, when such individuals' future earnings, not to mention their tax liability and future residence, necessarily depend on a multitude of other unpredictable variables. In addition, States were operating their own schools before the 2014 GE Rule was ever in effect, and "the GE Rule was never fully implemented." *Maryland*, 2020 WL 4039315, at *15. Whatever return the States originally hoped to gain from their investment in State-run schools thus presumably remains unaffected by the rescission, which simply maintains the status quo. The Court therefore should reject this basis for standing for the same reasons explained in *Maryland*.

      2.      **The alleged waste of State financial aid funds and the costs of enforcing State laws against fraudulent GE programs are self-inflicted injuries not fairly traceable to the rescission**

The second and third categories of injury identified by the States were also squarely rejected by the Court in *Maryland*. Like the plaintiff states in *Maryland*, the States allege that the rescission will lead to the waste of State financial aid on students who choose to attend proprietary GE programs that are "worthless," and they also allege that the rescission will lead students to "call upon Plaintiff States" to "seek redress" from "substandard and predatory programs." Am. Compl. ¶ 108. These same harms were asserted in *Maryland*, and the Court correctly recognized that neither of them qualifies as a cognizable injury-in-fact fairly traceable to the non-implementation of the 2014 GE Rule. *Maryland*, 2020 WL 4039315, at *13. Instead, the States' own actions in creating these "self-inflicted" harms "break the causal chain," preventing them from supporting the States' Article III standing. *See id.*

With respect to the alleged waste of state financial aid, the Court correctly recognized that states are under no federal obligation to funnel state financial aid funds to students attending proprietary schools. *See id.* at *14. Instead, the plaintiff states "*voluntarily* opted to provide their residents with grants and student loans for educational purposes," so any resulting "loss or harm to the States' fiscs is a quintessentially self-inflicted wound." *Id.* Here as well, the Amended Complaint only confirms the voluntary nature of the States' investments in their own financial assistance programs. Am. Compl. ¶¶ 126-138. Nothing in the States' assertions suggests that the structure of their educational assistance programs is dictated by the Department. Any harms incurred by the States in connection with those programs are therefore necessarily self-inflicted. *See Maryland*, 2020 WL 4039315, at *14.

Similarly, with respect to the prospect of increased expenditures on investigating fraudulent

GE programs, the Court in *Maryland* concluded that any such burden was not attributable to the *Department*. *Id.* "Instead, *the States' legislatures* have presumably passed laws that protect consumers and that authorize the investigation and prosecution of fraudulent GE Programs, and the state officials who enforce such laws have elected to use their prosecutorial discretion to target, investigate, and prosecute GE Programs for running afoul of state law." *Id.* The Court also questioned whether "state expenditures of this nature actually qualify as *injuries* in any meaningful sense"—again, particularly because the plaintiff states "were apparently incurring losses with respect to financial aid loans and grants to students, and making the same types of investments to investigate fraudulent for-profit schools, before the federal government even conceived of the GE Rule." *Id.* at *15.

Here, the States attempt to bolster their assertion of injury on the basis of investigative expenditures by emphasizing the Department's prior references to states' roles in enforcing state consumer protection laws. *See* Am. Compl. ¶¶ 142-44. However, the Department's recognition, both in the 2019 Rule and elsewhere, of the fact that states have consumer protection laws, *see* 84 Fed. Reg. at 31403; 84 Fed. Reg. 58834, 58843 (Nov. 1, 2019), and even its incorporation of pre-existing state accreditation and enforcement processes in a *separate* set of regulations, 34 C.F.R. §§ 600.4(a)(3), 600.5(a)(4), 600.9(a)(1), should in no way change the Court's analysis of the 2014 GE Rule. Indeed, although the States assert that, pursuant to 34 C.F.R. § 600.9(a)(1), they "must expend resources to accept and 'appropriately act'" on students' complaints, Am. Compl. ¶ 152, § 600.9 merely sets forth conditions for determining whether a school is "legally authorized" for purposes of the school's eligibility for Title IV aid, including that the State in which the school is located "has a process" to act on complaints. *See* 34 C.F.R. § 600.9(a)(1). Nothing in this provision—which has nothing to do with the 2014 GE Rule or its rescission—imposes obligations

