**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> ELISABETH D. DEVOS, in her official capacity as Secretary of Education, *et al*., <br><br> Defendants. | No. 20-cv-1719 (KBJ) |

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    I.   The Higher Education Act's gainful employment requirement................................. 2

    II.  The Department's rulemaking for the Higher Education Act's gainful
         employment requirement ....................................................................................... 3

        A.  Enforcing the Higher Education Act's gainful employment
            requirement ...................................................................................................... 3

        B.  The 2019 Rule ................................................................................................... 7

    III. This litigation ........................................................................................................ 8

STANDARD OF REVIEW ................................................................................................ 9

ARGUMENT ..................................................................................................................... 9

    I.   The 2019 Rule will injure the States ................................................................... 10

        A.  The 2019 Rule deprives the States of revenue received through public
            institutions ...................................................................................................... 11

        B.  The 2019 Rule imposes greater oversight expenditures on the States ...................... 19

        C.  The 2019 Rule interferes with the States' support of higher education.................... 26

    II.  The States' injuries provide standing for the procedural claim ....................................... 28

    III. The States' injuries are redressable.............................................................................. 30

CONCLUSION.................................................................................................................. 36

# TABLE OF AUTHORITIES

## Cases

*Air All. Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) ........................................ 10, 11, 22, 25

*Am. Fed'n of Teachers v. DeVos*, No. 20-455, 2020 WL 5257561 (N.D. Cal. Sept. 3, 2020) ................................................................................................................................ 30

*Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193 (D.C. Cir. 2015) ........................... 28, 29

*Arias v. DynCorp*, 752 F.3d 1011 (D.C. Cir. 2014) ..................................................................... 18

*Ass'n of Private Sector Colleges & Univs. v. Duncan*, 870 F. Supp. 2d 133 (D.D.C. 2012) ...................................................................................................................... 4

*Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015) ....................... 5

*Ass'n of Private Sector Colleges & Univs. v. Duncan*, 110 F. Supp. 3d 176 (D.D.C. 2015) ...................................................................................................................... 5

*Banner Health v. Price*, 867 F.3d 1323 (D.C. Cir. 2017) .......................................................... 30

*Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1 (D.D.C. 2019) .......................................................... 33

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ................................................................. 23, 24

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................................. 24

*Clean Wisconsin v. EPA*, 964 F.3d 1145 (D.C. Cir. 2020) .................................................. 10, 13

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020) (en banc). ............................................................................................. 30, 32

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28 (D.D.C. 2019) .................................................................................................................... 25

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017) .......................................................... 32

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) .................................................... 15, 16

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) ............................................. 10

*Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019) .............................................. 10

*Grutter v. Bollinger*, 539 U.S. 306 (2003) ................................................................................. 26

*Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976 (D.C. Cir. 2017) ....................... 9, 11

*Little Sisters v. Pennsylvania*, 140 S. Ct. 2367 (2020) .................................................. 23

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .............................................................. 9

*Maryland v. U.S. Dep't of Educ.*, No. 17-2139, 2020 WL 4039315 (D.D.C. July 17, 2020) ......................................................................................................... passim

*Massachusetts v. Dep't of Health & Human Servs.*, 923 F.3d 209 (1st Cir. 2019)...................... 23

*\*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ....................................... 28, 29, 33

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656 (1993)........................................................................................... 32

*New York v. Dep't of Labor*, No. 20-CV-3020 (JPO), 2020 WL 4462260 (S.D.N.Y. Aug. 3, 2020) ...................................................................................... 17

*New York v. Mnuchin*, 408 F. Supp. 3d 399 (S.D.N.Y. 2019)...................................... 17

*New York v. Scalia*, 464 F. Supp. 3d 528 (S.D.N.Y. 2020) .................................... 17, 25

*Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) ............................................ 18

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976) ............................................... 23, 24

*Pennsylvania v. President*, 930 F.3d 543 (3d Cir. 2019) ........................................... 23

*Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316 (2008)...................... 23

*Plyler v. Doe*, 457 U.S. 202 (1982)............................................................................ 26

*Selective Serv. Sys. v. Minnesota Pub. Interest Research Grp.*, 468 U.S. 841 (1984)........................................................................................................... 26

*\*Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719 (D.C. Cir. 2015) .................................................................................................... 32, 34

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............................................... 22

*Utah v. Evans*, 536 U.S. 452 (2002) ........................................................................ 32

*\*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) .......................................... 17, 18, 24

## Constitutional Provisions

R.I. Const. art. XII, sec. 1 .................................................................................... 26

## Statutes

110 ILCS 979/5 ......................................................................................................... 26

20 U.S.C. § 1001 .................................................................................................... 3, 20

20 U.S.C. § 1002 .................................................................................................... 2, 3

20 U.S.C. §§ 1070–1099d ........................................................................................ 2

C.R.S. § 23-3-102 ................................................................................................... 26

Minn. Stat. § 135A.011 ........................................................................................... 26

Minn. Stat. § 136A.61 ............................................................................................. 26

N.J. Stat. Ann. § 18A:71B-82 .................................................................................. 27

ORS 350.001 ........................................................................................................... 27

## Rules and Regulations

34 C.F.R. § 600.1 .................................................................................................... 20

34 C.F.R. § 600.4(a)(3) ............................................................................................ 20

34 C.F.R. § 600.9(a)(1) ....................................................................................... 20, 21

74 Fed. Reg. 24,728 (May 26, 2009) ......................................................................... 4

76 Fed. Reg. 34,386 (June 13, 2011) ......................................................................... 4

79 Fed. Reg. 64,890 (Oct. 31, 2014) ............................................................... 4, 5, 35

83 Fed. Reg. 40,167 (Aug. 14, 2018) ......................................................................... 7

84 Fed. Reg. 31,392 (July 1, 2019) ................................................................... passim

84 Fed. Reg. 58,834 (Nov. 1, 2019) ......................................................................... 21

## Other Authorities

Am. Compl., *Maryland v. U.S. Dep't of Educ.*, No. 17-2139 (June 22, 2018) (ECF
    No. 65-2) .......................................................................................................... 6

Federal Student Aid, Title IV Program Volume Reports, 2019-2020 New
    Disbursements by Location (Sept. 30, 2020) ............................................. 2, 15, 21

Federal Student Aid, Title IV Program Volume Reports, Award Year Summary by School Type (last visited Dec. 3, 2020) ...................................................................... 16, 21

Transcript of Oral Argument, *Little Sisters of the Poor Saints Peter and Paul Home*, 140 S. Ct. 2367 (2020) (Nos. 19-431 & 19-454) ........................................................ 23

U.S. Dep't of Educ., *Education Department Releases Final Debt-to-Earnings Rates for Gainful Employment Programs*, "Disclosure Template," (Jan. 9, 2017) ......................................................................................................................... 6, 35

U.S. Dep't of Educ., Gainful Employment Disclosure Template (last visited Dec. 3, 2020) ............................................................................................................................. 35

U.S. Senate, Health, Education, Labor and Pensions Committee, *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (July 30, 2012) .............................................................................. 24

# INTRODUCTION

The Department of Education has stopped enforcing the statutory requirement that higher education programs run by for-profit companies may receive federal financial aid only if the programs "prepare students for gainful employment in a recognized occupation." *See generally* 84 Fed. Reg. 31,392 (July 1, 2019) ("2019 Rule"). The consequences of the Department's action are predictable: more students will enroll in "sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both." *Id.* at 31,445.

The effect of those enrollment decisions on the plaintiff States is equally predictable. With more students enrolling in worthless programs, a greater number will forgo educational opportunities at public institutions. Decreased enrollment at public institutions diminishes the financial benefits that accrue to the plaintiff States when students enroll in those institutions. At the same time, by abandoning its own responsibilities, the Department pushes a greater share of responsibility for overseeing higher education onto the States. That oversight is costly, and many of those costs will be incurred complying with the States' obligations under federal law. Finally, much like the federal government, the States invest in higher education. That financial support helps realize a vital function of state government, which is to make the benefits of education broadly accessible. The 2019 Rule will cause much of that investment to go to waste.

Each of these harms independently establishes the States' standing in this case. The Department's arguments against standing all are uniquely flawed, but they also all share one common defect: they miss that this is a case challenging the 2019 Rule and not one to enforce any other agency action. Therefore, standing depends on how the 2019 Rule affects the States. For that reason, and others, this Court's decision in *Maryland v. United States Department of*

*Education*, No. 17-2139, 2020 WL 4039315 (D.D.C. July 17, 2020), on which the Department's motion to dismiss heavily relies, is only marginally relevant here.

At bottom, the 2019 Rule will injure the States, and vacating the 2019 Rule will redress those injuries. That establishes the States' standing. So the Department's motion to dismiss must be denied.

## BACKGROUND

### I.   The Higher Education Act's gainful employment requirement

Title IV of the Higher Education Act of 1965, as amended, provides the architecture for federal financial aid in support of students attending institutions of higher education. *See* 20 U.S.C. §§ 1070–1099d. Last year, the Department delivered nearly $48 billion in Title IV aid for students enrolled in institutions of higher education located in the plaintiff States. *See* Federal Student Aid, Title IV Program Volume Reports, 2019-2020 New Disbursements by Location (Sept. 30, 2020) ("Location Report").[1] That financial support opens higher education to those who might not otherwise be able to afford it.

The Higher Education Act also sets federally enforceable criteria for which institutions qualify as institutions of higher education, both generally and specifically for eligibility to receive Title IV aid. 20 U.S.C. §§ 1001–1002. For eligibility for Title IV aid, the Higher Education Act creates three classifications of institutions: (1) "public or other nonprofit"; (2) "proprietary"; and (3) "postsecondary vocational." *Id.* § 1002(a); *see also id.* § 1001(a)(4). Because institutions keep federal aid even if students cannot make required repayments on any loans, the Higher Education Act imposes safeguards to guard against ineffective institutions enrolling students who receive Title IV aid. For proprietary institutions and postsecondary

---

[1] https://studentaid.gov/data-center/student/title-iv.

