# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMONWEALTH OF PENNSYLVANIA *et al.*,

  Plaintiffs,

 v.

MITCHELL ZAIS, in his official capacity as
Acting Secretary of Education[1], *et al*.,

  Defendants.

No. 1:20-cv-1719 KBJ

## <u>DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Acting Secretary of Education Mitchell Zais is automatically substituted as a defendant is this case.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.     THE STATES LACK OF A COGNIZABLE INJURY-IN-FACT TRACEABLE
          TO THE 2019 RULE DEFEATS THEIR STANDING FOR ALL CLAIMS ....... 2

         A.     The States Fail To Identify Cognizable Injuries Fairly Traceable to
              the Rescission of the 2014 GE Rule's Transparency Framework ............. 3

         B.     The States Cannot Rely on the Speculative Loss of Hypothetical
              Tax Revenues To Establish Standing ......................................................... 4

         C.     The Alleged Costs of Enforcing State Laws Against Fraudulent
              GE Programs Are Self-Inflicted Injuries Not Fairly Traceable
              to the Rescission ...................................................................................... 12

         D.     The Alleged Interference With States' Support of Higher Education Is
              Not a Cognizable Injury That Could Confer Standing ............................. 18

    II.    THE STATES FAIL TO SHOW THAT A PROCEDURAL STANDING
         ANALYSIS APPLIES TO COUNT III ................................................................ 19

    III.   THE STATES FAIL TO SHOW THAT THEIR CLAIMS ARE
         REDRESSABLE ................................................................................................. 21

CONCLUSION ................................................................................................................. 25

## **TABLE OF AUTHORITIES**

<u>**Cases**</u>

*Action All. of Senior Citizens v. Sullivan*, 930 F.2d 77 (D.C. Cir. 1991) ....................................... 2

*Air Alliance Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) (per curiam) ............................ 15

*Allina Health Servs. v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014) ............................... 20

*\*Am. Fed'n of Teachers* ("*AFT*") *v. DeVos*,
    No. 20-455, 2020 WL 5257561 (N.D. Cal. Sept. 3, 2020) .................................. 21, 22, 25

*Am. Inst. v. IRS*, 804 F.3d 1193 (D.C. Cir. 2015) ......................................... 20

*Arias v. DynCorp*, 752 F.3d 1011 (D.C. Cir. 2014) ......................................... 8, 9

*Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011) ................................. 16

*Arpaio v. Obama*, 797 F.3d 11 (D.C. Cir. 2015) ......................................... 16

*Ass'n of Private Colls. & Univs. v. Duncan* ("*APSCU I*"),
    870 F. Supp. 2d 133 (D.D.C. 2012) ................................................. 23

*APSCU v. Duncan* ("*APSCU II*"), 681 F.3d 427 (D.C. Cir. 2012) ................................ 13

*APSCU. v. Duncan* ("*APSCU III*"), 110 F. Supp. 3d 176 (D.D.C. 2015),
    *aff'd APSCU v. Duncan* ("*APSCU IV*"), 640 Fed. Appx. 5, 7-8 (D.C. Cir. 2016)
    (unpublished) ................................................................. 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................20-21

*Ass'n of Proprietary Colls. v. Duncan* ("*APC*"), 107 F Supp. 3d 332 (S.D.N.Y. 2015) ............. 23

*Boehner v. McDermott*, 332 F. Supp. 2d 149 (D.D.C. 2004) ........................................ 2

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ................................................. 16, 17

*Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388 (1987) ................................................11-12

*Comm. on Judiciary of U.S. House of Representatives v. McGahn*,
    968 F.3d 755 (D.C. Cir. 2020) (en banc) ......................................... 24

*Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316 (D.C. Cir. 2009) ........................ 22

*Hagans v. Lavine*, 415 U.S. 528  (1974) ......................................... 17

*Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511 (D.C. Cir. 2016) .............................................. 20

*Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918 (D.C. Cir. 1989) ..................... 11

*Kiakombua v. Wolf*, No. 19-CV-1872 (KBJ), 2020 WL 6392824 (D.D.C. Oct. 31, 2020) ......... 20

*Koi Nation v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14 (D.D.C. 2019) ...................................... 2

*Little Sisters v. Pennsylvania*, 140 S. Ct. 2367 (2020) ................................................................ 16

*\*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ................................................................ 16

*\*Maryland v. U.S. Dep't of Educ.*, No. 17-2139, 2020 WL 4039315 (D.D.C. July 17, 2020),
    *vacated on other grounds by* No. 20-5268, 2020 WL 7868112
    (D.C. Cir. Dec. 22, 2020) ......................................................................................... *passim*

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ............................................................................... 15

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ... 11

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) .................................................................... 20

*Newdow v. Roberts,* 603 F.3d 1002 (D.C. Cir. 2010) .................................................................. 22

*New York v. Dep't of Labor*, 363 F. Supp. 3d 109 (D.D.C. 2019),
    *appeal pending*, No. 19-5125 (D.C. Cir.) ........................................................... 10, 15, 16

*New York v. Mnuchin*, 408 F. Supp. 3d 399 (S.D.N.Y. 2019),
    *appeal pending*, No. 19-3962 (2d Cir.) ......................................................................... 10

*New York v. Scalia*, 464 F. Supp. 3d 528, 542 (S.D.N.Y. 2020),
    *appeal pending*, No. 20-3806 (2d Cir.) ......................................................................... 10

*New York v. U.S. Dep't of Labor*,
    No. 20-3020, 2020 WL 4462260, at *4 (S.D.N.Y. Aug. 3, 2020) .................................. 10

*Pennsylvania v. Kleppe*, 533 F.2d 668 (D.C. Cir. 1976) ................................................... 8, 9, 12

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998) ...................................................... 16

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ................................................................. 2-3

*Teton Historic Aviation Found. v. U.S. Dep't of Defense*, 785 F.3d 719 (D.C. Cir. 2015) ......... 25

*Texas v.  United States*, 809 F.3d 134 (5th Cir. 2015) ......................................................... 16, 17

iv

*Woodhull Freedom Found. v. United States*, 948 F.3d 363 (D.C. Cir. 2020) ............................ 24

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) ............................................................ 8, 9, 10, 17

## **Statutes**

Higher Education Act Amendments of 1992, Pub. L. No. 102-325, § 803, 106 Stat. 448 (1992)  5

5 U.S.C. § 553 ............................................................................................ 20

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ............................................ *passim*

20 U.S.C. § 1001 ........................................................................................ 13

20 U.S.C. § 1002 ........................................................................................ 23

Higher Education Act ("HEA") Title IV, 20 U.S.C. §§ 1070 *et seq.* .................................. *passim*

20 U.S.C. § 1088 ........................................................................................ 23

## **Regulations**

Final regulations, 75 Fed. Reg. 66832 (Oct. 29, 2010) ........................................... 13, 14

Final regulations ("2014 GE Rule"), 79 Fed. Reg. 64890 (Oct. 31, 2014) ........................... 6, 7