on states or purports to direct states' exercise of their enforcement discretion. As the 2019 Rule indicates, the Department has recognized states' enforcement role, with respect to consumer protection, before, during, and after the existence of the 2014 GE Rule. *See* 84 Fed. Reg. at 31403 (the Department "*will continue to* rely on States to exercise their consumer protection functions" (emphasis added)). The Court's observations in *Maryland* that the plaintiff states "were apparently . . . making the same types of investments to investigate fraudulent for-profit schools, before the federal government even conceived of the GE Rule," and that this investment was never affected by the 2014 GE Rule because the Rule "was never fully implemented," remains squarely on point. *See Maryland*, 2020 WL 4039315, at *15; Am. Compl. ¶ 145 ("both before the GE Rule took effect and during its nascence, Plaintiff States were active in policing the for-profit industry through enforcement actions necessitated by for-profit institutions' abusive practices").

Essentially, the States here continue to rely on "the curious assumption that a cognizable injury occurs for standing purposes if the federal government fails to come to the rescue when unscrupulous third parties (e.g., failing GE Programs) act in unsavory ways that the plaintiff itself feels compelled to address in the absence of federal action." *Maryland*, 2020 WL 4039315, at *15 n.7. Even if a "statutory right to," or "actual reliance" on, federal agency action might in some circumstances suffice to confer standing, here, as in *Maryland*, the States demonstrate neither. *See id.* They therefore fail to identify a cognizable injury-in-fact on this basis. *Cf. Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 483 (1982) ("[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning.").

> 3.     **The alleged reduction in State-run school enrollees' contributions to the States' overall economies is far too speculative to support the States' standing**

The fourth category of injury identified by the States is nothing but a reformulation of the first category, but on a more elaborate, and attenuated, scale. It therefore should be rejected for the same reasons described *supra* Part I.A.1. In this supposed fourth category, the States allege that the rescission will lead to more of their residents being "unable to fully contribute to Plaintiff States' economies." Am. Compl. ¶ 108. As further described in the Amended Complaint, the States essentially build on the notion that, absent the 2014 GE Rule, fewer students will attend State-run schools, and they posit that, as a further result of that alleged reduction in attendance, the States will not realize as significant a contribution to their general, State-wide economies from their State-run schools, or the graduates of those schools. *Id.* ¶¶ 153-59.

It would be difficult to overstate the speculative nature of the States' contentions. If the prospect of lower enrollments at State-run schools is itself speculative, as the Court in *Maryland* recognized that it was, *see supra* Part I.A1, the impact of that speculative reduced enrollment—on the number of people employed by State-run schools, on the businesses in areas surrounding those schools, or on the overall aggregate economy of a State—is far more so, adding even more attenuated links to the causal chain. The States acknowledge as much by pointing out that external factors such as the coronavirus pandemic and the current economic situation are likely to affect enrollments. Am. Compl. ¶ 158. Such factors would likely have a far greater impact on State economies independent of whether certain prospective students enroll in proprietary GE programs, State-run schools, or neither. Indeed, although the States cite documents purporting to estimate the alleged benefit of State-run school enrollments on some States' overall economies, *e.g.*, Am. Compl. ¶ 154 n.60 (citing Pennsylvania's 2020-21 Appropriations Request, at 9), none of these

documents identifies any supposed impact of the rescission of the 2014 GE Rule on the States' economies, nor do they make any attempt to identify per-student economic contributions, or divide such contributions according to an enrollee's course of study (although there is no way to know what courses of study, if any, hypothetical future attendees at proprietary GE Programs would have enrolled in, had they instead enrolled at a State-run school). The notion that the rescission of the 2014 GE Rule will affect the number of teachers or other staff employed at State-run schools is pure conjecture.