2

vocational institutions, initial eligibility to receive Title IV aid depends on whether the institution "provides an eligible program of training to prepare students for gainful employment in a recognized occupation." *Id.* § 1002(b)(1)(A)(i), (c)(1)(A); *see also id.* § 1088(b)(1)(A)(i). So programs offered by proprietary or vocational institutions often are referred to as gainful employment programs. Proprietary institutions are run as for-profit entities. *Id.* § 1002(b)(1)(C).

The Higher Education Act also assigns oversight roles to various actors. An "institution of higher education" is one that, among other things, "is legally authorized within such State to provide a program of education beyond secondary education." *Id.* § 1001(a)(2); *see also id.* § 1002(b)(1)(B), (c)(1)(B). And, with some exceptions, institutions of higher education must be accredited by a nationally recognized agency. *Id.* §§ 1001(a)(5), 1002(b)(1)(D), (c)(1)(B). The three entities that share regulatory responsibility for higher education—the federal government, States, and private accreditors—are commonly referred to as "the triad." *See*, *e.g.*, 84 Fed. Reg. at 31,403.

## II.   The Department's rulemaking for the Higher Education Act's gainful employment requirement

### A.   Enforcing the Higher Education Act's gainful employment requirement

Title IV aid supports students attending public schools, non-profit schools, and schools operated by for-profit companies. That aid is a particularly important revenue stream for for-profit institutions, comprising 70% of total revenue for some. Am. Compl. ¶ 42 (ECF No. 22). Yet, for much of the last decade, at least, graduates of programs operated by those companies have been more likely than their counterparts to default on federal loans. *Id.* ¶¶ 43–44. Often those defaults reflect an institution prioritizing profits over student success, even resorting to fraud and misconduct. *Id.* ¶¶ 44–47.

Poor outcomes for graduates of for-profit programs that received Title IV aid exhibited that the Department historically had been distributing money to many programs that did not satisfy the Higher Education Act's gainful employment requirement. In 2009, the Department announced its intention to address this issue by improving enforcement of the gainful employment requirement. 74 Fed. Reg. 24,728 (May 26, 2009). The Department's first effort to do so culminated in a rule issued in 2011. 76 Fed. Reg. 34,386 (June 13, 2011). At that time, the Department explained that "significant advances in electronic reporting and analysis now allow the Department to collect accurate and timely data that could not have been utilized in the past." *Id.* at 34,392–393. Analysis of the new data would "provide the Department, students, and the institutions offering these programs with information about how well the programs are performing under the measures," enabling the Department to create a metrics-based approach to define what it means for a program to "prepare students for gainful employment in a recognized occupation." *Id.* at 34,393. With those data, the Department could "give[] meaning to an undefined statutory term, thereby fulfilling the Department's duty to enforce the provisions of the [Higher Education Act] in a clear and meaningful way." *Id.* That rule, however, was vacated because one inextricable component was unsupported by the administrative record. *See generally Ass'n of Private Sector Colleges & Univs. v. Duncan*, 870 F. Supp. 2d 133 (D.D.C. 2012).

After starting over, the Department promulgated a new rule in 2014. *See generally* 79 Fed. Reg. 64,890 (Oct. 31, 2014) ("2014 Rule"). The 2014 Rule had two complementary pieces. One aspect of the 2014 Rule—called the accountability framework—tied a program's eligibility for Title IV aid to a metrics-based method of evaluating whether the program prepared its graduates for gainful employment. Under the accountability framework, gainful employment programs lost eligibility to receive Title IV aid if, for successive years, the average graduates'

debt exceeded a certain percentage of earnings. *Id.* at 65,018–019. The Department collected

earnings data from the Social Security Administration. *Id.* If a program had disqualifying "debt-

to-earning" rates and was in danger of becoming ineligible for Title IV aid, it needed to alert its

enrolled and prospective students. *Id.* at 65,012–013.

The other aspect of the 2014 Rule—called the transparency framework—was designed to

"increase the quality and availability of information about the outcomes of students enrolled in

GE programs." *Id.* at 64,890. For each of its gainful employment programs, an institution had an

annual obligation to report to the Department information about enrollment in the program,

average loans and debt for the program's students, and job placement rates, among other

information. *Id.* at 65,013. Institutions also had to complete a template with information about

each of its programs, which would be disclosed to enrolled and prospective students. *Id.* The

Secretary had final say over what information institutions would have to disclose, but the

Secretary's judgment was to be informed by "consumer testing" that would "determine how to

make the disclosure template as meaningful as possible." *Id.* Institutions had to disclose all

required information on any of its webpages that discussed admissions to its programs or its

programs' costs, as well as in promotional materials and directly to prospective students. *Id.* at

65,014–015. Through these disclosures, students received information that warned them when

enrolling in a certain program would be imprudent.

Two industry groups challenged the 2014 Rule. In each case, the rule was upheld

entirely. *See Ass'n of Private Sector Colleges & Univs. v. Duncan*, 110 F. Supp. 3d 176 (D.D.C.

2015); *Ass'n of Proprietary Colleges v. Duncan*, 107 F. Supp. 3d 332 (S.D.N.Y. 2015).

In 2017, the 2014 Rule's first effective year, the Department identified over 2,000

programs, almost all operated by for-profit companies, that were not preparing students for

gainful employment as the Higher Education Act demands. Am. Compl ¶ 73. And the

Department's first disclosure template required that institutions share information about what

percentage of any of its program's students graduate on time, the program's costs, what

percentage of students typically borrow money to enroll, a typical graduate's total debt, monthly

loan payments, and annual earnings, what percentage of graduates are employed and the fields

they work in, and whether the program satisfies professional licensure requirements. *See* U.S.

Dep't of Educ., *Education Department Releases Final Debt-to-Earnings Rates for Gainful*

*Employment Programs*, "Disclosure Template" (Jan. 9, 2017).[2] So for the first time students had

access to uniform, reliable, and program-level information that could warn against harmful

enrollment decisions. Am. Compl. ¶ 75. After the Department started enforcing the Higher

Education Act's gainful employment requirement, many educational programs run by for-profit

companies closed. *See* 84 Fed. Reg. at 31,437–438.

Soon after a change in presidential administration, the Department delayed several of the

2014 Rule's annual compliance deadlines and stopped fulfilling its own obligations under the

rule. Am. Compl. ¶¶ 80–83. Many of the States that are plaintiffs here, and some that are not,

brought a suit challenging those delays and seeking an order that the Department enforce the

2014 Rule. *See* Am. Compl., *Maryland v. U.S. Dep't of Educ.*, No. 17-2139 (June 22, 2018)

(ECF No. 65-2). That suit was eventually dismissed for lack of standing. *See generally*

*Maryland*, 2020 WL 4039315, *appeal docketed*, *Maryland v. U.S. Dep't of Educ.*, Nos. 20-5268

& 20-5283 (D.C. Cir.).

---

[2] https://www.ed.gov/news/press-releases/education-department-releases-final-debt-earnings-rates-gainful-employment-programs.

### B.  The 2019 Rule

At the same time the Department was failing to enforce the 2014 Rule, the Department issued a notice of proposed rulemaking in which it proposed repealing the 2014 Rule without promulgating any replacement. 83 Fed. Reg. 40,167 (Aug. 14, 2018). Shortly before the Department issued that notice, the agreement that permitted the Social Security Administration to share with the Department data used for calculating debt-to-earning rates expired. *See* Jones Decl. ¶ 6, Attachment to Defs.' Mot. to Dismiss. Before that agreement expired, the Social Security Administration had turned down the Department's request to renew the agreement. *Id.* The Social Security Administration informed the Department that it did not intend to renew the data-sharing agreement after members of Congress had called for an investigation into the Department's use of the data it received. *Id.* ¶ 5.

Almost a year after issuing its proposed rule, the Department finalized the 2019 Rule. *See generally* 84 Fed. Reg. 31,392. The 2019 Rule eliminated the 2014 Rule, purportedly based on concerns about how the 2014 Rule operated, that rule's effects, and the Department's ability to enforce that rule without data from the Social Security Administration. *Id.* at 31,392–394. The 2019 Rule also cemented the Department's position that it need not promulgate any other enforceable definition of what it means to "prepare students for gainful employment in a recognized occupation" in lieu of the 2014 Rule. *Id.* at 31,401–403.

In the 2019 Rule, the Department acknowledged concerns that because of the rule "some students would be more likely to make poor educational investments," *id.* at 31,394, and also that because the Department would no longer condition eligibility for Title IV aid on compliance with the Higher Education Act's gainful employment requirement, "some students may choose sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both," *id.* at 31,445. The Department

further remarked that "this could lead to greater difficulty in repaying loans, increasing the use of income-driven repayment plans or risking defaults and the associated stress, increased costs, and reduced spending and investment on other priorities." *Id.*

Despite these concerns, the Department discounted the 2019 Rule's detrimental effect on student outcomes because the Department would "*continue to rely on States to execute their consumer protection functions* and accrediting agencies to evaluate program quality so that the regulatory triad will retain its importance and shared responsibility in the oversight of institutions of higher education." *Id.* at 31,403 (emphasis added). Also, the Department disagreed with comments stating that the 2019 Rule eliminated all program-level review of programs once subject to the 2014 Rule, noting that accreditors and States would perform those evaluations. *Id.*

The Department estimated that the 2019 Rule will cost the federal government $6.2 billion over the next ten years, primarily because programs that would have become ineligible to receive Title IV aid will remain eligible for that funding with the Department now declining to enforce the gainful employment provision. *Id.* at 31,447.

## III.   This litigation

The States filed this action shortly before the 2019 Rule's effective date. *See* Compl. (ECF No. 1). Afterward, this Court entered a scheduling order for the parties to brief the States' standing in light of this Court's decision in *Maryland*. *See* Min. Order. (Aug. 19, 2020).