Final regulations ("2019 Rule"), 84 Fed. Reg. 31392 (July 1, 2019) ................................ *passim*

Final regulations, 84 Fed. Reg. 58834 (Nov. 1, 2019) ............................................. 5, 13

34 C.F.R. § 600.4 ...................................................................................... 13

34 C.F.R. § 600.9 ..................................................................................... 13, 14

34 C.F.R. § 668.410 (2019) (rescinded 2020) ............................................................ 3

34 C.F.R. § 668.412 (2019) (rescinded 2020) ................................................... 3, 21, 24, 25

## **Other Sources**

Cellini, Stephanie Riegg, Rajeev Darolia, and Lesley J. Turner, "Where Do Students Go When

For-Profit Colleges Lose Federal Aid?" *Am. Econ. J.: Econ. P*., May 2020, 12(2): 48,
https://www.aeaweb.org/articles?id=10.1257/pol.20180265 ............................................ 5

Kavilanz, Parija, Nursing schools are rejecting thousands of applicants—in the middle of a
nursing shortage, *CNNMoney* (Apr. 30, 2018) (reporting that community colleges reject
many qualified nursing school applicants due to lack of capacity), *available at*
https://money.cnn.com/2018/04/30/news/economy/nursing-school-rejections/
index.html ................................................................................................................. 8

Whitman, David, When President George H.W. Bush "Cracked Down" on Abuses at For-Profit
Colleges (The Century Foundation Mar. 9, 2017), https://tcf.org/content/report/president-
george-h-w-bush-cracked-abuses-profit-colleges/ ............................................................ 5

## INTRODUCTION

The state plaintiffs (the "States") fail to establish their standing to challenge the 2019 rescission of the Title IV "gainful employment" ("GE") regulations promulgated by defendant the U.S. Department of Education ("Department") in 2014 (the "2014 GE Rule"). The States abandon any claim to *parens patriae* standing, and they acknowledge that any immediate economic impact of their predicted higher enrollments at State-run schools, had the 2014 GE Rule remained in effect, would be negative, in the form of higher net costs to educate additional students. Instead, the States posit that, in the long run, those unknown students would have earned more and paid higher taxes, if only they had gone to State-run schools. But the loss of such hypothetical tax revenues, like the higher oversight expenses that the States also still claim, remains speculative and self-inflicted, for the same reasons that this Court previously recognized in *Maryland v. U.S. Dep't of Educ.*, No. 17-2139, 2020 WL 4039315 (D.D.C. July 17, 2020) (related case), *vacated on other grounds by* No. 20-5268, 2020 WL 7868112 (D.C. Cir. Dec. 22, 2020).

To a large extent, the States' theory depends on the notion that students—and the States—are always better off if the students attend State-run schools, regardless of how good a proprietary school might be. But proprietary schools only exist because states allow them to. Nothing in federal law—including the Department regulations that the States continue to mischaracterize—requires states to authorize or otherwise support proprietary schools. The fact that states do so suggests that the States are well aware that their own schools lack an infinite capacity to accommodate every resident who seeks higher education, and the contrary suggestion of their putative expert is nothing but a chimera. The Court's detailed analysis of standing in *Maryland* squarely applies here and requires dismissal of the States' claims.

## ARGUMENT

I.   **THE STATES' LACK OF A COGNIZABLE INJURY-IN-FACT TRACEABLE TO THE 2019 RULE DEFEATS THEIR STANDING FOR ALL CLAIMS**

As discussed in Defendants' opening brief, the States lack standing to challenge the 2019 Rule's rescission of the 2014 GE Rule—largely for the reasons that this Court already explained in its opinion in *Maryland*. Although, as the States emphasize, the two cases address different agency actions, the source of the alleged injuries in both cases is the same—the Department's alleged failure to implement the 2014 GE Rule, whether by way of delayed implementation or rescission. The Court's decision in *Maryland* is therefore squarely on point, and the D.C. Circuit's recent vacatur of the decision under the *Munsingwear* doctrine in no way diminishes its persuasive value. *Koi Nation v. U.S. Dep't of Interior*, 361 F. Supp. 3d 14, 52 n.17 (D.D.C. 2019) ("the persuasiveness of [a vacated] decision remains both appropriate for consideration and citation" (citing *Action All. of Senior Citizens v. Sullivan*, 930 F.2d 77, 83 (D.C. Cir. 1991)); *Boehner v. McDermott*, 332 F. Supp. 2d 149, 156 (D.D.C. 2004) ("a vacated opinion may serve as a valuable source of guidance on the legal issues raised in the absence of contrary authority"). As the Court concluded in *Maryland*, the States cannot rely on *parens patriae* standing to assert their claims against the federal government, nor can they rely on the supposed downstream effects of the federal government "fail[ing] to come to the rescue when unscrupulous third parties (e.g., failing GE Programs) act in unsavory ways." *Maryland*, 2020 WL 4039315, at \*15.

In their opposition, the States abandon any reliance on a *parens patriae* theory of standing. Pl. Opp. at 10 n.4. Instead, they rely entirely on the notion that the States themselves will suffer a cognizable injury fairly traceable to the 2019 Rule—conceding that *all* of their claims, including their Count III, depend on such a showing. *See id.* at 29 (incorporating and relying upon the same injury-in-fact arguments for purposes of Count III); *cf. Summers v. Earth Island Inst.*, 555 U.S.

488, 496-97 (2009) (recognizing Article III injury-in-fact requirement applies to procedural standing). As discussed below, however, the States' theories of injury are flawed, and their claims should accordingly be dismissed.

### A.   The States Fail To Identify Cognizable Injuries Fairly Traceable to the Rescission of the 2014 GE Rule's Transparency Framework

As pointed out in Defendants' opening brief, the assertions of harm in the States' Amended Complaint relate solely to the 2019 Rule's rescission of the 2014 GE Rule's accountability framework at issue in Count I—including the warnings that the 2014 GE Rule had required GE programs to provide, under former 34 C.F.R. § 668.410, if they were in danger of losing Title IV eligibility. Def. Mem. at 14. The Amended Complaint does not assert any harm to States resulting from the rescission of the 2104 GE Rule's separate transparency framework, which is the subject of Count II. The States therefore fail to support their standing to assert Count II.