Moreover, although the States attempt to quantify the aggregate impact on their collective economies by suggesting that "over 134,000 students" graduated "between 2008 and 2012 from programs that were not passing" in the single year of debt-to-earnings rates that the Department conducted, and by estimating that those specific students had "over $2.7 billion in loan debt," Am. Compl. ¶ 156, they fail to acknowledge that their source was estimating the amount of Title IV loans, which are guaranteed by the United States. *See APSCU II*, 681 F.3d at 433 (explaining "schools receive the benefit of accepting [federal] tuition payments . . . regardless of whether" students repay their loans and that such failure to repay "shifts their tuition costs onto taxpayers"— meaning *federal* taxpayers). It is therefore unclear how significant any such debt burdens could be for the States even if the States' assertions were otherwise plausible. The same is true for the States' reliance on defaults of federal student loan debt, Am. Compl. ¶ 156, which again represents a cost to the federal government. Moreover, the States' reliance on calculations based on the single year of the Department's D/E rates is misleading because under the 2014 GE Rule, any GE program would have had to have failing or "in the zone" rates for at least two years before losing Title IV eligibility, so no GE program ever lost Title IV eligibility while the 2014 GE Rule was in effect, and it is unknown whether any programs would have lost eligibility, or which programs those might

have been. Nor do the States provide any meaningful way to extrapolate how many attendees at those programs would have ended up at State-run schools, had the 2014 GE Rule continued in effect, nor to calculate the supposed impact on States' overall economies from these numbers. Rather, the States merely speculate that hypothetical future proprietary school attendees who would have attended State-run schools would have a discernible impact on their overall economies. They fail to demonstrate that these assertions qualify as a cognizable injury-in-fact fairly traceable to the rescission.

**B.      Other Factors Show the States' Asserted Injuries Are Not Fairly Traceable to the 2019 Rule and Are Not Redressable**

**1.      The unavailability of SSA data prevented the Department from calculating D/E rates before the rescission of the 2014 GE Rule's accountability framework and forecloses any redress through this case**

In addition to the impossibility of predicting the conduct of independent third parties, other factors also show that the States' asserted injuries are not fairly traceable to the 2019 Rule and could not be redressed by setting that Rule aside. By requesting that the 2019 Rule be set aside, the States seek to resurrect the 2014 GE Rule's accountability framework, which is built upon the Department's calculation of debt-to-earnings rates for each GE program. But even before the accountability framework was rescinded, the Department was unable to complete these calculations for a second year. This is because, as this Court described in *Maryland*, the SSA declined to renew the MOU with the Department that had allowed it to provide the Department with aggregate earnings data for GE programs. *Maryland*, 2020 WL 4039315, at *8 & n.4; *see also* 84 Fed. Reg. at 31392 (acknowledging that "the Department is currently unable to calculate D/E rates"). On that basis, the Department had argued in *Maryland* that the plaintiff states' claims alleging unreasonable delays in the second year's D/E rate calculations were moot. *See Maryland*, 2020 WL 4039315, at *8.

For the same reasons, even if the States had otherwise asserted cognizable injuries that could be attributed to the Department's failure to continue calculating D/E rates, those injuries would not be fairly traceable to the rescission of the accountability framework, but instead would be the result of the Department's inability to complete those calculations even before the 2019 Rule went into effect. Essentially, the rescission did not change the status quo because the status quo before the 2019 Rule was that the Department was not calculating—and *could* not calculate—D/E rates for GE programs pursuant to the 2014 GE Rule.