Consistent with that order, the States amended the complaint. *See* Am. Compl. The amended complaint charges that the 2019 Rule violates the Administrative Procedure Act's substantive and procedural limits on agency rulemaking. The 2019 Rule does so because it announces that the Department will no longer give the Higher Education Act's ambiguous gainful employment provision an enforceable definition, a decision that is an unjustified change for the Department and contrary to law. Am. Compl. ¶¶ 163–166, 175. And the 2019 Rule

8

eliminated the 2014 Rule based on arbitrary concerns about that rule, and without considering

either alternatives or any reliance interests that the 2014 Rule had engendered. *Id.* ¶¶ 167–171,

175. Plus, the 2019 Rule relied on unidentified analyses. *Id.* ¶ 179. The States have asked that the

2019 Rule be declared unlawful and set side. *Id.* at 57.

The Department has now moved to dismiss the amended complaint under Federal Rule of

Civil Procedure 12(b)(1). *See* Defs.' Mot. to Dismiss; *see also* Defs.' Mem. Supp. Mot. to

Dismiss ("Defs.' Mem.").

## STANDARD OF REVIEW

Jurisdiction, like any part of a plaintiff's case, must be established with only the "manner

and degree of evidence required" for the stage of litigation at which jurisdiction has been

challenged. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Thus, when jurisdiction is

challenged through a motion under Federal Rule of Civil Procedure 12(b)(1), the Court must

accept all facts alleged in the complaint as true and draw reasonable inferences in favor of the

plaintiff. *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976, 980 (D.C. Cir. 2017).

## ARGUMENT

Because of the 2019 Rule, programs of higher education that fail to prepare students for

gainful employment will be eligible to receive Title IV aid despite the Higher Education Act's

contrary direction, and students will be without ready access to information that warns which

programs are unlikely to prepare them for a successful career. *See* Am. Compl ¶¶ 106–07, 122,

139.[3] As a result, more students will enroll in "sub-optimal programs" that "have demonstrated a

---

[3] The Department insists that the States have alleged injuries as a consequence only of substandard
programs' continued eligibility for Title IV aid. Defs.' Mem. at 14. But that does not accurately describe the
amended complaint. As alleged, the injuries flow from continued eligibility for Title IV aid and also from the
Department's decision that students will no longer receive information that warns them when enrolling in a certain
program might be harmful. *See* Am. Compl. ¶ 122; *see also id.* ¶¶ 106–07, 139. When the Department enforced the
Higher Education Act's gainful employment requirement through the 2014 Rule, the information that warned
students against bad decisions came both from disclosures under the 2014 Rule's transparency framework and

lower return on the student's investment, either through higher upfront costs, reduced earnings, or both." 84 Fed. Reg. at 31,445.

Those enrollment decisions will harm the States. First, increased competition from for-profit programs that do not satisfy the Higher Education Act's gainful employment requirement diverts money away from the States' public institutions and impedes the financial benefits that the States receive from enrollment at those schools. Second, the 2019 Rule imposes on the States greater oversight responsibility for higher education. Third, the Department's abdication of its own oversight responsibilities wastes the States' financial support for higher education. Each harm is a consequence of the 2019 Rule, redressable through a favorable ruling here, and so each supplies a basis for standing. No hypothetical reason that the Department may not be able to fully enforce the 2014 Rule if the 2019 Rule is set aside defeats jurisdiction.

## I.    The 2019 Rule will injure the States

A plaintiff has standing to sue when it has suffered a concrete, particularized injury, that the defendant caused, and which the court can redress. *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1058 (D.C. Cir. 2018). Like any other litigant, a state may have standing if injured directly. Harm to a state's "economic, environmental, or administrative interests as a result of federal action may" confer "standing to sue the federal government." *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020).[4] And when a plaintiff's injuries are economic, the harm need not be sizeable; "some" harm suffices. *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019). That harm can give rise to standing if already incurred or if the harm is either

---

specific notices that students would have received if considering enrolling in a program that did not pass the 2014 Rule's eligibility metrics.

[4] Sometimes states assert standing to vindicate sovereign or quasi-sovereign interests. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 178 (D.C. Cir. 2019). When a state seeks to vindicate a quasi-sovereign interest, it often is acting as *parens patriae* for its injured citizens. *Id.* The Department argues that the States may not sue the federal government in this capacity. Defs.' Mem. at 29–30. The States, however, have not advanced a theory of *parens patriae* standing.

certainly impending or there is a substantial risk it will occur. *Air Alliance*, 906 F.3d at 1058.

The 2019 Rule causes three qualifying injuries.

### A.  The 2019 Rule deprives the States of revenue received through public institutions

The effect of the Department declaring that it need not enforce the Higher Education

Act's gainful employment requirement is predictable. Because of the 2019 Rule, many students

who would have enrolled in a community college, public university, or public college will

instead enroll in ineffectual for-profit programs. Enrollment at public institutions of higher

education produces economic benefits for the States through tuition payments, federal money

that is distributed commensurate with enrollment, and increased income tax revenue. Therefore,

depressing enrollment at those institutions harms the States. Am. Compl. ¶¶ 109–124, 153–159.

At this stage, standing may be supported by these plausible allegations. *Johnson*, 869

F.3d at 980. Still, the record assembled by the States further exhibits the certainty of this injury.

The record includes the declaration of Dr. Stephanie Cellini, who specializes in the economics of

higher education and whose work was discussed heavily in both the 2014 and 2019 Rules. Dr.

Cellini has extensively researched what happens when the Department identifies, and merely

threatens to withhold federal aid from, poor-performing higher-education programs. *See* Cellini

Decl. (Ex. 1) ¶¶ 2, 5–6. Historically, in such a case, enrollment at those programs has declined.

*Id.* ¶¶ 6–8. Based on data taken from every county in the country between 1991 and 2000, the

average for-profit program lost about 226 students when identified as having loan default rates

above a certain threshold and when put at risk of losing federal aid. *Id.* ¶¶ 7–8. Sixty-eight

percent of departing students, rather than forgoing an education, enrolled in public institutions.

*Id.* ¶¶ 8–9. Many students opted to enroll in community colleges, which directly compete with

many for-profit programs and generally have open-enrollment policies. *Id.* ¶ 9 n.2; *see also* Cruz

Decl. (Ex. 2) ¶¶ 7, 11 (noting open-enrollment policy and competition between community colleges and for-profit programs); Dulude Decl. (Ex. 3) ¶¶ 10, 16–20 (same); Malatras (Ex. 4) Decl. ¶¶ 5, 12–14; Oyadomari-Chun Decl. (Ex. 5) ¶¶ 8, 14–18 (same); Sannicandro Decl. (Ex. 6) ¶¶ 5–6, 9–12 (same) *and* Durham Decl. (Ex. 7) ¶ 12 (noting open-enrollment policy); Rose Decl. (Ex. 8) ¶ 9 (same); Saavedra Decl. (Ex. 9) ¶ 11 (same). The movement from poor-performing programs to public institutions was directly caused by the Department's oversight. Cellini Decl. ¶ 10.

First-hand accounts confirm Dr. Cellini's research. Many students who enroll in for-profit programs decide between that option and a public institution. Alexander Decl. (Ex. 10) ¶ 5; Bailey Decl. (Ex. 11) ¶¶ 3, 5; Green Decl. (Ex. 12) ¶¶ 4, 7; Ford Decl. (Ex. 13) ¶ 4; Miller Decl. (Ex. 14) ¶ 11; Romero Decl. (Ex. 15) ¶¶10, 21; Rosenwald Decl. (Ex. 16) ¶ 8; Schwarm Decl. (Ex. 17) ¶ 6; Tibbits Decl. (Ex. 18) ¶ 7. When students decide between those options, they consider whether a program actually prepares its graduates for professional success. Alexander Decl. ¶¶ 6, 9; Bailey ¶¶ 4, 6–7; Green Decl. ¶¶ 5–9; Ford Decl. ¶ 6 ; Miller Decl. ¶¶ 7, 12–15; Romero Decl. ¶¶ 6, 11, 13, 19; Rosenwald Decl. ¶¶ 4, 9; Schwarm Decl. ¶¶ 7–8; Tibbits Decl. ¶¶ 2, 4–5, 8. Thus, because of the 2019 Rule the Department will not enforce a statutory provision that, when enforced, provides students with useful warnings against enrolling in for-profit programs that do not deliver what they promise. Bailey Decl. ¶ 7; Green Decl. ¶¶ 5–9; Ford Decl. ¶¶ 10–13; Miller Decl. ¶¶ 12–13; Romero Decl. ¶¶ 17–21; Rosenwald Decl. ¶ 9; Schwarm Decl. ¶ 14.

The Department calls the 2019 Rule's effect on student behavior "purely speculative." Defs.' Mem. at 15. But the Department identifies nothing that undermines the record compiled on this point. The closest the Department gets is noting that it had been "'unable to monetize' the

impact of the rescission on future students because it was not possible to determine what choices students might have made if they had been displaced from a GE program deemed ineligible under the 2014 GE Rule." Defs.' Mem. at 16 (quoting 84 Fed. Reg. at 31,444). First, that conclusory statement does not contradict Dr. Cellini's declaration, nor any other evidence the States present. Second, the 2019 Rule itself acknowledges that, generally, students "who lose access to a GE program will end up in a community college general studies program." 84 Fed. Reg. at 31,444. The Department did not monetize the rule's effect on enrollment decision only because the Department did not attempt to determine *how many* people displaced from a for-profit program would have ended up in a public institution, and could not say whether students enrolling instead in for-profit programs is a net positive or negative. *Id.*

Because the Department responds to the record with only conclusory assertions, this case is much like *Clean Wisconsin v. EPA*. There, Illinois and Chicago challenged agency action that allegedly would damage their parks, which they documented through an expert declaration. *Clean Wisconsin*, 964 F.3d at 1158–59. On that declaration alone, Illinois and Chicago established their standing. *Id.* at 1159. Like the Department here, the EPA had questioned the factual predicate for Illinois and Chicago's injury, but the EPA "never directed [the court] to evidence in the administrative record refuting petitioners' factual claims." *Id.* at 1160. As in *Clean Wisconsin*, Dr. Cellini's unrebutted declaration alone suffices to establish what students will do because of the 2019 Rule. Of course, the record here is more comprehensive than in *Clean Wisconsin* as Dr. Cellini's declaration is corroborated by declarations from students and public institutions alike.