In their opposition, the States fail to remedy this defect. They attempt to address the issue by asserting, in a footnote, that the Amended Complaint intended to ascribe its asserted injuries to the rescissions of both the accountability and the transparency frameworks. Pl. Opp. at 9 n.3. But the Amended Complaint never mentions the disclosures that were part of the transparency framework, addressed in the former 34 C.F.R. § 668.412, in connection with any injury to the States. Instead, it focuses solely on the "warnings about failing programs," Am. Compl. ¶ 107, and "warn[ings] . . about the programs' poor track record," Am. Compl. ¶ 139, that were part of the accountability framework. Moreover, the declaration of Dr. Cellini, upon which the States chiefly rely as providing evidence that their asserted harms are not speculative, is silent about any impact of transparency framework disclosures on the States, focusing instead solely on the "threatened . . . loss of federal student aid" that was part of the accountability framework, not the transparency framework. *See* Cellini Decl. ¶ 4 (Pl. Opp. ex.1); *see also id.* ¶¶ 5, 15. The Court therefore should

dismiss Count II for lack of standing at the outset. In any event, the States fail to overcome the problems that the Court identified in *Maryland* with respect to any of their claims

### B.   The States Cannot Rely on the Speculative Loss of  Hypothetical Tax Revenues To Establish Standing

The States' first theory of injury boils down to the notion that, in the absence of the 2014 GE Rule, more students will enroll in proprietary GE programs while fewer students will enroll in State-run programs, and the States will lose money as a result. The Court in *Maryland* deemed this prospect too speculative to support the States' standing, particularly because the States' theory was "contingent upon" the independent choices of students and other independent third parties. *Maryland*, 2020 WL 4039315, at *11-13; *see* Def. Mem. at 15-16. The States attempt to refute the Court's conclusion, chiefly through the Cellini Declaration, which cites research on the impact of an entirely different Department rule (the Cohort Default Rate ("CDR") rule) on student enrollments over twenty years ago. *See* Cellini Decl. ¶¶ 5-10 & n.1. Cellini then suggests that her CDR rule research can simply be transposed wholesale to the context of the 2014 GE Rule, even while acknowledging that the 2014 GE Rule "was never fully implemented"; that only a single year of D/E rates were calculated while it was in effect; and that no GE program lost Title IV eligibility as a result of those calculations. *Id.* ¶¶ 13-14. Despite the paucity of information about how the 2014 GE Rule *actually* would have operated, not to mention the structural differences between the CDR rule and the 2014 GE Rule and the potential impact of present-day circumstances—such as the proliferation of distance learning—on student choices, Cellini concludes that approximately 88,000 more students would have attended public schools (in unidentified states) if the 2014 GE Rule's accountability framework had not been rescinded. *Id.* ¶ 16.

The Cellini Declaration fails to overcome the speculative nature of the States' theory of harm. There are obvious differences between implementation of the CDR rule in the 1990s and

hypothetical implementation of the 2014 GE Rule today. Cellini's research admittedly focused on a time period "prior to widespread broadband penetration," when distance learning was uncommon and "most prospective for-profit students' choice sets were limited to colleges in their immediate vicinity."[2] Circumstances today, where students have a broad range of distance learning opportunities, are far different. *See, e.g.*, 84 Fed. Reg. 58834, 58841 (Nov. 1, 2019) (addressing state reciprocity agreements that have arisen to handle proliferation of distance learning opportunities). In addition, the CDR rule is still in effect, so any potential impact it may have on student behavior presumably is ongoing, and any GE program currently in operation is necessarily in a school that *satisfies* the CDR standards. Cellini makes no attempt to show that the 2014 GE Rule would have had an *additional* impact.

Moreover, the two rules never operated the same, nor were they intended to. For one thing, the CDR rule imposes sanctions on a school as a whole while the 2014 GE Rule addresses specific GE programs within a school. A GE Rule enrollee would theoretically have the option to transfer from a failing GE program to a program that retained Title IV eligibility at the same school. And unlike the CDR rule, the 2014 GE Rule was designed so that programs could only lose eligibility

---

[2] Cellini, Stephanie Riegg, Rajeev Darolia, and Lesley J. Turner, "Where Do Students Go When For-Profit Colleges Lose Federal Aid?" *Am. Econ. J.: Econ. P*., May 2020, 12(2): 48, https://www.aeaweb.org/articles?id=10.1257/pol.20180265. Even Cellini's claim to have established a "direct and causal link" between student enrollment decisions and threatened loss of Title IV aid is suspect. Although Cellini posits a "reputational" impact on student enrollment decisions, *id.* at 48, her research apparently did not track differences in recruiting efforts between community colleges and proprietary schools, which may have changed during this period due to the establishment of a new requirement that proprietary schools earn at least fifteen percent of their revenue from non-Title IV sources, *see* Higher Education Act Amendments of 1992, Pub. L. No. 102-325, § 803, 106 Stat. 448 (1992), or the "reputational" impact of widespread public criticism, in newspapers and Senate hearings, of certain proprietary schools during this period, *see* Whitman, David, When President George H.W. Bush "Cracked Down" on Abuses at For-Profit Colleges (The Century Foundation Mar. 9, 2017), https://tcf.org/content/report/president-george-h-w-bush-cracked-abuses-profit-colleges/ (describing series of newspaper articles).

after two or three years, precisely so that these programs would have a chance to improve their D/E rates upon receiving a failing or in-the-zone rate and *not* lose their eligibility. 79 Fed. Reg. 64890, 64891 (Oct. 31, 2014); *see id.* at 65080 (recognizing that school's responses could "vary significantly by institution and ultimately depend on institutional behavior"). Cellini's assumption that every GE program that the single year of D/E rate calculations identified as "failing" or "in the zone" would have lost Title IV eligibility, and her further assumption regarding student enrollment choices, are ill-conceived. To the contrary, the single year of calculations is of little value in predicting whether a particular GE program would have lost Title IV eligibility. Moreover, Cellini suggests that her predicted result would have occurred if "the potential loss of student aid" at GE programs deemed "failing" had "been disclosed to students," Cellini Decl. ¶ 15, but the D/E rate results for 2015 have been publicly available on the Department's website since January 2017—over eighteen months before the Department published a notice proposing to rescind the 2014 GE Rule. *Maryland*, 2020 WL 4039315, at *5, 7. Neither Cellini nor any of the States' other declarants identify any impact on State school enrollments resulting from the availability of that information.

Ultimately, these flaws pale in comparison to an even greater problem with the States' reliance on Cellini's conclusions. Although Cellini asserts that higher enrollments at State-run schools lead to higher tuition and fee payments to States, Cellini Decl. ¶ 19, she acknowledges that "states, on a per-student basis, contribute a higher amount toward community colleges' cost of education than students pay in tuition." *Id.* ¶ 21. Importantly, the States and their declarants concede that the *net* direct impact on States of higher State-run school enrollments, taking into account payments from students and the federal government, on the one hand, and costs incurred

by States, on the other, is a loss.[3] *See also Maryland*, 2020 WL 4039315, at *12 n.5 (recognizing that "record evidence" suggested higher State school enrollments cost States *more* money); 79 Fed. Reg. at 65081 (predicting that, if students transferred from proprietary to public schools, "[s]tate and local governments may experience increased costs"). The States therefore cannot show a concrete and immediate economic injury because their budgetary expenditures would be lower, not higher, as a result of lower State-run school enrollments.