Moreover, any such injuries are not redressable through this action because even if the rescission of the accountability framework were set aside, as requested in the States' Count I, the Department would remain unable to resume its calculations of D/E rates pursuant to the 2014 GE Rule. Jones Decl. ¶ 7 (explaining that the expiration of the MOU prevented the Department from completing the D/E rate calculations for a second year, and that "[t]he Department currently has no reason to expect that SSA will agree to renew its MOU in the future").[8] The court in *AFT*, considering the same issue, concluded that, due to the unavailability of SSA data, the plaintiffs' claims challenging the rescission of the 2014 GE Rule's accountability framework were not "'likely' to be redressed by a favorable outcome." *AFT*, 2020 WL 5257561, at *10. This Court should reach the same conclusion. As the court in *AFT* recognized, "[t]he use of SSA data was essential to the debt-to-earnings calculations, and the 2014 GE Rule did not allow the Secretary to

---

[8] Contrary to the States' contention, Am. Compl. ¶ 105, the statements in the Jones Declaration are consistent with the Department's statement in the 2019 Rule. As the declaration describes, the MOU expired on May 24, 2018. However, the SSA never provided the Department with "any written response confirming it would not renew the MOU." Jones Decl. ¶ 6. Ultimately, it became clear, from the SSA's oral communications and from the continued passage of time without the SSA renewing the MOU, that it had decided not to do so. However, the declaration does not suggest that the Department was aware of the SSA's decision during the negotiated rulemaking process or at the time it issued the Proposed Rule.

replace the SSA data with information from other sources." *Id.*; *cf.* 34 C.F.R. §§ 668.404(c)(1), .405(a)(3). Without SSA data, the Department therefore was unable to identify programs as "failing" or in the "zone" for a second year under the 2014 Rule, which in turn prevented any GE program from being deemed Title IV-ineligible. *See* 34 C.F.R. § 668.403. Similarly, even if the Court were to set aside the 2019 Rule, the Department could not simply return to calculating D/E rates under the 2014 Rule because such calculations are not possible without SSA data. 34 C.F.R. §§ 668.404(c)(1), .405(a)(3). The SSA is not a party to this case, and nothing in Title IV requires the SSA to cooperate with the Department in implementing the Department's regulations.

The situation here is thus analogous to that in *Lujan*, where the Supreme Court held the plaintiffs' claims not redressable because relief depended on other federal agencies not party to the suit, but those agencies would have no obligation to abide by the Court's ruling or the defendant agency's regulations. *See Lujan*, 504 U.S. at 569-71. Here, should the SSA continue—as it is free to do—to decline to enter into a new agreement with the Department, any prospect of reinstating some form of GE accountability framework would depend on the Department undertaking a new negotiated and administrative rulemaking process in order to determine how to proceed. But given that Title IV contains no unambiguous mandate that the Department establish a regulatory process to determine whether programs sufficiently prepare their students for gainful employment, *APC*, 107 F. Supp. 3d at 363; *APSCU II*, 110 F. Supp. 3d at 185-86, any prospect of a new rulemaking is itself speculative, as is the possibility that such a rulemaking would result in the re-establishment of a process like that set forth in the 2014 GE Rule. The States therefore cannot show that any alleged injury relating to the Department's rescission of the 2014 GE Rule's accountability framework would be redressable through this action.

26

> **2.    Because the Secretary had discretion to determine the content of any GE program disclosures pursuant to the 2014 GE Rule, the States cannot establish causation or redressability with respect to the rescission of the transparency framework**

A similar situation exists with respect to the Department's rescission of the 2014 GE Rule's transparency framework, and in particular the disclosure mechanism set forth in 34 C.F.R. § 668.412. Even aside from the States' failure to allege any injury resulting from the rescission of the transparency framework, which dooms their Count II at the outset, they also cannot show that any such injury is fairly traceable to the 2019 Rule or would be redressed if the Court were to set aside its rescission of the transparency framework. By its plain terms, § 668.412 does not require disclosure of specific information. While schools must use a disclosure template provided by the Secretary, there is no requirement that any specific category of information be included in that template. Rather, the regulation identifies potential categories of information that the Secretary "may include" in the template. 34 C.F.R. § 668.412(a). Thus, any decision regarding what the template must include is entirely up to the Secretary's discretion. *See id.* (providing that "[t]he Secretary identifies the information that must be included in the template"). Recognizing this, the court in *AFT* concluded that the plaintiffs there were unable to establish a cognizable informational injury, which requires a deprivation of information "that 'a statute requires the government or a third party to disclose' to them." *AFT*, 2020 WL 5257561, at *8 (quoting *Elec. Privacy Info. Ctr. v. U.S. Dep't of Commerce*, 928 F.3d 95, 103 (D.C. Cir. 2019)).