Now that the record demonstrates that the 2019 Rule will depress enrollment in public institutions, this case also is materially different than *Maryland*. In *Maryland*, this Court

concluded the record did not support the States' alleged injuries. *Maryland*, 2020 WL 4039315, at \*12 ("[T]he record evidence in this case does not necessarily or directly support this contention."); *id.* at \*13 ("[T]he States provide no evidence that the students who attend GE Programs and the admissions departments at state-run institutions will act predictably in the absence of information regarding the status of the GE Programs . . . ."); *id.* ("[A] successful showing of Article III standing requires significantly more than just the 'common sense' beliefs upon which the States' injury argument here."). Moreover, this case no longer depends on theorizing a counterfactual to the agency's non-enforcement of the 2014 Rule. *Id.* at \*12. Rather, the States are challenging discrete agency action—the 2019 Rule. And the record shows the predictable consequences of that rule.

What is more, even to the extent the circumstances here are like those in *Maryland*, the earlier conclusion that any anticipated movement from for-profit programs to public institutions is too speculative, respectfully, injects too much distance between the challenged agency action and its predictable consequences. In *Maryland*, this Court identified five assumptions that separate the failure to enforce the Higher Education Act's gainful employment provision and the States' injuries, as well as two sets of independent decision makers on which those assumptions depend. *Maryland*, 2020 WL 4039315, at \*12–13. One identified assumption was that admissions officers at public institutions would admit any student who left a for-profit program. *Id.* at \*12. Yet community colleges, where many students who turn away from for-profit programs will enroll, have open-enrollment policies. Cruz Decl. ¶ 7; Dulude Decl. ¶ 10; Durham Decl. ¶ 12; Malatras Decl. ¶ 5; Oyadomari-Chun Decl. ¶ 8; Rose Decl. ¶ 9; Saavedra Decl. ¶ 11; Sannicandro Decl. ¶¶ 5–6. Admissions departments, then, are not an independent actor relevant

to the States' theory, and favorable admissions decisions are not an assumption on which standing depends.

Three of the remaining assumptions that the Court identified—whether students would choose not to attend failing for-profit programs, whether they would apply to state institutions instead, and whether they would enroll having already decided to apply—all speak to a single question: What is the connection between enforcing, or not, the Higher Education Act's gainful employment requirement and student enrollment decisions? Unlike in *Maryland,* the record now demonstrates that, because of the 2019 Rule, fewer students will enroll in public institutions. And when agency action will affect a large group of people, whether those people "will likely react in predictable ways" is the relevant consideration. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). Accordingly, the record need not identify specific students affected by the 2019 Rule. *Contra* Defs.' Mem. at 15–16.

Decreasing enrollment in from public institutions, as the record shows the 2019 Rule will do, will economically harm the States. First, those schools will lose revenue from students' tuition payments and room and board payments. Cellini Decl. ¶¶ 19–20; Durham Decl. ¶ 17; Malatras Decl. ¶ 10; Saavedra Decl. ¶¶ 13–14; Sannicandro Decl. ¶ 16. Second, those schools will lose federal funding that is keyed to enrollment, such as student grants and work-study programs. Crane Decl. (Ex. 19) ¶ 13; Cruz Decl. ¶ 9; Dulude Decl. ¶ 15; Malatras Decl. ¶ 11; Oyadomari-Chun Decl. ¶ 12; Sannicandro Decl. ¶¶ 8, 16. For the last academic year, the federal government distributed $48 billion in federal aid to students enrolling in a postsecondary school located in one of the plaintiff States. *See* Location Report, *supra* note 1. Typically, about half of all Title IV aid goes to public institutions. *See* Federal Student Aid, Title IV Program Volume Reports, Award Year Summary by School Type ("School Type Report") (last visited Dec. 14,

2020).[5] Losing these funds supports the States' standing. *See Dep't of Commerce*, 139 S. Ct. at 2565 (ruling States' loss of federal funds allowed standing).

Third, community college graduates enjoy superior employment outcomes relative to graduates of programs that do not prepare students for gainful employment. So decreasing enrollment at those colleges harms the States' ability to meet their workforce needs and negatively impacts the States' income tax revenues. Cellini Decl. ¶¶ 27, 32–38; Crane Decl. ¶¶ 10–11; Dulude Decl. ¶¶ 16, 19; Durham Decl. ¶¶ 13, 16; Malatras Decl. ¶¶ 8–9, 15, 21; Oyadomari-Chun Decl. ¶ 10; Rose Decl. ¶ 19; Saavedra Decl. ¶ 10; Sannicandro ¶¶ 13, 15.

The Department incorrectly insists that the States have failed to "provide evidence" that increased enrollment in public institutions and any federal money that follows as a result actually benefits the States. Defs.' Mem. at 17–18. Dr. Cellini has calculated that, nationwide, states will lose $368 million in income tax revenue annually because of the 2019 Rule. Cellini Decl. ¶ 37. Massachusetts, in particular, faces a loss of $405 per year in tax revenue for each person who enrolls in a poorly performing for-profit program rather than a community college; for Pennsylvania, the loss will be $246 per person per year. *Id.* ¶ 38. So even if operating public institutions comes with some costs that private payments and federal money do not cover, Defs.' Mem. at 17 (citing *Maryland*, 2020 WL 4039315, at *12 & n.5), the tax gains offset those costs, Cellini Decl. ¶¶ 27, 32–38. The States reasonably invest in public institutions because, among other reasons, graduates of for-profit programs, and particularly those of programs that do not prepare students for gainful employment, do not, on the whole, make similar financial contributions to the States. *Id.* ¶¶ 27–31.The net financial benefit is hardly surprising as "the purpose of many governmental expenditures and tax benefits is to spur economic activity, which

---

[5] https://studentaid.gov/data-center/student/title-iv.

in turn increases government revenues or provides other anticipated benefits." *Maryland*, 2020 WL 4039315, at *15 (internal citations omitted).

This loss of "specific tax revenues" is an injury that provides standing. *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). Indeed, in several recent rulings, courts found states to have standing to challenge federal agency action on this exact basis. First, states had standing to challenge regulations that loosened restrictions on which entities may offer an association health insurance plan because the federal regulation would drain enrollment in competing health plans from which states collect premium taxes. *New York v. Dep't of Labor*, 363 F. Supp. 3d 109, 125–26 (D.D.C. 2019), *appeal docketed*, *New York v. Dep't of Labor*, No. 19-5125 (D.C. Cir.). Second, states had standing to challenge limits placed on how much of a taxpayer's state and local taxes could be deducted from her federally taxable income because the federal limitation would discourage home sales and thus decrease tax revenues that states collect from those sales. *New York v. Mnuchin*, 408 F. Supp. 3d 399, 409–10 (S.D.N.Y. 2019). Third, states had standing to challenge a regulation that would have reduced employees' wages, which in turn would have depressed the base from which states draw income taxes. *New York v. Scalia*, 464 F. Supp. 3d 528, 542 (S.D.N.Y. 2020). Fourth, New York had standing to challenge a regulation that restricted the availability of paid leave during the current pandemic because many employees would be forced to take unpaid leave which, unlike paid leave or working, produces no taxable income for New York. *New York v. Dep't of Labor*, No. 20-3020, 2020 WL 4462260, at *4 (S.D.N.Y. Aug. 3, 2020). As in all these cases, the States here have identified a specific type of tax revenue that will be lost because of the 2019 Rule: income tax from students who will enroll in low-quality for-profit programs instead of public institutions.

The Department cites to *Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976), *see* Defs.' Mem. at 18, but *Kleppe* is distinguishable. In *Kleppe*, Pennsylvania sought to compel federal payments to small businesses from a disaster relief program. *Id.* at 671. Pennsylvania's allegations of injury were "sketchy and uncertain," as the complaint did not "go beyond the unexpanded statement that Pennsylvania was injured." *Id.* at 671 n.14. Only at oral argument, Pennsylvania offered that it may be injured by the general loss of tax revenue attributable to inadequate payments from the relief program. *Id.* On this factual presentation, the D.C. Circuit stated that Pennsylvania's loss of tax revenues was just a "generalized grievance" and that the general impairment of tax revenues should not ordinarily support a state's standing. *Id.* at 672.

Notably, in *Wyoming v. Oklahoma*, the Supreme Court described *Kleppe* as an instance of a state complaining about agency action that "injured a State's economy and thereby caused a decline in general tax revenues." 502 U.S. at 448. The Court specifically distinguished that circumstance from losing an identifiable source of tax revenue. *Id.*

The D.C. Circuit has relied on the portion of *Kleppe* that the Department cites only once, ruling that Ecuadorian provinces did not have standing to sue a company that had sprayed herbicides. *Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014). The provinces had claimed that the herbicides caused a series of adverse consequences that cost the provinces tax revenue, but documented that injury through only generalized deficits in their annual budgets. *Id.* So in that case, the D.C. Circuit rejected standing based on a general claim of economic harm, following the distinction drawn in *Wyoming*. Here, the States are not complaining of generalized economic harm. Instead, the States have identified the loss of a specific source of tax revenue from an identifiable category of people. For that reason, *Kleppe* is inapplicable.