Recognizing that they cannot rely on an immediate budgetary harm, the States instead suggest that, years down the road, the unknown individuals who would have attended State-run schools, but for the 2019 Rule, would have earned more, and therefore would have paid more taxes to States. Pl. Opp. at 16 ("even if operating public institutions comes with some costs that private payments and federal money do not cover, . . . the tax gains offset those costs"). This hypothetical loss of long-term tax revenues thus represents the States' sole asserted financial injury. But—not surprisingly given the many uncertainties and confounding variables involved in analyzing the future financial status of unidentifiable people, living in unknown circumstances, in a counterfactual scenario—neither Cellini nor any of the States' other declarants support this asserted injury through a concrete accounting of losses and gains. To the contrary, Cellini concedes that any tax impact would be "difficult to quantify and ha[s] not been calculated in the context of for-profit and public higher education specifically," Cellini Decl. ¶ 40, and that any other impact is even "less quantifiable," *id.* ¶ 41. Nor does she even attempt to set forth a comparison of the costs of absorbing additional students into State-run schools and the supposed future tax revenue and other gains from

---

[3] The States' declarants who address the issue at all acknowledge that State-run schools receive funding from States in amounts that are tied to their enrollment. *E.g.*, Cruz Decl. ¶ 8; Malatras Decl. ¶ 10; Durham ¶ 17. None of these declarants suggest that higher State-run school enrollments would lower States' budgetary expenditures.

educating them, so as to support her bottom-line conclusion that the States eventually would have reaped a net benefit from the 2014 GE Rule (and therefore "will suffer net financial losses under the Repeal Rule"). *Id.* ¶ 42.[4] The States' assertions thus remain speculative.

Moreover, the hypothetical prospect of lost State tax revenues, or similar economic impacts, years in the future cannot, as a matter of law, support the States' standing. Lost tax revenues are "generally not cognizable as an injury-in-fact for purposes of standing." *Arias v. DynCorp*, 752 F.3d 1011, 1015 (D.C. Cir. 2014) (citing *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)). "[V]irtually all federal policies" will have "unavoidable economic repercussions" on state tax revenues, and accordingly, complaints about such losses typically amount to "the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing." *Kleppe*, 533 F.2d at 672. Standing does not exist "where diminution of tax receipts is largely an incidental result of the challenged action." *Id.*; *see also Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). Only where a state can allege some "fairly direct link between the state's status as a collector and recipient of revenues and the legislative or administrative action being challenged" can the reduced revenue be sufficient

---

[4] The general conclusion that "students attending public institutions have higher earnings than students attending for-profits," Cellini ¶ 27, is breathtakingly broad since it does not purport to account for different programs of study or degrees obtained. Even Cellini's attempt to compare proprietary and public school students in similar programs, *id.* ¶ 29, focuses only on outcomes of those able to access such programs at the time of her study and does not address limited community college capacities to accommodate higher numbers of students in their preferred programs of study. Due to states' finite budgetary allocations, and restrictions on high-demand, high-cost programs such as nursing (which may lead some students to choose non-public programs in the first place, or to enroll in general studies programs rather than higher-earning fields), the extrapolation of ever-higher *total* earnings regardless of the total number of enrollees is speculative. *Cf.* Kavilanz, Parija, Nursing schools are rejecting thousands of applicants—in the middle of a nursing shortage, *CNNMoney* (Apr. 30, 2018) (reporting that community colleges reject many qualified nursing school applicants due to lack of capacity), *available at* https://money.cnn.com/2018/04/30/news/economy/nursing-school-rejections/index.html .

to support Article III standing. *Kleppe*, 533 F.2d at 672. In both *Kleppe* and *Arias*, the D.C. Circuit rejected states' claimed injuries because the challenged actions had no direct connection to taxation, and any impact on states' tax revenues therefore was incidental. *Id.*; *Arias*, 752 F.3d at 1015. On the other hand, in *Wyoming*, the Court held that a state had standing to sue another state because the challenged law of the defendant state was specifically intended to reduce the purchase of coal from the plaintiff state, thus directly reducing the plaintiff state's receipt of severance tax revenue from those purchases. *Wyoming*, 502 U.S. at 446-48 (concluding that those taxes were "directly linked" and "demonstrably affected" by Oklahoma's action).

The situation here is similar to that in *Kleppe* and *Arias*, and unlike that in *Wyoming*. The 2019 Rule is not aimed at the States at all, much less at their revenues from income tax paid by graduates of State-run schools. Any impact on such revenues can only be considered incidental, rather than direct. In arguing to the contrary, the States identify a nebulous category of future state taxpayers—those who "will enroll in low-quality for-profit programs instead of public institutions." Pl. Opp. at 17. However, income tax paid years in the future to different States by disparate individuals engaged in various occupations or with various other income sources, based solely on where they *might* have gone to school years in the past but did not, cannot possibly qualify as "specific tax revenues" for purposes of State standing. Under the States' theory, *any* federal action that conceivably might affect the future earnings of any group of people could confer state standing. States could thus challenge the federal government's failure to give pay raises to federal employees on the grounds that those employees will pay less in state taxes, even though such a decision otherwise has nothing whatsoever to do with states. Such a result is contrary to *Kleppe* and far removed from anything approved in *Wyoming*.

The States rely on several recent district court decisions that themselves go too far in

recognizing state standing based on alleged tax impacts far less direct than that in *Wyoming*. But even if those decisions—most of which are already on appeal—are ultimately upheld, they would not support the States' theory here, which relies on an even more attenuated impact on a far broader range of tax revenues. None of the cases cited by the States support the notion that hypothetical lost tax revenues on hypothetical future income that would not have been earned until years in the future can qualify as a cognizable injury for standing purposes. Instead, in *New York v. Dep't of Labor*, 363 F. Supp. 3d 109 (D.D.C. 2019), *appeal pending*, No. 19-5125 (D.C. Cir.), the "specific tax revenues" at issue were taxes on premiums for a certain kind of health insurance plan. *Id.* at 125. The court found a "fairly direct link" between a rule that would replace such plans with alternatives that would not be subject to such taxes and an immediate loss of tax revenue. *See id*. Similarly, in *New York v. Mnuchin*, 408 F. Supp. 3d 399 (S.D.N.Y. 2019), *appeal pending*, No. 19-3962 (2d Cir.), the state plaintiffs alleged a direct and immediate impact on their real estate transfer tax revenues from a federal action limiting federal deductions of state and local taxes, which they alleged would depress real estate sales prices. *Id.* at 409-10.