The other prongs of standing also cannot be satisfied. Even before the 2019 Rule rescinded the transparency framework, the Secretary had exercised the discretion granted by the regulation to simplify the template and omit several categories of information previously required, including

completion rates, loan repayment rates, and job placement rates.[9] To the extent the Amended Complaint is construed as alleging an injury due to the omission of such information from disclosures, such an injury therefore is not fairly traceable to the 2019 Rule but is instead the result of the Secretary's exercise of discretion under the 2014 GE Rule.

Similarly, as the court in *AFT* further held, there is also "a redressability problem" because even if the Court set aside the rescission of § 668.412, the Secretary would have no obligation to require programs to disclose any specific categories of information. *See AFT*, 2020 WL 5257561, at *8. Rather, the Secretary would still have full discretion under § 668.412(a) to determine what information should be included in programs' disclosures. *Cf. Marino v. NOAA*, 451 F. Supp. 3d 55, 60-61 (D.D.C. 2020) (where the defendant had discretion over disclosure, the fact that certain disclosures were required in the past does not confer a right to similar disclosures in the future). Significantly, the States fail to identify any information that the Secretary is "likely" to require in disclosures, *Spokeo, Inc*., 136 S. Ct. at 1547, if § 668.412(a) were reinstated, that is not already available through other tools provided by the Department—namely, the College Scorecard and Navigator. Indeed, the 2019 Rule contemplates that all Title IV schools will provide accurate information about their GE programs through the Department's College Scorecard. 84 Fed. Reg. at 31394, 31450 (indicating that College Scorecard would be expanded to include program-level data).[10] The States therefore cannot show that any asserted injury with respect to the 2019 Rule's

---

[9] *See* Dep't of Educ., EA #119 (May 9, 2019), *available at* https://ifap.ed.gov/gainful-employment-information-dear-colleague-letters-and-electronic-announcements.

[10] In accord with its stated intention, the Department has expanded the College Scorecard to provide program-level information. *See* Dep't of Educ., Press Release (Nov. 20, 2019), *available at* https://www.ed.gov/news/press-releases/secretary-devos-delivers-promise-provide-students-relevant-actionable-information-needed-make-personalized-education-decisions; *see also* http://collegescorecard.ed.gov .

rescission of the transparency framework is likely to be redressed by a favorable decision and thus fail to establish standing to assert Count II on this basis as well.

### C. The States Cannot Rely on *Parens Patriae* Standing To Bring APA Claims Against the Federal Government

The States assert in passing that "[r]epealing the GE Rule will harm students." Am. Compl. ¶ 6. But to the extent the States intend through this assertion to invoke *parens patriae* standing on behalf of their residents, their attempt cannot withstand the Court's contrary reasoning in *Maryland*, relying on Supreme Court and D.C. Circuit authority. *Maryland*, 2020 WL 4039315, at *19. As the Court in *Maryland* recognized, states generally lack standing as *parens patriae* when bringing suit against the federal government because, in such a circumstance, "'it is the United States, and not the [s]tate, which represents [the citizens] as *parens patriae*.'" *Id.* (quoting *Mellon*, 262 U.S. at 485-86); *cf. Snapp*, 458 U.S. at 609-10 & n.16 (recognizing that states' *parens patriae* standing to assert interests in the "health and well-being of [their] residents" is foreclosed in suits against the federal government).