Between the States' loss of tuition revenue, federal revenue, and specific tax revenue that the 2019 Rule causes, the States have standing.

### B.  The 2019 Rule imposes greater oversight expenditures on the States

The States have a second basis for standing. Federal enforcement of the Higher Education Act's gainful employment requirement weeds out ineffectual, as well as abusive, higher education programs run by for-profit companies. Am. Compl. ¶¶ 73–79. But the 2019 Rule eliminates this enforcement. Because the Department will not fulfill its own oversight responsibilities, the States will shoulder greater oversight responsibility for higher education. That increased burden comes at a cost to the States. *Id.* ¶¶ 140–152. Those costs give rise to standing.

For this injury, the record demonstrates that States are responsible for authorizing institutions of higher education to operate within each State's borders. Landis Decl. (Ex. 20) ¶¶ 9–11. Ostro Decl. (Ex. 21) ¶ 11; Rodríguez Decl. ¶ 7 (Ex. 22); Talbot Decl. (Ex. 23) ¶ 5. The 2019 Rule specifically identifies the States' responsibility for evaluating programs as a reason that, despite the 2019 Rule, program-level accountability measures will remain in place. 84 Fed. Reg. at 31,403. But as a result of the 2019 Rule, there will be no federal mechanism to weed out programs that fail to meet the Higher Education Act's standards. Consequently, the States will bear the burden and the cost for reviewing, evaluating, and authorizing more programs. Those processes cost time and money. *See* Ostro Decl. ¶¶ 14–17, 21; Talbot Decl. ¶¶ 8–10, 17, 37. These are expenses attributable to the 2019 Rule, and thus provide standing.

Next, the States receive complaints about, and investigate, institutions of higher education. Landis Decl. ¶¶ 12–13, 22; Ostro Decl. ¶¶ 22–24; Rodríguez Decl. ¶ 5, 8–14; Talbot Decl. ¶¶ 19–21, 40 – 43. In fact, the 2019 Rule cited state-level enforcement efforts that will occur after the 2019 Rule as reason to minimize the harm that the 2019 Rule will cause. 84 Fed.

Reg. at 31,403. Educational programs operated by for-profit companies generate a disproportionate number of the complaints that the States receive, and those programs are the subject of many of the resulting investigations. Landis Decl. ¶¶ 15–16, 22; Ostro Decl. ¶¶ 25–27; Rodríguez ¶ 15; Talbot Decl. ¶¶ 22–23, 46. These investigations are costly, and the States will perform more of them because of the 2019 Rule. Landis Decl. ¶¶ 14, 17–18, 24–25; Ostro. Decl. ¶ 29; Rodríguez Decl. ¶ 17; Talbot Decl. ¶¶ 24–27, 41, 44. This, too, is a basis for standing.

Although this Court previously held similar injuries were self-inflicted and thus incapable of sustaining standing, this Court specifically observed that the States had not presented the Court with "any federal law or regulation that requires the States to investigate or prosecute GE Programs in the manner that the States describe." *Maryland*, 2020 WL 4039315, at *14. Now, however, the States do so.

Under federal law, an institution of higher education must be authorized within a state to provide postsecondary education. 20 U.S.C. § 1001(a)(2). Relatedly, a school may receive Title IV aid only if it is "legally authorized to provide an educational program beyond secondary education in the State in which the institution is physically located in accordance with § 600.9." 34 C.F.R. § 600.4(a)(3); *see also id.* § 600.1 (establishing qualifications for aid under the Higher Education Act). Schools are legally authorized to provide an educational program only if the state in which the school is located has "a process to review and appropriately act on complaints concerning the institution including enforcing applicable State laws." *Id.* § 600.9(a)(1).

The States have in place processes that satisfy these federal obligations. *See, e.g.*, DeFilippo Decl. (Ex. 24) ¶ 7; Landis Decl. ¶¶ 12–13; Ostro Decl. ¶¶ 22–24; Talbot Decl. ¶¶ 19–21; Rodríguez Decl. ¶¶ 12–14. Because the 2019 Rule frees substandard programs from federal oversight, those programs will flourish, and the States' processes will be burdened by more

students filing complaints about ineffectual and abusive programs; the States will then spend more time and money to "appropriately act" on those complaints. DeFilippo Decl. ¶¶ 8–9; Landis Decl. ¶¶ 15–19, 22–25; Ostro Decl. ¶¶ 25–30; Talbot Decl. ¶¶ 22–27; Rodríguez Decl. ¶¶ 15–17.

While the Department underscores that the States' federal obligations come from a "*separate* set of regulations," Defs.' Mem. at 20 (emphasis in original), the source of the States' federal obligations is not relevant to standing. Compliance with these existing obligations will be more costly because of the 2019 Rule. The Department also presses that this federal regulatory obligation does not actually command States to exercise any enforcement authority. Defs.' Mem. at 20–21. But the States' obligation is to "appropriately *act* on complaints." 34 C.F.R § 600.9(a)(1) (emphasis added). In a separate recent rulemaking, the Department cited this exact regulation as giving students important protections. 84 Fed. Reg. 58,834, 58,843 (Nov. 1, 2019). And the Department's last argument—that section 600.9 is only a condition for determining if a school may receive Title IV aid, Defs.' Mem. at 20—suggests that the States should be content if no school within any State's borders qualifies for Title IV aid. No state, however, can forgo a process on which schools' eligibility for Title IV aid depends. Last year, Title IV aid injected $48 billion into the States collectively. *See* Location Report, *supra* note 1. Half of that aid went to public institutions. *See* School Type Report, *supra* note 5. Plus, any state that opted against adopting a required complaint process would be at a devastating disadvantage trying to attract or keep any students in state, making it impossible to develop anything near the workforce or economy necessary to sustain that State.

Even without the federal obligation, the oversight expenses that will follow from the 2019 Rule supply standing. The increased expenses incurred here are like those that the D.C.

Circuit considered in *Air Alliance v. EPA*. There, states sued the EPA after the EPA delayed the effective date of a rule that, if it had gone into effect, would have revised safety standards at facilities that use certain hazardous chemicals. *Air Alliance*, 906 F.3d at 1055–57. States spend money when hazardous chemicals are released within their territory and so had an interest in the safety rule. *Id.* at 1059. That proprietary interest established standing because "[m]onetary expenditures to mitigate and recover from harms that could have been prevented absent the Delay Rule are precisely the kind of 'pocketbook' injury that is incurred by the state itself." *Id.* at 1059–60. The States had standing despite neither owning the facilities put in danger by the EPA's delay rule nor participating in any business regulated under the safety rule.

Similarly, in *New York v. Labor*, another judge on this Court ruled that states could challenge a regulation that relaxed standards for association health insurance plans because, as the states alleged, the regulation "will cause a substantially increased regulatory burden on the States as they substantially ramp up enforcement against a new type of plan[] or face a wave of fraud and abuse . . . ." 363 F. Supp. 3d at 124. As here, the challenged regulation before the court in *New York v. Labor* specifically anticipated that it would impose increased oversight demands on the states. *Id.* Applying *Air Alliance*, the court held that "[t]he States' direct regulatory costs also support standing." *Id.* at 126.

As in *Air Alliance* and *New York v. Labor*, other courts have concluded that states have standing when the byproduct of federal rulemaking is greater state expenditures. The Fifth Circuit ruled that Texas had standing to contest the DAPA program because that program made half a million people eligible for a Texas driver's license and Texas spent at least $130 for each license. *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015). Similarly, the First, Third, and Ninth Circuits all ruled that states had standing to challenge rules that permit employers to

remove contraceptive coverage from their employees' insurance plans because the rules would force more women to seek contraceptive care from state-funded programs. *Massachusetts v. Dep't of Health & Human Servs.*, 923 F.3d 209, 225–26 (1st Cir. 2019); *Pennsylvania v. President*, 930 F.3d 543, 562–64 (3d Cir. 2019), *rev'd on other grounds*, *Little Sisters v. Pennsylvania*, 140 S. Ct. 2367 (2020); *California v. Azar*, 911 F.3d 558, 572–74 (9th Cir. 2018).

In *Maryland*, this Court disagreed with the reasoning of *Texas* and *California*, but there are several reasons that conclusion should not be followed here.

First, the Supreme Court's recent decision in *Little Sisters v. Pennsylvania* affirms the approach to standing taken in *California*. In *Little Sisters*, Pennsylvania had challenged the same agency action at issue in *California*, and articulated an identical basis for state standing as in *California*. *Compare Pennsylvania v. President*, 930 F.3d at 562–64 *with California*, 911 F.3d at 572–74. At oral argument, Justice Thomas questioned Pennsylvania's standing. *See* Transcript of Oral Argument at 31–32, 55–58, *Little Sisters v. Pennsylvania*, 140 S. Ct. 2367 (2020) (Nos. 19-431 & 19-454).[6] Still, the Court resolved the case on its merits. *See generally Little Sisters v. Pennsylvania*, 140 S. Ct. 2367 (2020). If Pennsylvania did not have standing, the Court would have had no choice but to rule on that jurisdictional basis. *See, e.g.*, *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008) ("[W]e bear an independent obligation to assure ourselves that jurisdiction is proper before proceeding to the merits.").

Second, this Court's earlier opinion identified *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976), as the Supreme Court's most relevant precedent. In that case, Pennsylvania sued New Jersey over a New Jersey tax on nonresident income. Pennsylvania asserted standing because it gave its own residents a tax credit for taxes paid to other states. *Id.* at 663. That credit meant

---

[6] https://www.supremecourt.gov/oral_arguments/argument_transcripts/2019/19-431_d1o2.pdf.

Pennsylvania lost out when other states, such as New Jersey, taxed nonresidents' income. But because Pennsylvania's injuries came only from its own choice to attach relevance to New Jersey's laws, New Jersey was not the cause of Pennsylvania's injuries. *Id.* at 665.