The States also cite two cases where the court recognized state standing based on loss of income tax revenues, but in both of these cases, the alleged loss was again far more direct and immediate than what the States allege here. *See New York v. Scalia*, 464 F. Supp. 3d 528, 542 (S.D.N.Y. 2020), *appeal pending*, No. 20-3806 (2d Cir.) (states had standing based on allegations that Department of Labor rule that reduced eligibility for back pay would result in fewer back pay awards, thus preventing states from receiving income tax revenues from such awards); *New York v. U.S. Dep't of Labor*, No. 20-3020, 2020 WL 4462260, at *4 (S.D.N.Y. Aug. 3, 2020) (state had standing based on allegation that Department of Labor rule that reduced availability of paid leave would lead employees to take more unpaid leave, thus lowering their earnings and reducing state

income tax revenues on such earnings). In both of these cases, the lost income tax revenues at issue derived from a discrete source—a lack of back pay in *Scalia*, and the lack of paid leave in *U.S. Dep't of Labor*—that, in the court's view, was clearly tied to the challenged rule. Here, on the other hand, Cellini simply posits a correlation, in general, between students attending State-run schools and later having higher earnings, and a further correlation between such higher earnings and States' future "increased tax revenue, decreased social safety net spending, increased productivity, reductions in crime, improved health, and other spillovers." Cellini Decl. ¶ 18; *see id.* ¶¶ 27-39. She then concludes that lower attendance at State-run schools will have the opposite result. Such an attenuated chain of indirect impacts cannot possibly qualify as a loss of specific tax revenues with a direct link to the 2019 Rule. The States therefore fail to show Article III standing on this basis.

The States' focus in their opposition brief on future reductions in income tax revenues and other impacts on their overall economy also undercuts their prudential standing. The attenuated financial injuries the States allege are well outside "the zone of interests to be protected or regulated by [the HEA's gainful employment language]." *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). "The fundamental, and unexceptionable, idea behind" the zone-of-interests rule "is a presumption that Congress intends to deny" a right to sue "to 'those plaintiffs whose suits are more likely to frustrate than to further statutory objectives.'" *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 922 (D.C. Cir. 1989) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987)). A plaintiff is not a "suitable challenger" of agency action under the zone-of-interests test if its interests are "so marginally related to or inconsistent with the purposes implicit in the statute [the agency allegedly violated] that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*,

11

479 U.S. at 399; *see also Kleppe*, 533 F.2d at 671 (concluding that States' interest in protecting their tax revenue did "not satisfy the requirement of being arguably within the zone of interests protected by the Small Business Act"). As the D.C. Circuit held in *Kleppe*, a State's allegations of lost tax revenues fall outside the zone of interests where, as here, the underlying statute was designed to promote particular objectives without regard to the States' financial interests. *Id.* at 671-72. Even under the States' interpretation of the HEA, nothing in the provisions containing the phrase "gainful employment" suggests that Congress was concerned with states' long-term income tax revenues or any of the other "spillovers" that Dr. Cellini attempts to identify, *see* Cellini Decl. ¶ 18. The States therefore lack standing on this basis as well.

### C.    The Alleged Costs of Enforcing State Laws Against Fraudulent GE Programs Are Self-Inflicted Injuries Not Fairly Traceable to the Rescission

The States also continue to allege that the rescission of the 2014 GE Rule will result in "greater oversight responsibilities" of the States over proprietary schools. Pl. Opp. at 19. This Court rejected that very claim in *Maryland*, recognizing that any expenditures by the state plaintiffs on such efforts are a result of the states' own budgetary choices and would thus qualify as "self-inflicted" harm. Def. Mem. at 19-20; *Maryland*, 2020 WL 4039315, at *13-15. Such injuries "break the causal chain" and are not fairly traceable to the defendant's conduct. *Id.* at *13 (internal quotation omitted)).

In their opposition brief, the States acknowledge that the Court in *Maryland* rejected this basis for standing. Pl. Opp. at 20. But they argue that their Amended Complaint cures the defect that the Court in *Maryland* identified because, they assert, it identifies a "'federal law or regulation that requires the States to investigate or prosecute GE Programs in the manner that the States describe.'" *Id.* (quoting *Maryland*, 2020 WL 4039315, at *14).

As explained in Defendants' opening brief, however, the statutory and regulatory provisions

upon which the States now seek to rely do not impose enforcement obligations on the States. Def. Mem. at 20-21. The States cite 20 U.S.C. § 1001(a)(2), but that provision simply includes as one part of the definition of "institution of higher education" that the institution "is legally authorized" within the state where it is located "to provide a program of education beyond secondary education." 20 U.S.C. § 1001(a)(2). Nothing in § 1001(a)(2) or its regulatory parallel, 34 C.F.R. § 600.4(a)(3), imposes any obligation on states. Rather, these provisions empower states to exercise their discretion in authorizing schools—for example, by applying performance standards or any other criteria that states deem appropriate.

Nor does the regulatory provision upon which the States chiefly focus, 34 C.F.R. § 600.9(a)(1). That provision further defines terms in § 600.4 by explaining that a school is "legally authorized" by a state if, among other things, "the State has a process to review and appropriately act on complaints concerning the institution including enforcing applicable State laws." 34 C.F.R. § 600.9(a)(1). The D.C. Circuit has already recognized that this provision "does not impose any mandatory requirements on states," but instead "merely establish[es] criteria for schools that choose to participate in federal programs." *APSCU v. Duncan* ("*APSCU II*"), 681 F.3d 427, 458 (D.C. Cir. 2012); *see also* 75 Fed. Reg. 66832, 66858 (Oct. 29, 2010) (explaining that this provision "do[es] not seek to regulate what a State must do, but instead considers [*sic*] whether a State authorization is sufficient for an institution that participates, or seeks to participate, in Federal programs."). Similarly, the recent rule that the States cite, Pl. Opp. at 21, emphasizes states' autonomy over authorization. 84 Fed. Reg. at 58843 ("if the institution is physically located in or operating in a given State, the State has the authority to determine, for the purpose of State authorization, how that institution will be authorized by the State").

Moreover, to the extent the Department expected that, in fact, states would maintain "a

process" that would allow schools to satisfy the authorization requirement in § 600.9(a)(1), the regulation is worded in such general terms that states necessarily have significant discretion over their own processes. Indeed, the Department acknowledged that states might adopt different criteria for different schools. *See* 75 Fed. Reg. at 66863 ("States may meet this requirement in a number of ways, and also with different ways for different types of institutions. . . . We believe that the provisions . . . are so basic that State compliance will be easily established for most institutions."); 84 Fed. Reg. at 58845 (recognizing that a state's "process" could even consist of relying on another state, through a reciprocity agreement, to address any complaints, particularly in the context of distance learning). And the regulation's reference to "ha[ving] a process" says nothing about how or when a state should utilize that process—again leaving enforcement entirely to states' discretion.

In the absence of any mandatory level of enforcement dictated by the Department, the States' argument—which relies on the notion that States will choose to *act* on complaints, Pl. Opp. at 20-21—falls flat. Nothing in § 600.9(a)(1) should change the Court's conclusion in *Maryland* that no federal law requires the States to "investigate or prosecute GE Programs," and that any resources allocated by states to enforcement actions against proprietary schools do not qualify as an injury-in-fact but are, if anything, self-inflicted injuries. *Maryland*, 2020 WL 4039315, at *14. Indeed, since § 600.9(a)(1) does not require the States to treat proprietary schools the same as State-run schools, the provision appears to empower the States to withhold Title IV eligibility from proprietary schools simply by excluding them categorically from the States' enforcement regimes. The fact that the States have not done so further undermines Cellini's conclusions. After all, if Cellini were correct that States necessarily benefit by increased enrollments at State-run schools, regardless of the quality of proprietary schools, there would be no reason for the States to "legally authorize[]" proprietary schools for purposes of Title IV. Yet the States uniformly do allow such

schools to qualify for Title IV participation.