One exception to this bar is when Congress expressly waives it. *See Maryland*, 2020 WL 4039315, at *20. However, such waivers are "decidedly rare" and must be "explicit" in the statutory text. *See id.* (citing *Md. People's Counsel v. FERC*, 760 F.2d 318, 321-22 (D.C. Cir. 1985)). This Court in *Maryland*, following D.C. Circuit authority in *Manitoba*, 923 F.3d at 181, properly rejected the notion that the APA provides such an express waiver. *See Maryland*, 2020 WL 4039315, at *20. "The APA never explicitly mentions a state or state agency, much less expressly authorizes a state or state entity to sue the federal government in their role as *parens patriae*," even though the *Mellon* bar had been in effect "for more than two decades by the time that the APA was enacted." *Id.*; *see United States v. Wells*, 519 U.S. 482, 495 (1997) ("[W]e presume that Congress expects its statutes to be read in conformity with this Court's precedents[.]"). *Parens patriae*

standing therefore is foreclosed here, just as it was in *Maryland*.

## II.   THE STATES LACK STANDING TO ASSERT COUNT III

The States also lack standing to assert Count III. In Count III, the States assert that the Department failed to disclose "research" in its notice of proposed rulemaking and "analysis" in the 2019 Rule itself. Am. Compl. ¶ 179. The States contend that this alleged failure qualifies as a violation of the requirement, set forth in 5 U.S.C. § 553, that an agency include in its notice of proposed rulemaking "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Am. Compl. ¶ 177 (quoting 5 U.S.C. § 553(c)). They also appear to suggest that this alleged failure qualifies as a "procedural" injury, *see id.*, which may qualify as a cognizable injury-in-fact where a plaintiff "can show that the agency failed to abide by a procedural requirement that was 'designed to protect some threatened concrete interest' of the plaintiff." *Kiakombua v. Wolf*, No. 19-CV-1872 (KBJ), 2020 WL 6392824, at *13 (D.D.C. Oct. 31, 2020) (quoting *Lujan*, 504 U.S. at 573 n.8).

For several reasons, the States' attempt to invoke the standing analysis applicable to procedural rights is misconceived. By asserting that the Department failed to disclose material upon which it relied, the States apparently seek to invoke the D.C. Circuit's critical-material doctrine, "which states that '[u]nder APA notice and comment requirements, among the information that must be revealed for public evaluation are the technical studies and data upon which the agency relies in its rulemaking.'" *Post Acute Med. at Hammond, LLC v. Azar*, 311 F. Supp. 3d 176, 184 (D.D.C. 2018) (quoting *Banner Health v. Price,* 867 F.3d 1323, 1336 (D.C. Cir. 2017)). Importantly, the rationale behind the critical-material doctrine is that an agency's "failure to disclose critical material, on which it relies, deprives commenters of a right under § 553 'to participate in rulemaking.'" *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).

The D.C. Circuit has thus recognized that an agency need not disclose every piece of data it considered, particularly where the ability to comment was not impaired, but only "the most critical factual material that is used to support the agency's position." *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999) (collecting cases finding failures to disclose did not qualify as procedural error).

In addition, some caution is appropriate when considering claims invoking this doctrine, given the Supreme Court's holding that § 553 "established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures." *Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc*., 435 U.S. 519, 524 (1978). Because 5 U.S.C. § 553 does not specify an obligation to disclose studies, the D.C. Circuit has recognized some "tension" between the Court's holding in *Vermont Yankee* and the critical-material doctrine. *Allina Health Servs.*, 746 F.3d at 1110; *see also Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 246 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (stating that the doctrine "cannot be squared with the text of § 553"). The court has thus "more carefully examined whether a failure to disclose such material actually harmed" a plaintiff. *Allina Health Servs*., 746 F.3d at 1110; *see also, e.g., Am. Radio Relay League, Inc*., 524 F.3d at 239 (emphasizing the "narrowness" of its holding under this doctrine). Here, the States fail to establish standing to raise Count III even under a procedural injury analysis.