Relevant here, the Supreme Court did not follow *Pennsylvania v. New Jersey* in a seemingly similar case. In *Wyoming v. Oklahoma*, the Supreme Court ruled that Wyoming had standing to sue Oklahoma about an Oklahoma tax that favored Oklahoma-mined coal, and which cost Wyoming tax revenue. *Wyoming*, 502 U.S. at 447–48. Notably, Wyoming was injured despite not having any law that ascribed import to Oklahoma's coal tax.

This case resembles *Wyoming v. Oklahoma*, and not *Pennsylvania v. New Jersey*, because the States' increased oversight costs are not the result of having incorporated the laws of another sovereign into their own laws. *See California*, 911 F.3d at 574 (drawing this distinction). This Court previously distinguished *Wyoming v. Oklahoma* because, unlike here, Oklahoma's law "specifically targeted" Wyoming. *Maryland*. 2020 WL 4039315, at *17. Yet a defendant's intent is not part of analyzing standing. Rather, injuries need only be fairly traceable to the defendant's act. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). As in *Wyoming v. Oklahoma*, the injuries here are fairly traceable to Department's act rather than an act of the States.

Third, the case for standing is even more compelling here than in either *Texas* or *California* because the States' injuries are experienced performing oversight of higher education. For oversight of higher education, the States are in a partnership with the federal government and private accreditors. *See* U.S. Senate, Health, Education, Labor and Pensions Committee, *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* at 18 (July 30, 2012). The 2019 Rule itself recognizes this triad's shared responsibilities. 84 Fed. Reg. at 31,403 (referencing the oversight responsibilities shared by the "regulatory

triad"). The States' injuries, then, are not volitional, but instead the product of a fixed feature of how the oversight of higher education operates. And the 2019 Rule leaves a void that makes it more expensive for the States to fulfill their own responsibilities.

Finally, the Department maintains that the States had oversight expenses before the 2014 Rule, and that the States cannot be injured by the 2019 Rule because the States never fully realized the 2014 Rule's benefits. Defs.' Mem. at 21 (citing *Maryland*, 2020 WL 4039315, at *15). *Air Alliance*, however, provides a conclusive answer to each assertion. States had standing there based on expenses from delaying the safety rule even though, separate from the safety rule and its delay, the states had already been spending money to respond to chemical releases. *Air Alliance,* 906 F.3d at 1059. Plus, the underlying safety rule had never gone into effect. *Id.* at 1056–57. Still, the States had standing. That the States here have oversight expenses independent of the 2019 Rule "is not a basis to deny [the States] standing" when the allegation is that the 2019 Rule will increase those expenses. *New York v. Scalia*, 464 F. Supp. 3d at 544.[7]

Relatedly, the Department tries to avoid standing by setting the wrong baseline for evaluating the States' injuries. While the Department presents the States' injuries as reflecting merely a desire for the federal government to intervene against unscrupulous for-profit programs, Defs.' Mem. at 21 (citing *Maryland*, 2020 WL 4039315, at *15), this suit challenges the 2019 Rule—it is not, unlike *Maryland*, a suit to compel government action. And the "baseline for measuring the impact of a change or rescission of a final rule is the requirements of the rule itself, not the world as it would have been had the rule never been promulgated." *Council of Parent Attorneys & Advocates, Inc. v. DeVos*, 365 F. Supp. 3d 28, 44 (D.D.C. 2019) (quoting *Air Alliance*, 906 F.3d at 1068).

---

[7] The Department advances a similarly flawed argument with respect to the States' first injury. *See* Defs.' Mem. at 18 (arguing that the States do not have standing because public institutions existed before the 2014 Rule).

Independently, then, the increased oversight expenses caused by the 2019 Rule furnish standing.

### C.  The 2019 Rule interferes with the States' support of higher education

Interfering with the States' support for higher education, as the 2019 Rule does, is a third injury that confers standing. Am. Compl. ¶¶ 125–139.

As the Supreme Court has said, "education is perhaps the most important function of state and local governments." *Plyler v. Doe*, 457 U.S. 202, 222 (1982) (internal citations omitted). That is so because education is "required in the performance of our most basic public responsibilities," "is the very foundation of good citizenship," and "is a principal instrument in awakening the child to cultural values, [and] in preparing him for later professional training." *Id.* at 222–23. *Plyler* pertained to primary and secondary education, but the Court has since explained that the reasons providing primary and secondary education is a critical function of state government also apply to higher education. *Grutter v. Bollinger*, 539 U.S. 306, 331 (2003); *see also Selective Serv. Sys. v. Minnesota Pub. Interest Research Grp.*, 468 U.S. 841, 878–79 & n.22 (1984) (Marshall, J., dissenting) (stressing that access to higher education is no less important than access to primary and secondary education for providing tools of economically productive life).

The States, too, identify supporting access to higher education as an indispensable function. Doing so not only advances democratic values but also develops workforces needed to sustain the States' modern economies. *See, e.g.*, R.I. Const. art. XII, sec. 1 (making a constitutional commitment to "adopt all means" needed to secure the advantages of education); C.R.S. § 23-3-102 (noting the importance of higher education to the welfare of Colorado); 110 ILCS 979/5 (describing higher education as "an essential function of State government"); Minn. Stat. §§ 135A.011, 136A.61 (stating that investing in higher education promotes "democratic

26

values," elevates the State's stature "in the world market," and prepares a workforce to meet Minnesota's needs); N.J. Stat. Ann. § 18A:71B-82 (establishing financial assistance for postsecondary education because it is "vital to New Jersey's efforts to attract and retain highly skilled businesses, and to ensure the State's continued economic well-being"); ORS 350.001 (funding higher education for the State's "survival and economic well-being").

To achieve these objectives, the States support public institutions of higher education, and many of the States offer financial aid for students to enroll in postsecondary schools. Crane Decl ¶ 8; Cruz Decl. ¶ 6; Dulude Decl. ¶¶ 8–10; Durham Decl. ¶¶ 6, 8; Talbot Decl. ¶¶ 7–9; Oyadomari-Chun Decl. ¶¶ 7, 10; Rose Decl. ¶ 8; Saavedra Decl. ¶ 10; Sannicandro Decl. ¶¶ 4–6; Socolow Decl. (Ex. 25) ¶ 11; Zarnikow Decl. (Ex. 26) ¶¶ 13, 18. State money, when supporting students enrolling in worthwhile postsecondary schools, makes the benefits of higher education available to a broader swath of the States' citizens. Crane Decl. ¶ 12; Cruz Decl. ¶ 6; Dulude Decl.¶¶ 7–11; Malatras Decl. ¶ 5; Ostro Decl. ¶ 20; Rose Decl. ¶ 12; Sannicandro Decl. ¶ 7; Socolow Decl. ¶ 6; Zarnikow Decl. ¶¶ 11–14, 21. And when that happens, States are better able to meet their needs for an informed and skilled workforce. Dulude Decl. ¶¶ 13, 16, 19; Socolow Decl. ¶ 6; Zarnikow ¶¶ 20–22.

In light of the 2019 Rule, however, a greater number of students will enroll in "sub-optimal programs" that "have demonstrated a lower return on the student's investment, either through higher upfront costs, reduced earnings, or both." 84 Fed. Reg. at 31,445. The federal government estimates that it will lose $6.2 billion over the next decade as students use federal financial aid to enroll in programs that will not prepare them for gainful employment. Similarly, state money will be squandered when students enroll in programs that provide little of the value for which the aid is designed. Zarnikow Decl. ¶¶ 20, 27. The purpose of the States' public

institutions—to make quality higher education broadly available—also is impaired. Durham Decl. ¶ 17; Dulude Decl. ¶¶ 19–21, 27, 32; Malatras Decl. ¶ 21; Rose Decl. ¶ 18; Sannicandro Decl. ¶¶ 4–6, 15. By wasting money spent to accomplish one of state government's vital missions, the 2019 Rule causes a third injury sufficient for standing.

Here, too, the Department views the injury as self-inflicted. Defs.' Mem. at 19. But as with oversight of higher education, the States must support higher education because doing so is a vital function of state government. For that reason, the States' injuries here are no less avoidable than those in *Air Alliance*, *New York v. Labor*, *Texas*, or the collection of cases about access to contraceptive care. *See supra*, Section I.B.

In the 2019 Rule, the Department intimates that, although it will no longer enforce any program-level accountability measures, the States can fill the gap. 84 Fed. Reg. at 31,403. While that might suggest the States can avoid state money being wasted by performing increased oversight of higher education programs, that suggestion only further reveals that the 2019 Rule harms the States. Even assuming the States have the tools to perform a program-level review comparable to that which the Department will now forgo, that review would be costly and detract from other priorities. Socolow ¶ 13; Ostro Decl. ¶¶ 11, 21. And those are expenses the States would not incur but for the 2019 Rule.

This class of injury—caused by the 2019 Rule—is a third independent basis for standing.

## II.   The States' injuries provide standing for the procedural claim

As with substantive claims under the Administrative Procedure Act, a plaintiff has standing to bring a procedural claim under the Administrative Procedure Act if "the agency action threatens [the plaintiff's] concrete interest." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014); *see also Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1196 (D.C. Cir. 2015) ("[T]o demonstrate Article III standing to maintain its procedural challenge . . . the

Institute need show only that the Program itself, rather than the procedures used to adopt it, causes a redressable harm."). In other words, the plaintiff must be injured by the content of the agency action, just as with a substantive claim. Procedural claims are unlike substantive claims, however, because "the normal standards for immediacy and redressability are relaxed." *Mendoza*, 754 F.3d at 1010. A plaintiff need not "establish that correcting the procedural violation would necessarily alter the final effect of the agency's action on the plaintiffs' interest." *Id.* If the agency's action has injured the plaintiff, then the court "will assume[] the causal relationship between the procedural defect and the final agency action." *Id.* (internal citations omitted).