As the state plaintiffs did in *Maryland*, the States also invoke *Air Alliance Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) (per curiam). But unlike the situation here, the state plaintiffs in *Air Alliance* identified proprietary or quasi-sovereign interests in state-owned or controlled territory, which would be harmed by the delay of an EPA rule designed to decrease the incidence of accidental hazardous chemical releases, and there was no dispute that states' clean-up of such releases required expenditures that otherwise would be unnecessary. *See id.* at 1056, 1059-60. The States simply ignore the crucial fact that the "pocketbook injury" at issue in *Air Alliance*—like that in *Massachusetts v. EPA*, 549 U.S. 497 (2007)—was directly connected to the states' *territorial* interests—not simply their regulatory choices. This Court has already properly rejected the notion that the *Air Alliance* decision supports state standing based on a state's alleged future enforcement of its own consumer protection laws. *See Maryland*, 2020 WL 4039315, at *16 (recognizing that the states there, raising the same argument, "failed to assert any cognizable nonsovereign injury, . . . either as landowners or as business owners").

The States' reliance on *New York v. Dep't of Labor*—a case that was decided before *Maryland* but did not affect this Court's conclusion there that the states' asserted regulatory harms were self-inflicted—is also misplaced. Again, even if the court's decision in *New York* is upheld, that case presented significantly different circumstances from those here. Most notably, in promulgating the rule at issue in *New York*, the Department of Labor expressly "depend[ed] on state insurance regulators for oversight and enforcement," even going so far as to take into account the time states would need to adopt or modify their own regulations and enforcement programs when establishing the rule's applicability dates, and the state plaintiffs in turn were able to identify specific costs and expenditures that they had made. *New York*, 363 F. Supp. 3d at 126-27. Here, the

2019 Rule identified no similar dependence on states, nor did it suggest states would need to modify their pre-existing enforcement regimes. Nor can the States identify specific costs associated with any impact of the 2019 Rule on their asserted oversight obligation. As the Court in *Maryland* recognized, states already "devoted substantial resources to investigation and enforcement efforts directed against fraudulent activity by for-profit colleges and universities." *Maryland*, 2020 WL 4039315, at *15 (internal quotation omitted).

The Court thus should follow its own analysis in *Maryland* rather than that in *New York*. As the Court in *Maryland* recognized, no law or principle requires the States to prevent or restrain fraud, and the trigger for any such oversight or enforcement by the States is the independent fraudulent actions of proprietary schools, which "lack any legitimate causal connection" to the 2019 Rule. *Arpaio v. Obama*, 797 F.3d 11, 31-22 (D.C. Cir. 2015); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (standing "is ordinarily 'substantially more difficult' to establish" when an alleged injury turns on the conduct of third parties).

The Court also should continue to reject the States' invocation of other courts' decisions in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), and *California v. Azar*, 911 F.3d 558 (9th Cir. 2018). *See Maryland*, 2020 WL 4039315, at *17-18. The States rely on the Supreme Court's failure to address standing in a different case, *Little Sisters v. Pennsylvania*, 140 S. Ct. 2367 (2020), as suggesting the Court implicitly approved of the *Texas* and *California* decisions. Pl. Opp. at 23. However, the Supreme Court has repeatedly rejected the notion that its silence is equivalent to a precedential holding, particularly when it comes to jurisdiction. *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144–45 (2011) (where a "jurisdictional" defect "is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed"); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91–92 (1998) ("drive-by

jurisdictional rulings . . . have no precedential effect"); *Hagans v. Lavine*, 415 U.S. 528, 535 n.5 (1974) ("[W]hen questions of jurisdiction have been passed on in prior decisions sub silentio, this Court has never considered itself bound when a subsequent case finally brings the jurisdictional issue before us."). The Court therefore should follow its prior analysis and conclude that neither *Texas* nor *California* and the other contraceptive coverage decisions that the States cite support the States' standing.

The States also seek to revisit the Court's distinction of *Wyoming* by arguing that the defendant's "intent" is irrelevant. Pl. Opp. at 24. But the Court in *Maryland* correctly recognized that because "Oklahoma had *specifically targeted* Wyoming coal through its new law," this purpose served to "forge[] the causal link between the challenged law and Wyoming's injury." *Maryland*, 2020 WL 4039315, at *17. In other words, Wyoming's injury could not be deemed self-inflicted when it was purposefully inflicted by Oklahoma. Here, in contrast, the Department's promulgation of the 2019 Rule was not similarly aimed at the States, so as to forge a causal link with their asserted enforcement costs. Rather, any such costs here are due to the States' own budgetary choices as well as the fraudulent actions of third parties—an element completely lacking in *Wyoming*.

The States' additional arguments have no bearing on the self-inflicted nature of their injury. They contend that they are in "partnership" with the federal government and accreditors in providing oversight of higher education. Pl. Opp. at 24-25. However, as explained above, no federal law requires the States to meet any particular criteria when providing oversight. Indeed, the notion of partnership suggests that the States have discretion over their own actions. The States also argue that their asserted injury should be measured against the 2014 GE Rule's requirements. Pl. Opp. at 25. But as the Court recognized in *Maryland*, the States fail to show any "actual

reliance" on the 2014 GE Rule. *Maryland*, 2020 WL 4039315, at *15 n.7. And because the 2014 GE Rule was never fully implemented, the States' assertions regarding its impact are necessarily hypothetical and speculative. In any event, a different baseline would have no effect whatsoever on the causation prong of standing, which is the prong that the Court addressed when concluding that the state plaintiffs' injuries in *Maryland* were self-inflicted. The States thus fail to support their standing based on an alleged future increase in oversight expenses.

### D.     The Alleged Interference With States' Support of Higher Education Is Not a Cognizable Injury That Could Confer Standing

As explained in Defendants' opening brief, the Court in *Maryland* also correctly rejected as self-inflicted the state plaintiffs' asserted injury in the form of wasted state educational aid. *Maryland*, 2020 WL 4039315, at *14. The Court observed that the states had "*voluntarily* opted to provide their residents with grants and student loans for educational purposes," and chose not to "restrict[] the availability of such grants or loans to those students who enroll in GE Programs that the States condone." *Id.* The States' assertion of such injuries in their Amended Complaint, Am. Compl. ¶¶ 125-39, should be rejected for the same reasons. Def. Mem. at 19.