### A.     The States Fail To Identify a Cognizable Procedural Harm Under the Critical Material Doctrine

The States fail to allege a cognizable injury within the scope of the critical material doctrine. For one thing, they do not assert that their ability to comment during the rulemaking process was impaired because they lacked access to critical internal studies or data referenced in the Proposed Rule that were not made public. Indeed, nowhere in Count III, or elsewhere in the

31

Amended Complaint, do the States attempt to draw a connection between an alleged lack of access to critical material and any procedural harm on the part of the States with respect to the rulemaking process that resulted in the 2019 Rule.

Instead, in regard to the Proposed Rule, the States simply allege that the Department failed to provide clear citations when referencing published research. *See* Am. Compl. ¶ 87 (citing Proposed Rule's reference to "[r]esearch published subsequent to the promulgation of the GE regulations"), *id.* ¶ 88 (acknowledging that a reference in the proposed rule to "[o]ther research findings" included a citation but alleging that the cited findings "did not relate to GE programs"). As for the final 2019 Rule, the States assert that they were unable to figure out what "analysis provided by Federal Student Aid, in 2018," the Department was referencing, Am. Compl. ¶ 97, when it stated that "42.2 percent of students currently enrolled at proprietary institutions had enrolled at a non-profit institution during a prior enrollment," 84 Fed. Reg. at 31398. However, the States do not identify this piece of information as critical, nor do they assert that their access to the underlying analysis would have meaningfully affected their ability to participate in the rulemaking process. And any such allegation would be dubious since, by the time the final 2019 Rule was issued, the comment period had already ended. The same is true in regard to the Department's reference to its own "analysis of the outstanding student loan portfolio" in response to a commenter's provision of a bibliography of other material. *See* Am. Compl. ¶ 97; 84 Fed. Reg. at 31403. Indeed, there is no indication in the 2019 Rule that the Department created a written "analysis" at all; rather, its use of the term "analysis" in response to the commenter suggests that it was simply referencing its own conclusions based on available information. The States thus fail to identify a cognizable procedural harm, and their attempt to invoke the critical-material doctrine

therefore should be rejected at the outset.[11]

**B.     The States Fail To Satisfy the Other Requirements for Procedural Standing**

In addition, the States fail to satisfy other applicable requirements of standing in the context

of a procedural injury. For one thing, violation of a procedural requirement, by itself, is insufficient

to establish an injury. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Rather, in

addition to asserting a procedural violation, a plaintiff must identify "some concrete interest that

is affected by the deprivation," *id.*, which must be "caused by the *substance* of [the challenged]

agency action." *City of Orrville v. FERC*, 147 F.3d 979, 986 (D.C. Cir. 1998) (internal quotation

omitted). In other words, the required concrete interest is the same Article III injury-in-fact

required in a traditional standing analysis. *See Summers*, 555 U.S. at 496–97 (2009) ("Unlike

redressability, . . . the requirement of injury in fact is a hard floor of Article III jurisdiction that

cannot be removed by statute."). In *City of Orrville*, the D.C. Circuit held that the plaintiff lacked

standing to assert a violation of its "'procedural right' to comment on certain documents" because

its asserted injury was too speculative to satisfy Article III requirements. *City of Orrville*, 147 F.3d

at 986. Here, the States similarly fail to identify a cognizable concrete interest for Count III for the

same reasons they fail to identify a cognizable injury-in-fact with respect to Counts I and II. *See*

*Ctr. for Biological Diversity v. Bernhardt*, No. 19-CV-02898 (APM), 2020 WL 5702087, at *9

(D.D.C. Sept. 24, 2020) (rejecting plaintiffs' standing to assert procedural violations based on

---

[11] The court in *AFT* has held that a similar claim brought by the *AFT* plaintiffs could proceed. *AFT*, 2020 WL 5257561, at *10-11. Although Defendants have not sought reconsideration of the *AFT* court's holding that the *AFT* plaintiffs' Count 11 alleged a procedural injury, Defendants disagree with the court's conclusion, issued without significant analysis, as well as with its decision that the *AFT* plaintiffs have standing to pursue this claim. Defendants have sought partial reconsideration with respect to the court's apparent failure to analyze whether the *AFT* plaintiffs had identified a cognizable concrete interest or satisfied the causation or redressability prongs of standing with respect to Count 11. *See AFT* ECF Nos. 38 (Def. Mot. for Partial Reconsideration), 42 (Def. Proposed Reply). Defendants' motion in that case remains pending.

court's prior conclusion that plaintiffs failed to identify cognizable injury-in-fact for substantive claims).