In *Mendoza v. Perez*, for example, domestic herders sued the Department of Labor for changing policies governing certain work visas without going through notice-and-comment rulemaking procedures. *Id.* at 1009. To assess standing for this procedural claim, the D.C. Circuit examined whether the substance of the new policies harmed the domestic herders. *Id.* at 1010. And the substance did because the policies put domestic herders at a competitive disadvantage with the herders working on a visa. *Id.* at 1011–12. Likewise, in *American Institute*, an association of accountants had standing to challenge on procedural grounds an IRS policy that was completed without notice-and-comment rulemaking because the policy would put the association's members at a competitive professional disadvantage. 804 F.3d at 1197.

Therefore, the injuries described in the preceding three sections, *supra* Sections I.A–I.C, also establish the States' standing to challenge the Department's violation of the Administrative Procedure Act's procedural provisions. The 2019 Rule harms the States and was a product of a rulemaking process that the States have alleged was defective because the Department relied on

analyses that it did not disclose. Am. Compl. ¶¶ 176–179. The relationship between the defect and the rule can be assumed.

The Department's first argument about its procedural violations does not address the States' standing. Instead, the Department argues that the States' procedural claim will fail on the merits because the Department did not violate the rulemaking requirements that have been described in *Banner Health v. Price*, 867 F.3d 1323 (D.C. Cir. 2017), and elsewhere. Defs.' Mem. at 31–32. That is neither an argument about standing nor one that can be considered for purposes of a motion under Rule 12(b)(1). *See Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc) ("When determining whether a plaintiff has Article III standing, the court must assume that the [plaintiff] will prevail on the merits."). The rest of the Department's argument, Defs.' Mem. at 33–35, repeats the same points the Department makes elsewhere. And for the reasons discussed in the preceding and following sections, those arguments are unsound.

## III.   The States' injuries are redressable

Finally, neither of the Department's last two arguments—that the Social Security Administration data used in the 2014 Rule's accountability framework is unavailable, Defs.' Mem. at 24–26, and that the Secretary had discretion over what disclosures any program must make under the 2014 Rule's transparency framework, *id.* at 27–29—defeats the States' standing.

First, those arguments gloss over that this case is not one to enforce the 2014 Rule but instead to vacate the 2019 Rule. Together, the Department's arguments minimize what the 2019 Rule accomplishes and ignore many of the bases on which the rule is being contested.[8] *One*

---

[8] The recent decision from the Northern District of California that the Department cites, *see generally Am. Fed'n of Teachers v. DeVos*, No. 20-455, 2020 WL 5257561 (N.D. Cal. Sept. 3, 2020), made the same error.

consequence of the 2019 Rule is eliminating the 2014 Rule, supposedly because of the Department's concerns with enforcing that rule. 84 Fed. Reg. at 31,396–401. Indeed, the States have challenged the 2019 Rule because the purported concerns that precipitated that decision were arbitrary. Am. Compl. ¶¶ 169–171, 175. Vacating the 2019 Rule, then, would make the 2014 Rule the Department's operative regulations once again, at least temporarily.

But the 2019 Rule achieved more than just repealing the 2014 Rule. The rule also finalized the Department's position that it need not further define the Higher Education Act's gainful employment requirement to enforce that provision, and thus will not promulgate an alternative to the 2014 Rule. 84 Fed. Reg. at 31,401–404. The States have alleged the 2019 Rule is unlawful because that conclusion is inadequately justified, and, in any event, wrong as a matter of law. Am. Compl. ¶¶ 163–166. Relatedly, the States have alleged that, even if the Department had legitimate concerns about the 2014 Rule, the Department failed to consider alternative ways to satisfy its obligations under the Higher Education Act. *Id.* ¶¶ 167–168, 175. If the 2019 Rule is set aside, the Department must initiate a new rulemaking that proceeds under a correct understanding of the Higher Education Act. And the Department would have to consider anew whether it had legitimate concerns about enforcing the 2014 Rule and, if it did, which alternatives to the 2014 Rule would meet the Department's statutory obligations. That relief would address the States' injuries irrespective of the unavailability of data from the Social Security Administration and independent of the Secretary's discretion under the 2014 Rule.

On this point, the Department argues that it has no obligation to establish a regulatory process for enforcing the Higher Education Act's gainful employment requirement and so it is speculative to assume that the Department will initiate a new rulemaking process even if the 2019 Rule is vacated. Defs.' Mem. at 26. But the States have alleged otherwise, Am. Compl.

¶¶ 165–167, so the Department's argument presumes it will prevail on the merits. That presumption cannot be entertained while analyzing standing. *McGahn*, 968 F.3d at 762.

What is more, the States need not establish for standing that the result of vacating the 2019 Rule would be a new rulemaking process that would certainly redress the injuries caused by the 2019 Rule. As the Supreme Court has explained, when the consequence of a judicial ruling is "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered," a plaintiff has standing. *Utah v. Evans*, 536 U.S. 452, 464 (2002); *see also Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an opportunity to pursue a benefit . . . even though the plaintiff may not be able to show that it was certain to receive that benefit had it been accorded the lost opportunity."). Consistent with that principle, the Supreme Court has ruled, for example, that bankruptcy creditors had standing to contest a structured dismissal because the dismissal alone cost creditors "a chance to obtain a settlement that respected their priority." *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 983 (2017). And the Supreme Court also has ruled that a contractor had standing to challenge a city ordinance that made it "more difficult" for any bid from that contractor to be selected, even without the contractor alleging its bid would have been chosen without the ordinance. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

These decisions teach that vacating the 2019 Rule provides the States' meaningful redress. At a minimum, doing so would improve the likelihood of the Department enforcing the Higher Education Act's gainful employment provision. For standing, increasing the likelihood of that outcome is sufficient.

Second, even if the only consequence of setting aside the 2019 Rule is a return to the 2014 Rule, the current relationship between the Department and the Social Security Administration does not frustrate the States' standing.

As a legal matter, a plaintiff does not lose standing to challenge an injurious action just because there may be other sources of overlapping injury. In *Mendoza v. Perez*, domestic herders' standing to challenge certain agency guidance was disputed on the basis that the injuries actually were caused by older policies. 754 F.3d at 1015. But as the D.C. Circuit explained, "the fact that previous rules may also have caused the plaintiffs injury does not break the causal link between the rules they now challenge and the asserted injury. The only relevant inquiry is whether the [challenged policies] cause injury." *Id.* Similarly, another judge on this Court has ruled that a plaintiff had standing to challenge the FDA's grant of market exclusivity to a competitor even though there may have been an independent reason that the plaintiff could not market its product, deciding that a favorable ruling would "clear at least one of two independent reasons" the plaintiff was injured. *Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1, 19 (D.D.C. 2019). Here, nothing about the availability of data from the Social Security Administration breaks the causal relationship between the 2019 Rule and the harm that the States suffer. Nor does the possible unavailability of that data mean this Court cannot redress the injuries specific to the 2019 Rule.

And as a factual matter, the Department's contention that it has "no reason to expect that [the Social Security Administration] will agree to renew its MOU in the future," Defs.' Mem. at 25 (quoting Jones Decl. ¶ 7), must be treated with skepticism. The record shows that the Department has been cagey at best about its dealings with the Social Security Administration. In the 2019 Rule, the Department claimed that it did not propose or seek comment on an alternative

to the 2014 Rule that would not rely on data from the Social Security Administration because the Department was unaware at the time of its proposed rule that the Social Security Administration would not renew the agencies' agreement. 84 Fed. Reg. at 31,392–393. Yet the agencies' agreement expired several months before the Department's notice of proposed rulemaking. Am. Compl. ¶ 105. At a minimum, then, the Department knew at the time of its proposed rulemaking that it did not have any agreement with the Social Security Administration. But worse than that, even *before* the agreement expired, the Social Security Administration rebuffed the Department's request to renew the data-sharing agreement and communicated that it was disinclined to do so. Jones Decl. ¶ 6. And as even the Department's own declarant acknowledges, the Social Security Administration's unwillingness to execute a new agreement was spurred by the current administration's questionable use of data received from the Social Security Administration. *Id.* ¶¶ 5–6. Vacating the 2019 Rule would, at least, give a future administration with different priorities and practices the option of starting over with the Social Security Administration. That would increase the likelihood of relief for the States.

Third, the Secretary's discretion under the 2014 Rule for the content of disclosures does not thwart the States' standing.[9] The D.C. Circuit addressed an analogous circumstance in *Teton Historic Aviation Foundation v. United States Department of Defense*, 785 F.3d 719 (D.C. Cir. 2015). There, an aviation foundation sued the Department of Defense over a classification of surplus airline parts that limited the number of parts available for sale. *Id.* at 725. The court recognized that the Department of Defense "might do almost anything with its own property

---

[9] The Department also says that curtailing disclosures does not injure the States because whatever information the Secretary may require be disclosed to enforce the Higher Education Act's gainful employment requirement already is accessible through the Department's College Scorecard. Defs.' Mem. at 28 & n.10. The College Scorecard, however, is not an adequate substitute. *See* Am. Compl. ¶ 101. The College Scorecard notwithstanding, the effect of the 2019 Rule is that institutions no longer have to "engage in the direct distribution of disclosures or maintain records to prove that students receive those disclosures," 84 Fed. Reg. at 31,418, nor must they "post disclosures of program outcomes on their websites," *id.* at 31,419.

whether Teton wins or loses" because, as the Department of Defense claimed, it had "complete discretion" over the sale of surplus parts. *Id.* at 726–27. Additionally, no "rule or law would force the Department to do anything at all" if the plaintiff prevails. *Id.* at 727. Still, the plaintiffs had standing because, based on the Department of Defense's past practices and financial incentives, there was more than a remote possibility that the desired parts would be available for sale if the court vacated the classification and "Article III does not demand a demonstration that victory in court will without doubt cure the identified injury." *Id.*

Here, the Department's invocation of discretion is even less compelling than in *Teton*. Unlike the "complete discretion" claimed by the Department of Defense, the 2014 Rule directs the exercise of the Secretary's discretion over the sort of information institutions must disclose. Under the 2014 Rule, the Secretary "will conduct consumer testing to determine how to make the disclosure template as meaningful as possible." 79 Fed. Reg. at 65,013.