In their opposition brief, the States attempt to counter the notion that their provision of financial support to students of proprietary GE programs is voluntary, arguing that they "must support higher education because doing so is a vital function of state government." Pl. Opp. at 28. They thus suggest that, as a result of the 2019 Rule, "state money will be squandered." *Id.* at 27. But the States cite nothing that compels them to provide support in a manner that they deem wasteful. As the Court in *Maryland* observed, "nothing *requires* the States to run their financial aid regimes such that they incur losses of this nature." *Maryland*, 2020 WL 4039315, at *14 (emphasis added). Indeed, under the States' theory of the case, State aid to students attending *any* proprietary school is wasted, not just those proprietary GE programs that may have lost Title IV eligibility

under the 2014 GE Rule. Cellini Decl. ¶¶ 31, 35 (concluding that "the overwhelming majority of for-profit students would be better off attending a public institution" because they would earn more in the long term, and states in turn would receive higher income tax revenues). Yet the States provided financial aid to such students before the 2014 GE Rule was promulgated and continue to do so. The Court should adhere to its prior ruling that any injury connected to the provision of such aid is self-inflicted.

Moreover, the States continue to gloss over not only their own choices regarding how to distribute State aid and support, but also the independent choices of individuals regarding which, if any, postsecondary program to attend. The 2019 Rule's estimate of $6.2 billion in additional federal financial aid—cited by the States as evidence that they will similarly provide some amount of aid to such individuals—reflects the result of individuals *choosing* to attend a GE program instead of "opt[ing] out of a postsecondary education experience" altogether if that program had lost Title IV eligibility under the 2014 GE Rule. *See* 84 Fed. Reg. at 31447. And even under the States' theory, the waste at issue is due to the actions of "unscrupulous third parties"—proprietary GE programs acting "in unsavory ways." *Maryland*, 2020 WL 4039315, at *15 n.7. The States thus fail to show that any injury they might suffer from providing financial aid to students at proprietary GE programs is fairly traceable to the 2019 Rule. *Id.* at *18 (recognizing the state plaintiffs' injuries "depend on numerous intervening decisions that other regulated and unregulated entities make").

In sum, the States fail to identify a cognizable injury-in-fact fairly traceable to the 2019 Rule. The Court may thus end its analysis here and dismiss the States' claims on this basis alone.

## II.   THE STATES FAIL TO SHOW THAT A PROCEDURAL STANDING ANALYSIS APPLIES TO COUNT III

Aside from the States' failure to satisfy the injury and causation prongs of standing—which the States concede are required for Count III as well as Counts I and II, Pl. Opp. at 29, the States'

invocation of the specific standing analysis that applies to "procedural" injuries, for purposes of Count III, is flawed for additional reasons. As explained in Defendants' opening brief, that analysis is inapplicable here because the States do not identify a violation of a "procedural requirement" that could give rise to a procedural standing analysis in the first place. Def. Mem. at 29-32. Significantly, unlike the cases cited in their opposition brief, the States do not allege that the 2019 Rule was promulgated *without* notice-and-comment rulemaking, so as to implicate the express statutory requirement in 5 U.S.C. § 553. *Cf.* Pl. Opp. at 29 (citing *Mendoza v. Perez*, 754 F.3d 1002, 1009 (D.C. Cir. 2014) (alleging failure to follow notice-and-comment requirements); *Am. Inst. v. IRS*, 804 F.3d 1193, 1197 (D.C. Cir. 2015) (same)). Instead, they allege that the Department provided vague citations to published material referenced in the proposed rule. Am. Compl. ¶¶ 87-88, 179, and failed to disclose an "analysis" in the 2019 Rule, where there was no indication that any document existed containing the referenced analysis, *id.* ¶¶ 97, 179. As explained in Defendants' opening brief, these allegations are insufficient to invoke procedural standing under D.C. Circuit authority because, at most, only a "failure to disclose critical material, on which [the agency] relies," may implicate a procedural right. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014); *see Kiakombua v. Wolf*, No. 19-CV-1872 (KBJ), 2020 WL 6392824, at *13 (D.D.C. Oct. 31, 2020).

The States are incorrect in suggesting that Defendants seek to address the merits of their procedural claim, rather than standing. To the contrary, the States' failure to assert facts that identify a violation of a procedural requirement is fatal to their standing. *See Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016) (at the pleading stage, a plaintiff must "'state[] a plausible claim' that each element of standing is satisfied" (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 678–79 (2009)). Here, that standard is not met insofar as the States seek to invoke a "procedural rights" analysis of their standing to assert Count III.

Moreover, the States acknowledge that a "procedural rights" analysis would have no impact on their burden to identify a cognizable injury-in-fact fairly traceable to the 2019 Rule. *See* Pl. Opp. at 29 (conceding that "the plaintiff must be injured by the content of the agency action, just as with a substantive claim"). They therefore rely on the same injuries addressed above for purposes of Count III. As discussed above, the same defects that the Court recognized in *Maryland* prevent the States from satisfying the injury-in-fact or causation elements of standing.

## III.   THE STATES FAIL TO SHOW THAT THEIR CLAIMS ARE REDRESSABLE

As explained in Defendants' opening brief, the States' challenges to the rescission of the 2014 GE Rule's accountability framework cannot be redressed through their claims in this case. Def. Mem. at 24-27. The SSA's unwillingness to provide aggregate earnings data for GE program graduates precludes the resumption of D/E rate calculations, which rely on the SSA's voluntary provision of such data. The 2014 GE Rule contains no alternative mechanism for calculating D/E rates, nor is the Department under any obligation to promulgate a new rule if the 2019 Rule were set aside.

Defendants also identified similar redressability problems insofar as the States challenge the rescission of the GE Rule's transparency framework. Def. Mem. at 28-29. The States seek to compel the Department to require GE programs to disclose certain information, but the relevant former regulation, 34 C.F.R. § 668.412(a), vests discretion in the Secretary to determine what information programs should disclose. The Secretary would retain that discretion even if the Court set aside the 2019 Rule. *See AFT v. DeVos*, No. 20-455, 2020 WL 5257561, at *8 (N.D. Cal. Sept. 3, 2020). Moreover, the Department now provides similar program-level information through the

College Scorecard.[5]  *See* 84 Fed. Reg. at 31394, 31450.

In response, the States essentially concede that the Department cannot implement the 2014 GE Rule in the absence of SSA data. *See* Pl. Opp. at 31 (acknowledging that the 2014 GE Rule's operation may be "temporar[y]"—presumably because it would be impossible due to the lack of SSA data). Although the States speculate that SSA data might become available again in the new Administration, Pl. Opp. at 34, they ignore that standing must exist at the time a case is filed. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009) ("[S]tanding is assessed as of the time a suit commences."). The States also cite cases addressing "overlapping injury," Pl. Opp. at 33, but those cases have nothing to do with redressability. The fact remains that, absent the SSA's provision of aggregate earnings data to the Department, which the Court has no power to compel because the SSA is not a party, the 2014 GE Rule cannot be resurrected in any meaningful way. The States' attempt to cast aspersions on the Department for not revealing earlier that it was unable to obtain SSA data has no relevance to a standing analysis.[6] As the court in *AFT* correctly concluded, redress is therefore unlikely with respect to the rescission of the accountability framework. *AFT*, 2020 WL 5257561, at *10; *see also Newdow v. Roberts,* 603 F.3d 1002, 1010–11 (D.C. Cir. 2010) (plaintiffs could not establish redressability because "[i]t [was] impossible for th[e] court to grant [their requested] relief").