The States also cannot satisfy the causation or redressability prongs of standing for Count III. For a claim alleging a procedural deficiency, the plaintiff must show "at least two links"—that between the alleged procedural violation and "some substantive government decision that may have been wrongly decided" and that between "that substantive decision" and "the plaintiff's particularized injury." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305–06 (D.C. Cir. 2013) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (en banc)). With respect to the second link, the same traceability problems discussed above, with respect to the States' asserted injuries for purposes of Counts I and II, also prevent them from satisfying the causation requirement for purposes of their purported procedural claim.

The same is true with respect to redressability. Although the redressability requirement is "relaxed" for procedural claims, a plaintiff still must show some genuine possibility that its asserted injury will be remedied. *Narragansett Indian Tribal Historic Pres. Office*, 949 F.3d at 13. "[A] wholly speculative prospect of redress still does not pass muster." *Id.* Thus, in *Narragansett*, the D.C. Circuit held that the plaintiff failed to satisfy the redressability prong of standing for a procedural claim because the pipeline that the plaintiff had sought to halt had already been constructed before the case reached the Court of Appeals, so "fixing the alleged [procedural] defect . . . could not possibly prevent or mitigate the [asserted] harm." *Id.*

Here, as discussed above, the prospect that the redress sought by the States—setting aside the 2019 Rule and resurrecting the accountability and transparency frameworks of the 2014 GE Rule—would remedy the injuries they have asserted is wholly speculative. Count III is not redressable for the same reasons. To the extent Count III concerns the rescission of the

Case 1:20-cv-01719-KBJ   Document 27-1   Filed 01/21/21   Page 42 of 43


accountability framework,[12] there is no realistic prospect of resuming debt-to-earnings calculations in the absence of SSA data. *AFT*, 2020 WL 5257561, at *10.[13] Thus, even if the Court ultimately were to issue a remand to the Department to provide technical studies and data that the States assert are lacking, that would not result in the accountability framework being resurrected because, at the end of the day, there is no agreement in place between the Department and SSA, as would be required in order to calculate debt-to-earnings rates pursuant to the 2014 GE Rule. Similarly, to the extent Count III concerns the rescission of the transparency framework, the Secretary is under no obligation, even under the 2014 GE Rule, to require disclosure of more information than is already provided through the Department's Scorecard and Navigator tools, and the notion that different information would be disclosed is therefore entirely speculative. *AFT*, 2020 WL 5257561, at *8. The same is true with respect to any relief the Court might order to remedy any deficiency in the 2019 Rule's reasoning. The Court therefore should dismiss Count III for lack of standing even if it applies a procedural injury analysis.

## CONCLUSION

For the foregoing reasons, this case should be dismissed in its entirety with prejudice.

Dated: November 13, 2020                    Respectfully Submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

---

[12] *See* Am. Compl. ¶¶ 87-88 (asserting failure to identify research relating to debt-to-earnings data); *id.* ¶ 97 (citing discussion in 2019 Rule focused on importance of providing earnings data for all programs, not just GE programs).

[13] The court in *AFT* did not appear to apply its holding on redressability, or address redressability at all, when holding that the plaintiffs in those cases had shown standing to pursue certain procedural claims. For this reason, among others, Defendants have sought partial reconsideration of the *AFT* court's order, as noted *supra*.

_/s/ Kathryn L. Wyer_____
KATHRYN L. WYER
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Room 12014
Washington, DC  20005
Tel.: (202) 616-8475
Fax: (202) 616-8470
Email: kathryn.wyer@usdoj.gov
*Attorneys for Defendants*