Past practices also signal that, when 2014 Rule has been in effect, the Department has not ignored this particular requirement. Under the current administration, the last disclosure template required institutions to disclose the expected length of a program, the program's costs if completed within that time, the average debt load for students who complete the program in the intended amount of time, and whether the program meets any licensure requirements. *See* U.S. Dep't of Educ., Gainful Employment Disclosure Template (last visited Dec. 14, 2020).[10] Under the prior administration, the disclosure template included information about a program's on-time graduation rates, costs, typical debt, and average earnings, for example. *See* Disclosure Template, *supra* note 2. That is the exact sort of information that influences student decision making. Alexander Decl. ¶¶ 6, 9; Bailey ¶¶ 4, 6–7; Green Decl. ¶¶ 5-9; Ford Decl. ¶ 6 ; Miller

---

[10] https://www2.ed.gov/policy/highered/reg/hearulemaking/2009/negreg-summerfall.html.

Decl. ¶¶ 7, 12–15; Romero Decl. ¶¶ 6, 11, 13, 19; Rosenwald Decl. ¶¶ 4, 9; Schwarm Decl. ¶¶ 7–8; Tibbits Decl. ¶¶ 2, 4–5, 8. Of course, given the upcoming change in administrations, it is hardly speculative to expect that, if the 2014 Rule becomes the Department's operative regulation once again, the Secretary will require robust disclosures.

For each of these reasons, redress for the States' injuries is made more likely by vacating the 2019 Rule. Neither of the Department's arguments suggests otherwise.

## CONCLUSION

For all the reasons set forth above, Defendants' Motion to Dismiss should be denied.

December 14, 2020

Respectfully submitted,

**JOSH SHAPIRO**
*Attorney General*
*Commonwealth of Pennsylvania*

Michael J. Fischer
Jesse F. Harvey
Chief Deputy Attorneys General

/s/ *Jacob B. Boyer*
Jacob B. Boyer (PA Bar No. 324396)
Kevin R. Green
Francesca Iovino
Deputy Attorneys General
Office of the Pennsylvania Attorney General
1600 Arch Street, Suite 300
Philadelphia, PA 19103
(267) 768-3968
jboyer@attorneygeneral.gov
*Attorneys for Commonwealth of*
*Pennsylvania*

**BRIAN E. FROSH**
*Attorney General*
*State of Maryland*

/s/ *Christopher J. Madaio*
Christopher J. Madaio
Assistant Attorney General
Office of the Attorney General
Consumer Protection Division
200 St. Paul Place, 16th Floor
Baltimore, MD 21202
(410) 576-6585
cmadaio@oag.state.md.us
*Attorney for Plaintiff State of Maryland*

**PHILIP J. WEISER**
*Attorney General*
*State of Colorado*

/s/ *Martha Fulford*

Martha Fulford (D.C. Bar No. 101194)
First Assistant Attorney General
Olivia D. Webster
Senior Assistant Attorney General
Brady J. Grassmeyer
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
martha.fulford@coag.gov
*Attorneys for State of Colorado*

**GURBIR S. GREWAL**
*Attorney General*
*State of New Jersey*

Mayur P. Saxena
Assistant Attorney General

/s/ *Elspeth Faiman Hans*

Elspeth Faiman Hans
John T. Passante
Deputy Attorneys General
Office of the Attorney General
Division of Law
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 376-2752
elspeth.hans@law.njoag.gov
*Attorneys for State of New Jersey*

**WILLIAM TONG**
*Attorney General*
*State of Connecticut*

/s/ *Joseph J. Chambers*

Joseph J. Chambers
Assistant Attorney General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5270
joseph.chambers@ct.gov
*Attorney for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
*Attorney General*
*State of Delaware*

/s/ *Christian Douglas Wright*

Christian Douglas Wright
Director of Impact Litigation
Vanessa L. Kassab
Deputy Attorney General
Delaware Department of Justice
820 North French Street, 5th Floor
Wilmington, DE 19801
(302) 577-8600
christian.wright@delaware.gov
vanessa.kassab@delaware.gov
*Attorneys for State of Delaware*

**KARL A. RACINE**
*Attorney General*
*District of Columbia*

/s/ *Benjamin M. Wiseman*

Benjamin M. Wiseman (D.C. Bar No.

**CLARE E. CONNORS**
*Attorney General*
*State of Hawaii*

/s/ *Bryan C. Yee*

Bryan C. Yee

37

1005442)
Director, Office of Consumer Protection
Attorney General for the District of
Columbia
441 4th Street, NW, 6th Floor
Washington, D.C. 20001
(202) 741-5226
benjamin.wiseman@dc.gov
*Attorney for District of Columbia*

Thomas Francis Mana Moriarty
Deputy Attorneys General
425 Queen Street
Honolulu, HI 96813
(808) 586-1180
bryan.c.yee@hawaii.gov
mana.moriarty@hawaii.gov
*Attorneys for State of Hawaii*

**KWAME RAOUL**
*Attorney General*
*State of Illinois*

/s/ *Greg Grzeskiewicz*
Greg Grzeskiewicz
Bureau Chief, Consumer Fraud Bureau
Joseph Sanders
Gregory W. Jones
Assistant Attorneys General
Office of the Illinois Attorney General
Consumer Fraud Bureau
100 West Randolph Street, 12th Floor.
Chicago, IL 60601
(312) 814-6796 (Sanders)
(312) 814-4987 (Jones)
jsanders@atg.state.il.us
gjones@atg.state.il.us
*Attorneys for State of Illinois*

**MAURA HEALEY**
*Attorney General*
*Commonwealth of Massachusetts*

/s/ *Yael Shavit*
Yael Shavit
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2197
yael.shavit@mass.gov
*Attorney for Commonwealth of Massachusetts*

**DANA NESSEL**
*Attorney General*
*State of Michigan*

/s/ *Ann M. Sherman*
Ann M. Sherman
Brian Green
Assistant Attorneys General
Michigan Department of Attorney General
525 West Ottawa Street, 7th Floor
P.O. Box 30736
Lansing, MI 48933
(517) 335-7632
ShermanA@michigan.gov

**KEITH ELLISON**
*Attorney General*
*State of Minnesota*

/s/ *Jason Pleggenkuhle*
Jason Pleggenkuhle
Assistant Attorney General
Bremer Tower, Suite 1200
445 Minnesota Street
St. Paul, MN 55101
(651) 757-1147
jason.pleggenkuhle@ag.state.mn.us
*Attorney for State of Minnesota*

GreenB@michigan.gov
*Attorneys for State of Michigan*

**HECTOR H. BALDERAS**
*Attorney General*
*State of New Mexico*

/s/ *Lisa Giandomenico*
Lisa Giandomenico
Assistant Attorney General
Consumer and Environmental Protection
Division
201 3rd Street NW Suite 300
Albuquerque, NM 87102
(505) 490-4846
lgiandomenico@nmag.gov
*Attorney for State of New Mexico*

**LETITIA A. JAMES**
*Attorney General*
*State of New York*

/s/ *Jane M. Azia*
Jane M. Azia
Chief, Bureau of Consumer Frauds and
Protection
28 Liberty Street
New York, NY 10005
(212) 416-8727
jane.azia@ag.ny.gov
*Attorney for State of New York*

**JOSHUA H. STEIN**
*Attorney General*
*State of North Carolina*

/s/ *Matthew L. Liles*
Matthew L. Liles (D.C. Bar No. 994408)
Assistant Attorney General
North Carolina Department of Justice
114 West Edenton Street
Raleigh, NC 27603
(919) 716-0141
mliles@ncdoj.gov
*Attorney for State of North Carolina*

**ELLEN F. ROSENBLUM**
*Attorney General*
*State of Oregon*

/s/ *Katherine A. Campbell*
Katherine A. Campbell
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97101
(971) 673-1880
katherine.campbell@doj.state.or.us
*Attorney for State of Oregon*

**PETER F. NERONHA**
*Attorney General*
*State of Rhode Island*

/s/ *Justin S. Sullivan*
Justin S. Sullivan
David R. Marzilli
Special Assistant Attorneys General
Rhode Island Office of Attorney General
150 South Main Street
Providence, RI 02903

**THOMAS J. DONOVAN, JR.**
*Attorney General*
*State of Vermont*

/s/ *Christopher J. Curtis*
Christopher J. Curtis
Assistant Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5586
christopher.curtis@vermont.gov

(401) 274-4400 ext. 2007 (Sullivan)                    *Attorney for State of Vermont*
(401) 274-4400 ext. 2030 (Marzilli)
jjsullivan@riag.ri.gov
dmarzilli@riag.ri.gov
*Attorneys for State of Rhode Island*


**MARK R. HERRING**                                    **JOSHUA L. KAUL**
*Attorney General*                                     *Attorney General*
*Commonwealth of Virginia*                             *State of Wisconsin*

/s/ *Samuel T. Towell*                                 /s/ *Shannon A. Conlin*
Samuel T. Towell                                       Shannon A. Conlin
Deputy Attorney General, Civil Litigation             Assistant Attorney General
Mark S. Kubiak                                         Wisconsin Department of Justice
Assistant Attorney General, Consumer                  Post Office Box 7857
Protection Section                                     Madison, WI 53707-7857
202 North Ninth Street                                 (608) 266-1677
Richmond, VA 23219                                     conlinsa@doj.state.wi.us
(804) 786-6731                                         *Attorney for State of Wisconsin*
stowell@oag.state.va.us
*Attorneys for Commonwealth of Virginia*