The States attempt to overcome this problem by suggesting that the 2019 Rule "achieved

---

[5] The Department continues to refine the College Scorecard to enhance its utility to prospective students and others seeking to compare postsecondary educational programs. *See* U.S. Dep't of Educ., Press Release (Jan. 12, 2021), *available at*  https://www.ed.gov/news/press-releases/us-department-education-announces-additional-college-scorecard-updates-providing-greater-transparency-borrower-repayment-progress-and-postsecondary-costs.

[6] As explained in Defendants' opening brief, the SSA never provided the Department with a written decision indicating it would not renew its agreement to provide SSA data, so the Department remained uncertain for some time regarding whether the agreement would be renewed. *See* Def. Mem. at 25 n.8. (citing Jones Decl. ¶ 6).

more than just repealing the 2014 Rule" because it "finalized the Department position" regarding the "gainful employment" language in 20 U.S.C. §§ 1002 and 1088, as if that position exists independent of the 2019 Rule (it does not). Pl. Opp. at 31. They further suggest that, even though the 2014 GE Rule cannot effectively be reinstated, the Department can nevertheless be compelled to "initiate a new rulemaking" that would "enforce" the statutory references to "gainful employment." *See id.* But that is not true. This is not a situation where Congress directed the Secretary to implement a statutory requirement. To the contrary, for nearly 45 years after the HEA was enacted, there were no regulations addressing the statutory "gainful employment" language. And when the Department did promulgate such regulations, it did so on the basis that the phrase was ambiguous, not that there was an unambiguous statutory requirement that had to be implemented. *See APSCU v. Duncan* ("*APSCU I*"), 870 F. Supp. 2d 133, 146 (D.D.C. 2012) (agreeing with Department that "[t]here is no unambiguous meaning of what makes employment 'gainful'"); *APSCU v. Duncan* ("*APSCU III*"), 110 F. Supp. 3d 176, 185-86 (D.D.C. 2015) ("it is beyond dispute that the statute is silent regarding how, exactly, the Department should assess whether a program 'prepare[s] students for' [gainful] employment"), *aff'd APSCU v. Duncan* ("*APSCU IV*"), 640 Fed. Appx. 5, 7-8 (D.C. Cir. 2016) (unpublished); *APC v. Duncan*, 107 F. Supp. 3d 332, 359 (S.D.N.Y. 2015) (following *APSCU I*). Although these courts upheld the Department's prior interpretation as reasonable, they recognized that the "gainful employment" language *could* simply mean that programs provide training for a paying job in a particular occupation. *See APSCU III*, 110 F. Supp. 3d at 186. Regulations along the lines of the 2014 GE Rule are not necessary to implement such an interpretation. Thus, even if the Court were to set aside the 2019 Rule, the Department would be within its discretion in not promulgating any regulations to replace the 2014 GE Rule. Moreover, to the extent the new Administration is

inclined to promulgate new regulations, it is likely to initiate that process irrespective of whether the 2019 Rule has been set aside or not. Such independent action would not qualify as redress here.

The States argue that the Court must presume that their interpretation of the statutory "gainful employment" language is correct for purposes of standing. Pl. Opp. at 32. But they cite no case that has applied such a standard in the context of an APA claim. In *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755 (D.C. Cir. 2020) (en banc), a non-APA case, the court assumed that plaintiffs "will prevail on the merits," but failed to suggest that a court must assume a clearly incorrect statutory interpretation in face of unanimous authority to the contrary. *Id.* at 762; c*f. Woodhull Freedom Found. v. United States*, 948 F.3d 363, 371 (D.C. Cir. 2020) (recognizing that a plaintiff's "non-frivolous" statutory interpretation "must be taken as correct" when its "theory of injury is that the defendant has violated a statute and caused the plaintiff harm," but that this standard does not apply in other contexts (internal quotation omitted)). Here, in any event, the fact that the phrase "gainful employment" appears only in the definitions of other statutory terms is sufficient to reject the notion that this language *requires* the Department to promulgate regulations that specifically address this language (to say nothing of the decades when there were no such regulations). Thus, regardless of whether such a rule applies in the APA context, the Court need not assume that the States' frivolous interpretation of the "gainful employment" language in the HEA is correct. *Cf. id.* (recognizing only "non-frivolous" interpretations must be accepted for purposes of standing).

With respect to the 2014 GE Rule's transparency framework, the States similarly acknowledge that the Department would be under no obligation, if § 668.412 were reinstated, to require disclosure of specific information. Although they suggest that the 2014 GE Rule "directs the exercise of the Secretary's discretion" by referring to consumer testing, Pl. Opp. at 35, that

reference imposes no substantive constraint on the Secretary's discretion over disclosures. *See* 34 C.F.R. § 668.412(a) (listing categories of information the Secretary "may" include in a template); *see also AFT*, 2020 WL 5257561, at *8 (concluding that the language of § 668.412(a) could not give rise to an informational injury and also raised redressability problems).

The States also suggest that the D.C. Circuit in *Teton Historic Aviation Foundation v. U.S. Dep't of Defense*, 785 F.3d 719 (D.C. Cir. 2015), found redressability in a similar circumstance. However, the court in *Teton* recognized that something "more than speculation" was required to show redressability. *Id.* at 727. It suggested that the standard was met in that case based on the defendant agency's "past behavior and its future incentives." *Id.* Significantly, that case involved prospective sales of aircraft parts, where economic incentives played a role. The States identify nothing that would incentivize the Secretary to include any particular information in a disclosure template if the 2019 Rule were set aside. The fact that the Department has transferred its attention to the College Scorecard, and has continued to develop the Scorecard as a means to provide prospective students with information about all programs, strongly suggests that the Department would be unlikely to require disclosure of anything not already in the Scorecard. The States therefore fail to show that their claims are redressable.

## CONCLUSION

For the foregoing reasons, this case should be dismissed in its entirety with prejudice.

Dated: January 19, 2021                    Respectfully Submitted,

                                           JOHN V. COGHLAN
                                           Deputy Assistant Attorney General

                                           MARCIA BERMAN
                                           Assistant Director, Federal Programs Branch

                                            _/s/ Kathryn L. Wyer_____
                                           KATHRYN L. WYER

United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Room 12014
Washington, DC  20005
Tel.: (202) 616-8475
Email: kathryn.wyer@usdoj.gov
*Attorneys for Defendants*